IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:21-cr-00394-TNM |
| : | |
| MATTHEW MARTIN, : | |
| : | |
| Defendant. : | |

### UNITED STATES' TRIAL BRIEF

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and various legal issues likely to be brought before the Court.

### I.  THE JANUARY 6 CAPITOL RIOT AND THE DEFENDANT'S ACTIONS

On January 6, 2021, thousands of people descended on the U.S. Capitol building and grounds when a joint session of Congress had convened to certify the votes of the Electoral College for the 2020 Presidential Election. Vice President Michael Pence, as the President of the Senate, was there to preside over the joint session and, later, the Senate proceedings. On that day, physical barriers surrounded the U.S. Capitol building and grounds.  At all relevant times, the United States Capitol building and its grounds—including the eastern stairs leading to the Capitol Rotunda, the terrace outside the Rotunda doors, and the entire Capitol building itself—were closed to members of the public.

The defendant, Matthew Martin, a federal contractor who held a top-secret security clearance on January 6, 2021, was among the group of rioters who illegally entered the U.S. Capitol grounds, and then the Capitol building, that day. After learning that the Capitol had been breached, the defendant climbed the Capitol's eastern stairs to enter through the Rotunda doors and remained inside the building for approximately 10 minutes. While present in the Capitol, the defendant

watched other rioters fight with police officers who sought to clear the Rotunda. Through his conduct, the defendant violated 18 U.S.C §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5014(e)(2)(G).

## II.     THE GOVERNMENT'S PROOF

With this filing, the government aims to streamline the presentation of evidence in the trial and focus the legal issues before this Court. To prove the general events that took place during the riot, the government plans to present stipulated testimony and exhibits related to the U.S. Capitol Police (USCP), the U.S. House and Senate, and the U.S. Secret Service (USSS). The government will also present testimony of a USCP witness, the lead FBI agent who investigated this case, and a Metropolitan Police Department officer who helped clear the Capitol Rotunda of rioters shortly after 3:00 p.m., while the defendant was present. This presentation will prove the charged offenses beyond a reasonable doubt.

The government requests approximately five minutes for its opening statement and approximately 30 minutes, in total, for its closing argument and rebuttal.

### A.  Stipulated Testimony

In recent weeks, two other matters have proceeded to trial that involve offenses committed on January 6, 2021: *United States v. Guy Reffitt*, 1:21-cr-00032-DLF (February 28 through March 8, 2022) and *United States v. Couy Griffin*, 1:21-cr-00092-TNM (March 21-22, 2022). Both featured testimony from a USCP Inspector; both featured testimony from a USSS representative. The *Reffitt* trial also featured testimony from the General Counsel to the Secretary of the U.S. Senate; in *Griffin*, the government presented a montage of video and documentary evidence from Congress without accompanying witness testimony. In particular, the *Griffin* case was presented

to this Court; undersigned government counsel, defense counsel, and the defendant were present throughout.

The testimony and evidence presented through these witnesses is relevant to prove several key elements of the offenses. Counts One and Two, which charge violations of 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), require proof that the defendant entered or remained within a restricted building or grounds. Grounds may be restricted, under this statute, if a USSS protectee is temporarily visiting. 18 U.S.C. § 1752(c)(1)(B). Here, that is the former Vice President, who was visiting the Capitol in his capacity as President of the Senate, for the proceedings relating to the certification of the Electoral College vote.

Counts Two and Three, which charge violations of 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D), require proof of an intent to impede or disrupt government business or official functions (Count Two) or a session of Congress, either house of Congress, or a hearing before a Congressional committee (Count Three). Count Two further requires proof that the disorderly or disruptive conduct occurred "when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2). The testimony and evidence from the USCP and from the House and Senate will establish these points: Congressional proceedings were disrupted when the riot forced Congress to adjourn and members to evacuate and, even after that, the riot and the presence of rioters constituted an ongoing disruption in that Congress could not reconvene until the building and grounds were secured.[1]

At the same time, the government expects that the testimony from these witnesses will be non-controversial. The government does not expect any of these witnesses to identify the defendant or to describe the defendant's conduct. Both parties recognize that this Court has

---

[1] On this point, the government will offer USCP testimony to supplement the record developed in *Griffin*.

recently heard such evidence and found it to be credible. To save time, and to focus on the facts that will be in dispute, the government plans to offer into evidence transcripts of testimony from the *Reffitt* trial, the *Griffin* trial, or both, along with key pieces of evidence. The government has discussed this plan with defense counsel, and defense counsel does not object to it. The government will offer brief, supplemental testimony from a USCP witness to establish precisely how the USCP responded to the riot and how the presence of rioters in the Capitol building forced Congress to adjourn and to remain adjourned until the Capitol building and grounds were secured.

### B. Testimony from FBI and MPD Witnesses

The government will present testimony from Travis Taylor, the FBI case agent assigned to this matter. Agent Taylor interviewed the defendant on January 15, 2021. He arrested the defendant on April 22, 2021 and, with the defendant's consent, seized and searched the defendant's phone. Agent Taylor also has reviewed USCP footage that captures the defendant in the Capitol building. Given this foundation, Agent Taylor will describe the electronic and other evidence of the defendant's conduct on January 6, 2021.

On January 5, 2021, the defendant flew from Albuquerque, New Mexico to Washington, D.C. and checked into the J.W. Marriott at 1331 Pennsylvania Avenue, N.W., near the White House. The defendant, who worked at the National Laboratory in Los Alamos, New Mexico, had taken time off work to attend the former President's "Stop the Steal" rally, and had let his supervisor know that he was traveling to Washington, D.C.

On January 6, 2021, the defendant attended the former President's rally. Photographs and video footage from the defendant's cell phone confirm his presence there. Then, the defendant returned to his hotel. While at his hotel, the defendant learned that the Capitol had been breached. At 1:52 p.m., the defendant recorded a 14-second video later found on his cell phone showing the

view from his hotel room as he watched people walking down the street. This video also captures the sound of a news broadcast that the defendant was listening to, in his hotel room, which discussed the certification of the Electoral College vote. By the time of this broadcast, rioters had overrun barricades and police lines on Capitol grounds but had had not yet breached the building. The first breach of the building occurred at around 2:13 p.m. at the Senate Wing Doors. By 2:23 p.m., the defendant had left his hotel room, as shown by a brief video he recorded outside. Later in the day, at 6:11 p.m., the defendant would text his supervisor "I was in the hotel when I got word the capital was breached."

By 2:27 p.m., the defendant had reached a line of police cars near the U.S. District Court and the Capitol Building. The defendant remained on the west side of the Capitol building until at least 2:39 p.m., then had reached the east side by at least 2:49 p.m. Sometime between 2:39 and 2:49 p.m., the defendant entered the restricted area. As he entered the restricted area and crossed from the west to the east side of the Capitol grounds, the defendant passed signs announcing: "Area closed by order of the United States Capitol Police Board." that the grounds were closed. By at least 2:54 p.m., the defendant had climbed the eastern stairs and stood on the landing outside the Rotunda doors. The defendant remained on that landing for several minutes, filming the crowd and the Rotunda doors, before entering the building at approximately 3:03 p.m.

Several things about the defendant's entry are noteworthy. First, the windowpanes in the Rotunda doors had been smashed. This was captured on the defendant's video and would have been obvious to him as he entered. Second, alarms were sounding throughout the building; they were piercingly loud and easily audible above the crowd noise. This, too, was captured on the defendant's video. Third, police officers stood on either side of the doorway as the defendant

entered. Later that day, the defendant would comment on these officers in text messages with his supervisor:

>The Supervisor (6:07 p.m.):   You can't overrun the capital building.
>The Defendant (6:09 p.m.):   Actually you can, rather easily I might add. Not as much security as you think. Our numbers were freaking huge. They were not prepared.[2]

As with his knowledge of the breach, the defendant recast this moment in his FBI interview. He told Agent Taylor "While I was at the top, they started letting people into the building. And I -- so I joined the -- they were holding the doors open, the guards were. And I walked in and saw the rotunda." Notably, neither the defendant nor the other rioters nearby entered the U.S. Capitol through a security checkpoint, visitor center, or magnetometer, nor did he present identification to a security official. All these hallmarks of entry into a secure government building were missing that day, and with good reason: the Capitol and grounds were entirely closed to the public until they were overrun by the rioters.

The defendant remained in the Capitol building for about ten minutes, from approximately 3:03 p.m. to 3:13 p.m. He proceeded into the Rotunda where, again, he recorded footage on his cell phone. The defendant's presence coincided with efforts by police officers to clear the Rotunda. As shown both through his own cell phone videos and through USCP surveillance footage, the defendant recorded officers as they entered the Rotunda to clear the rioters, then remained in the Rotunda and observed the officers' efforts for about four minutes. The defendant never physically engaged with, or spoke with, officers. At one point, though, he approached and joined the crowd that was facing down officers. After about 4 minutes, during which there were instances of assault and physical resistance by the mob, the defendant left the Rotunda and left the Capitol building.

---

[2] As explained below, the defendant was speaking generally about the riot, and was not admitting to his supervisor that he had entered the Capitol building. Indeed, he sought to withhold that information.

Speaking to Agent Travis, after the fact, the defendant described the purpose of the riot he left his hotel room to join, saying that his fellow rioters "were just very passionate about the election and feel like it was stolen." He confirmed: "I feel like it's stolen." The defendant told Special Agent Travis that they were "holding out hope they could stop the [Electoral vote] . . . they didn't want Biden becoming [president] . . . they wanted, like, the electors rejected and to go to the House through that process of voting."

The defendant left the Capitol building at about 3:13 p.m., remained in and around the Capitol grounds for a time, and then returned to his hotel room. At about 8:19 p.m., the defendant's cell phone recorded him again looking out the window at a line of police cars and listening to a news program.

Also, after leaving the Capitol, the defendant exchanged text messages with his supervisor and personal trainer. When speaking with his supervisor, the defendant delighted in his presence in Washington, D.C. and aligned himself with the crowd, but strongly suggested—without lying outright—that he did not enter the Capitol building.

| | |
|---|---|
| The Defendant (5:51 p.m.): | You seen the news? |
| The Supervisor (6:01 p.m.): | Yes. Pls tell me you stayed outside and are now at your hotel. |
| The Supervisor (6:01 p.m.): | 6pm curfew |
| The Defendant (6:01 p.m.): | I'm now in my hotel. |
| The Supervisor (6:02 p.m.): | Smart |
| The Supervisor (6:02 p.m.): | Craziness |
| The Defendant (6:03 p.m.): | It was beautiful. I will remember today for the rest of my life. |
| . . . | |
| The Supervisor (6:10 p.m.): | I hope you stayed outside. That's essential. |
| The Defendant (6:11 p.m.): | I was in the hotel when I got word the capital was breached. |
| The Defendant (6:16 p.m.): | Eating an MRE right now. No room service. I glad I thought to bring one. |
| The Defendant (6:20 p.m.): | My view [sent image from hotel] |

But the defendant was much more forthcoming with his personal trainer:

7

| | |
|---|---|
| The Defendant (5:07 p.m.): | I was in there. [Sent picture, taken in the Rotunda, as proof] |
| The Defendant (6:49 p.m.): | By the way, don't tell [my supervisor] I was in the capital. |
| The Trainer (6:56 p.m.): | Okay I won't say a word. |

The government will also present testimony from an officer with the Metropolitan Police Department who was involved with clearing the Rotunda while the defendant was present therein. The government expects this witness to address the police efforts to clear the Rotunda; the size of the crowd; the violence, threats, and vitriol that members of the crowd directed at police; and the way in which the size of the crowd magnified the threat that police faced. The government may present body-worn camera footage from this officer and/or nearby officers and concurrent USCP security camera footage which align with the defendant's own video.

### C. Elements of the Crimes Alleged

The Information charges two offenses under 18 U.S.C. § 1752 and two offenses under 40 U.S.C. § 5104. The elements of those offenses are as follows.

#### i. Entering or Remaining in a Restricted Building or Grounds

Count One of the Information charges the defendant with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

2. Second, that the defendant did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant knowingly entered or remained in a restricted building or grounds, the Court may consider all of the evidence, including what the defendant did or said.[3]

### ii. Disorderly or Disruptive Conduct in a Restricted Building or Grounds

Count Two of the Information charges the defendant with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2. Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3. Third, that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person.

---

[3] *See* Seventh Circuit Pattern Criminal Jury Instructions; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005).

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.[4]

The terms "restricted building or grounds" and "knowingly" have the same meanings described in the instructions for Count One.

### iii. Disorderly Conduct in a Capitol Building

Count Three of the Information charges the defendant with disorderly and disruptive conduct in a Capitol Building, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings.

2. Second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

3. Third, that the defendant acted willfully and knowingly.

The term "United States Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C.[5]

The term "disorderly or disruptive conduct" has the same meaning described in the instructions for Count Two defining "disorderly conduct" and "disruptive conduct."

---

[4] Redbook 6.643.
[5] 40 U.S.C. § 5101

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.[6]

The term "knowingly" has the same meaning described in the instructions for Count One.

### iv.    Parading, Demonstrating, or Picketing in a Capitol Building

Count Four of the Information charges the defendant with parading, demonstrating, or picketing in a Capitol Building, which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings.

2. Second, that the defendant acted willfully and knowingly.

The terms "parade" and "picket" have their ordinary meanings. The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying.[7]

The terms "United States Capitol Buildings," "knowingly," and "willfully" have the same meanings described in the instructions for Counts One and Three.

## III.    THE PARTIES' EVIDENCE AND ANTICIPATED DEFENSES

The parties are mutually committed to trying the case expeditiously and without lengthy arguments about objections. The government has met and conferred with defense counsel about

---

[6]    *See United States v. Bryan*, 524 U.S. 184, 190 (1998).

[7]    *Bynum v. United States Capitol Police Board*, 93 F. Supp. 2d 50, 58 (D.D.C. 2000).

the evidence it plans to present. Based on that meeting, the government expects that all, or nearly all, of its evidence will be admitted without objection. Likewise, based on defense counsel's representations about his plan for trial, the government expects that it would not object to most of the defendant's exhibits. The government may nonetheless object to particular portions of exhibits, or particular questions about exhibits.[8]

The government does not expect the defendant to raise factual or legal arguments about the location or the movement of the Vice President, the timing of the Vice President's business, whether the existence of the Vice President's ceremonial office prevent him from visiting the Capitol temporarily, or any other such technical argument. Instead, the government anticipates that the defense will focus on the defendant's actions and his *mens rea*.

---

[8] For example, the government will offer statements that the defendant made to the FBI during his interview. Because the defendant is an opposing party, his statements are not hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). There is no similar rule allowing the defendant to admit his own statements. Barring an exemption from hearsay (e.g., Rule 801(d)), an exception to the hearsay rule (e.g., Rule 803), or statements made admissible by the Rule of Completeness (Rule 106), the defendant's own statements, when offered by him, are inadmissible hearsay.

## IV.     CONCLUSION

The defendant joined the mob that entered the U.S. Capitol building on January 6, 2021. He entered the building after it had been breached, with knowledge that the breach had happened; he entered to join a crowd that was seeking to stop the certification of the Electoral College vote. And, after police entered the Capitol building's Rotunda and began to clash with rioters, the defendant chose to join the crowd that faced down the police. At trial, the evidence will prove beyond a reasonable doubt that he committed each offense charged in the Information.

                Respectfully Submitted,
                MATTHEW M. GRAVES
                United States Attorney

By:    *s/ Michael J. Romano*
           MICHAEL J. ROMANO
           IL Bar No. 6293658
           Trial Attorney, Detailee
           555 4th Street, N.W.
           Washington, DC 20530
           Michael.Romano@usdoj.gov
           (202) 307-6691

           *s/ Mary L. Dohrmann*
           MARY L. DOHRMANN
           NY Bar No. 5443874
           Assistant United States Attorney
           555 4th Street, N.W.
           Washington, DC 20530
           Mary.Dohrmann@usdoj.gov
           (202) 252-7035