```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      ) Criminal Action
                                       ) No. 21-cr-394
 4                      Plaintiff,     )
                                       ) BENCH TRIAL
 5      vs.                            )
                                       ) Washington, DC
 6      Matthew Martin,                ) April 5, 2022
                                       ) Time:  9:30 a.m.
 7                      Defendant.     )
        _____
 8
                          TRANSCRIPT OF BENCH TRIAL
 9                              HELD BEFORE
                   THE HONORABLE JUDGE TREVOR N. McFADDEN
10                      UNITED STATES DISTRICT JUDGE

11      _____

                          A P P E A R A N C E S
12
        For Plaintiff:      Mary Dohrmann
13                          Michael Romano
                            U.S. Attorney's Office
14                          555 Fourth Street Northwest
                            Washington, DC  20530
15
        For Defendant:      Dan Cron
16                          Dan Cron Law Firm, P.C.
                            425 Sandoval Street
17                          Santa Fe, NM  87501

18      _____

19      Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                                Official Court Reporter
20                              United States Courthouse, Room 6523
                                333 Constitution Avenue, NW
21                              Washington, DC  20001
                                202-354-3267
22

23

24

25
```

1           THE COURTROOM DEPUTY:  Your Honor, this is criminal

2    case 21-394, *United States of America versus Matthew Martin*.

3           Counsel, please come forward and identify yourselves

4    for the record, starting with the government.

5           MS. DOHRMANN:  Good morning, Your Honor.  Mary

6    Dohrmann on behalf of the United States.  And also present is

7    Michael Romano on behalf of the United States.

8           THE COURT:  Good morning, folks.

9           MR. ROMANO:  Good morning, Your Honor.

10           MR. CRON:  Good morning, Your Honor.  Dan Cron on

11    behalf of Matthew Martin, who is present here in court today.

12           THE COURT:  Good morning, Mr. Cron.  Good morning,

13    Mr. Martin.

14           THE DEFENDANT:  Good morning.

15           THE COURT:  Ms. Dohrmann, is the government ready for

16    trial?

17           MS. DOHRMANN:  Yes, Your Honor.

18           THE COURT:  All right.  Mr. Cron, is defense ready

19    for trial?

20           MR. CRON:  Yes, Your Honor.

21           THE COURT:  Am I correct that your client still

22    wishes to waive his right to jury?

23           MR. CRON:  Yes.  And we signed another form to that

24    effect this morning.

25           THE COURT:  All right.  Mr. Martin, could you come

1    forward, please, sir.

2              Mr. Martin, I'm informed that you desire to waive

3    your right to a jury trial; is that correct?

4              THE DEFENDANT:  That is correct.

5              THE COURT:  Before accepting your waiver to jury

6    trial there are a number of questions that I need to ask you to

7    ensure that your waiver is valid.  If you do not understand any

8    of these questions, I'll ask you just to let me know.  And if

9    you need a chance to talk with your attorney, I'm happy to give

10   you that time for you to talk with your attorney privately.

11   Just let me know if you would like to do that.

12             Do you understand all that, sir?

13             THE DEFENDANT:  I do.

14             THE COURT:  All right.  What's your full name, sir?

15             THE DEFENDANT:  My full name is Matthew Anthony

16   Martin.

17             THE COURT:  And how old are you, sir?

18             THE DEFENDANT:  I am 42.

19             THE COURT:  And how far did you go in school --

20             THE DEFENDANT:  43.  I'm sorry, just turned.

21   What?  Excuse me.

22             THE COURT:  How far did you go in school?

23             THE DEFENDANT:  I have a bachelor of science in

24   electrical engineering.

25             THE COURT:  Fair to say you can read and write

1      English?

2              THE DEFENDANT:  Yes.

3              THE COURT:  What is your employment background?

4              THE DEFENDANT:  My employment -- I'm unemployed right

5      now.  I was employed as an electrical engineer.

6              THE COURT:  Have you consumed any alcohol, drugs,

7      medicine or pills in the last 24 hours?

8              THE DEFENDANT:  No.

9              THE COURT:  Have you received any treatment recently

10     for any type of mental illness or emotional disturbance or

11     addiction to narcotic drugs of any kind?

12             THE DEFENDANT:  No.

13             THE COURT:  Do you understand that you're entitled to

14     a trial by a jury on the charges filed against you?

15             THE DEFENDANT:  I do.

16             THE COURT:  Do you understand that a jury trial means

17     you would be tried by a jury consisting of 12 people and all of

18     the jurors must agree on the verdict?

19             THE DEFENDANT:  I do.

20             THE COURT:  Do you understand you have a right to

21     participate in the selection of the jury?

22             THE DEFENDANT:  I do.

23             THE COURT:  Do you understand if I approve your

24     waiver of jury trial, the Court will try your case and

25     determine your innocence or guilt?

```
1                THE DEFENDANT:  I do.

2                THE COURT:  Have you discussed with your attorney the

3       advantages or disadvantages of a jury trial?

4                THE DEFENDANT:  I have.

5                THE COURT:  Mr. Cron, let me ask you, have you

6       discussed with your client the advantages and disadvantages of

7       a jury trial?

8                MR. CRON:  I certainly have.

9                THE COURT:  Do you have any doubt the defendant is

10      making a knowing and voluntary waiver of his right to a jury

11      trial?

12               MR. CRON:  None whatsoever.

13               THE COURT:  Has anything come to your attention

14      suggesting that Mr. Martin may not be competent to waive a jury

15      trial?

16               MR. CRON:  No.

17               THE COURT:  Ms. Dohrmann, has anything come to your

18      attention suggesting the defendant may be incompetent to waive

19      a jury trial?

20               MS. DOHRMANN:  No, Your Honor.

21               THE COURT:  Mr. Martin, is this your signature on

22      this Waiver of Trial by Jury form?

23               THE DEFENDANT:  Yes, it is.

24               THE COURT:  All right.  I find that the defendant,

25      Matthew Martin, has knowingly and voluntarily waived his right
```

1    to a jury trial.  I will now sign the form that he and both

2    attorneys have already signed.

3              Sir, you may have a seat.

4              I received an ex parte filing from the government

5    last night.  Mr. Crabb, would you approach, please?

6              (Bench discussion:)

7              THE COURT:  All right.  Could you just state your

8    name for the record?

9              MR. CRABB:  Yes.  John Crabb, for the United States

10   Attorney's Office.

11             THE COURT:  All right.  I know, back in the Superior

12   Court days, I know we often were filing these last minute -- I

13   don't remember going through a stack like that before.

14             MR. CRABB:  Apologize again.

15             THE COURT:  Are you seeking for this to be under

16   seal?

17             MR. CRABB:  Yes.

18             THE COURT:  Okay.  I think it is appropriate to place

19   it under seal.

20   ████████████████████████████████████████

21   ████████

22   ████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████









12          (Open court:)

13          THE COURT:  I've reviewed the government's trial

14 brief.  I think we can get started.

15          Anything else before, Ms. Dohrmann, you call your

16 first witness?

17          MS. DOHRMANN:  Your Honor, the government would

18 request opening, just briefly.

19          THE COURT:  So how long is brief?

20          MS. DOHRMANN:  About five minutes.

21          THE COURT:  How about one minute?  I've read this,

22 this is a misdemeanor trial.  I want to get going.

23          Mr. Cron, anything we need to address before we

24 begin?

25          MR. CRON:  Just a couple of things --

```
 1              THE COURT:  Why don't you approach the podium, sir.
 2              MR. CRON:  We have been working to have some
 3    stipulations for the Court, and have been working on that as
 4    late as last night.  I just got the copy of the last version,
 5    I'm almost finished reading it.  And if I could just have a
 6    minute or two to finish this so I can sign it and we can submit
 7    that to the court, I think that will help streamline the
 8    proceedings.
 9              And, also, I wish to make an opening statement, as
10    well.
11              THE COURT:  Okay.  So, are you serious about a minute
12    or two?
13              MR. CRON:  Pardon me?
14              THE COURT:  You're serious about a minute?  It's
15    going to take you a minute or two to read this?
16              MR. CRON:  Yes.  I'm almost through it.
17              THE COURT:  Okay.  That's fine.
18              MR. CRON:  Thank you.
19              (Pause.)
20              MR. CRON:  I think I met the deadline, Your Honor.
21              THE COURT:  You did.
22              MR. CRON:  Let's see.  If we could present this to
23    the Court, its signed by both parties.
24              THE COURT:  Okay.  Can I have that from Mr. Cron?
25              Thanks.  Okay.  So, yeah, I got to say, in
```

1    misdemeanor bench trials, I don't think there's much of a

2    practice for opening statements.  I'll give each party two

3    minutes.  But I'm pretty familiar with these cases now and,

4    obviously, I'll give you an opportunity to talk afterwards, in

5    closing arguments.

6         But if you want to very briefly lay things out, I'll

7    hear from you, Ms. Dohrmann.

8         MS. DOHRMANN:  Thank you, Your Honor.  On January 6,

9    2021, when the defendant's boss told him, "You can't overrun

10   the Capitol building," here is what the defendant said,

11   "Actually you can, rather easily I might add.  Not as much

12   security as you think.  Our numbers were freaking huge.  They

13   were not prepared."  These are the words of a United States

14   government contractor about overrunning the law enforcement

15   officers protecting the U.S. Capitol on January 6, 2021.

16        His boss's warning came too late, because he had

17   already done so by the time she texted him that.  He's guilty

18   of violating 18 U.S.C. 1752(a)(1) and (a)(2) and 40 U.S.C.

19   5104(e)(2)(D) and (G).

20        Your Honor, you have read in the trial brief about

21   how the defendant came -- is a federal contractor, with a top

22   security clearance, who came from New Mexico to Washington,

23   D.C. in order to be present on January 6, 2021.  You've read in

24   the trial brief about how he walked from his hotel room at the

25   JW Marriott to the Capitol to participate in the ongoing breach

1    that was occurring, how he recorded video of police presence,

2    how he recorded video of police interactions with rioters.

3           You've read in the trial brief about the chaotic and

4    disorderly scene inside the rotunda, and you'll see video of

5    that, and how he would have noticed teargas and more law

6    enforcement presence and, in fact, demonstrated that he did

7    notice those things.

8           One detail that wasn't in the trial brief, Your

9    Honor, is what happened after he was pushed out of the rotunda

10   by the MPD officers who were able to make headway in clearing

11   it.

12          THE COURT:  Do you mean literally pushed out?

13          MS. DOHRMANN:  Yes, Your Honor, in a -- yes.  Not in

14   direct contact with a law enforcement officer, but by the law

15   enforcement officer's efforts with the crowd.

16          THE COURT:  Okay.

17          MS. DOHRMANN:  Did he go back to his hotel room then,

18   Your Honor?  No.  The defendant remained on the Capitol grounds

19   for at least another hour, and more.  He took a picture of what

20   appears to be blood spatter on the concrete on Capitol grounds.

21   He went onto the terrace on the north side, the Senate side of

22   the building, where another breach was underway.  He saw fellow

23   rioters attacking the windows, and he again recorded the

24   efforts of law enforcement officers to stop the breach,

25   including clouds of teargas being deployed.  Your Honor knows

1     from the trial brief the defendant knew that what he did was

2     illegal.  But he couldn't resist sending a few text messages

3     that evening, bragging about what he had done.  We've talked

4     about some of them already.

5          Our presentation will be brief, Your Honor.  You'll

6     hear from Inspector John Erickson of the United States Capitol

7     Police about the restricted areas in the rotunda and its

8     importance as a central location and part of the path the

9     Vice President traveled to fulfil his constitutional duties

10    that day.  You'll also have the testimony of United States

11    Secret Service Officer Lanelle Hawa to consider regarding

12    Secret Service's actions and activities that day.  You'll see

13    video of the riot and the defendant's role in it.

14          You'll hear from FBI Special Agent Travis Taylor

15    about the investigation regarding the defendant, including CCTV

16    footage video and cell phone evidence in the case.  And you'll

17    also hear what the defendant told the FBI about his conduct on

18    January 6, once he realized his job was on the line.

19          You'll also hear from Metropolitan Police Department

20    Civil Disturbance Unit Officer Jonathan Monroe about what was

21    going on inside the rotunda while the defendant was present and

22    Monroe's efforts to clear it.

23          In sum, Your Honor, you'll see that the defendant

24    went to the Capitol with a purpose, to be part of the crowd

25    stopping constitutional proceedings.  He brought a large metal,

1    extendable flagpole and other demonstrating gear.  He waited to

2    get inside, passing multiple signs of area restrictions and

3    police presence, ignoring alarms and sirens.  And he entered a

4    central location and he recorded video of police being

5    antagonized by rioters, all while the Vice President of the

6    United States and the United States Congress were halted and

7    evacuated and while the greatly outnumbered law enforcement

8    officers struggled to contain the chaos that the defendant had

9    hurried to join.

10            THE COURT:  All right.  Thank you, Ms. Dohrmann.

11            MS. DOHRMANN:  Thank you, Your Honor.

12            THE COURT:  Mr. Cron.

13            MR. CRON:  Thank you, Your Honor.  If it please the

14   Court.  It's a simple narrative about what Matthew Martin did

15   concerning January 6th.  He saw a Tweet from the President,

16   inviting people to come.  He booked a plane ticket the same

17   day.  He came the night before, did not go to the Capitol prior

18   to the 6th.  He, the next morning, got up, he went to the

19   rally.  And he actually left the rally early because he was

20   cold and hungry.  He stayed in his room until a little bit

21   before 2 o'clock, at which point he had decided to go down to

22   the Capitol.

23            He walked down Pennsylvania Avenue.  He went north on

24   the sidewalk on First Avenue to Constitution.  He walked on the

25   sidewalk on Constitution towards the Capitol, and he continued,

1    then, walking on a walking path from Constitution toward the

2    Capitol.  He went up the steps of the walkway for the northeast

3    corner of the Capitol.  He encountered no bike racks blocking

4    his path on the sidewalks or the walkways before he reached the

5    east side.  He climbed no walls on the way.  He walked the east

6    side, made his way to the center steps, went up the center

7    steps.  And at some point the doors opened, the crowd slowly

8    moved towards the doors and he went into the Capitol.

9          Now, the evidence is going to show that there were

10   two Capitol policemen, one of them propping open each door.

11   The one closest to Mr. Martin actually waived him in.  And

12   you'll be able to see that on the video that we have put

13   together for the Court's benefit.

14         After Mr. Martin arrived at the rotunda, Metro police

15   officers started coming towards the back, they herded people

16   out.  He was in the rotunda for about six minutes, and quite a

17   little bit of that time was consumed with him trying to get

18   out, which the crowd was moving very slowly.

19         He was in the building itself for a total of ten

20   minutes.  None of the Capitol police inside the rotunda told

21   him he couldn't be there or to leave.  He was holding a flag

22   inside, but he did not waive it around.  He did not speak a

23   single word to anybody while he was in there.  He had no

24   weapons, gas mask, bullhorn, body armor, nothing like that.

25   While he was at the Capitol he did not assault anyone, he did

1      not vandalize anything, and he did not go into any area of the

2      building that he had not been invited into.

3              In short, Your Honor, we believe that the evidence

4      will show that Mr. Martin violated no laws and we will ask the

5      Court to find him not guilty at the conclusion of our case.

6              THE COURT:  All right.  So, Mr. Cron, you know, I

7      heard the first two witnesses two weeks ago.  Obviously, none

8      of that is binding on you.  I'm, you know, coming with a

9      complete open mind here, and certainly willing to be persuaded

10     differently than I was last time.  Be helpful for me to

11     understand, is your position that there was no U.S. Secret

12     Service restricted area, or that your client didn't knowingly

13     enter it?  That, yes, maybe there was an area, but the police

14     officers waived him in?

15             MR. CRON:  I know the Court determined in the prior

16     trial that, you know, there was an area marked off.  Our

17     position is that by the time he got there, there were none of

18     the barriers on the walkways, that he went all the way up to

19     the Capitol and that he did not knowingly, you know, breach the

20     perimeter.

21             THE COURT:  Okay.  Okay.  Thank you.  All right.

22             Ms. Dohrmann, please call your first witness.

23             MS. DOHRMANN:  Your Honor, if we could read the

24     stipulations between the parties first?  I think that might

25     expedite the entry of evidence.

1          THE COURT:  Okay.

2          MS. DOHRMANN:  And --

3          THE COURT:  Actually, you know what?  If you're just

4    planning to read this seven-page document, I think I can read

5    probably faster than you can.

6          MS. DOHRMANN:  I think that's right, Your Honor.

7    Thank you very much.

8          MR. ROMANO:  Your Honor, the government calls Capitol

9    Police Inspector John Erickson.

10         THE COURT:  All right.

11         MR. ROMANO:  The Court will see, in the stipulation,

12   that the parties have stipulated to Inspector Erickson's prior

13   testimony from the *Couy Griffin* trial, as well as Inspector

14   Hawa's testimony.  So what we offer from Officer Erickson will

15   be supplement to that.

16         THE COURT:  Good to see you again, Inspector

17   Erickson.  Please approach the stand and remain standing for

18   just a moment.

19                     JOHN ERICKSON,

20   was called as a witness and, having been first duly sworn, was

21   examined and testified as follows:

22         MR. ROMANO:  Your Honor, just as housekeeping

23   matters, before we proceed with questioning I would like to

24   offer various exhibits that we plan to use through this witness

25   and other witnesses.  We've discussed with defense counsel and

```
 1        I anticipate no objection.

 2               Government offers Exhibits 1 through 5, 100 through

 3        116, 202 --

 4               THE COURT:  Hold on.  Hold on just a moment, sir.

 5        Okay.  1 through 5.

 6               MR. ROMANO:  Yep.  100 through 116.

 7               THE COURT:  Okay.

 8               MR. ROMANO:  202 and 203, 205 through 212, 300

 9        through 330.

10               THE COURT:  Oh, my goodness.  Okay.

11               MR. ROMANO:  And then the 400 series are the

12        stipulation that you have, Your Honor.

13               THE COURT:  Okay.  Mr. Cron, are you in a position

14        now to say that you don't object to any of these?

15               MR. CRON:  What was the last series?

16               MR. ROMANO:  300 to 330.

17               MR. CRON:  What was the last series?

18               MR. ROMANO:  It was 300 to 330.

19               MR. CRON:  Okay.  And did you say something about

20        400?

21               MR. ROMANO:  Yes, I said those are the stipulations

22        that the Court has.

23               MR. CRON:  Oh, okay.  Yes, we have no objection, Your

24        Honor.

25               THE COURT:  Okay.  So, I will admit 1 through 5,
```

```
 1    100 through --
 2                  MR. ROMANO:  116, I believe it was.
 3                  THE COURT:  -- 116, 202 and 203, 205 through 212, 300
 4    through 330, and the 400s without objection.
 5                  All right.  You made proceed, sir.
 6                  MR. ROMANO:  Thank you, Your Honor.
 7                          DIRECT EXAMINATION
 8    BY MR. ROMANO:
 9    Q.  Good morning, Inspector.
10    A.  Good morning.
11    Q.  Can you please state your name for the record?
12    A.  John Erickson.
13    Q.  And, Inspector, you testified about two weeks ago in
14    another trial related to the events of January 6th, is that
15    right?
16    A.  That is correct.
17    Q.  That was *United States versus Couy Griffin*?
18    A.  That's correct.
19    Q.  Inspector, have you had an opportunity to review your
20    transcript from the *Griffin* trial?
21    A.  I have.
22    Q.  And did the transcript accurately reflect your testimony?
23    A.  Yes, it did.
24    Q.  Okay.  I want to focus on areas that you didn't discuss
25    during that trial, the east front and the Capitol rotunda.
```

1    First of all, are you familiar with the east front of the U.S.

2    Capitol grounds?

3    A.  Yes, I am.

4    Q.  And what does that area include?

5    A.  The east front includes, starting from the building east,

6    the east plaza, which is for vehicular traffic, authorized

7    only, and then it pushes out east into two grassy areas, a

8    north and a south egg, up First Street.

9    Q.  Can we call up Exhibit 100, please.

10            Inspector, do you see Exhibit 100 on the screen in

11   front of you?

12   A.  I do.

13   Q.  And does the yellow outline identify the restricted area on

14   January 6th, 2021?

15   A.  Yes, it does.

16   Q.  And on that day did you travel to locations within the east

17   front at all?

18   A.  No, I did not.

19   Q.  Okay.  And so, on this map, what portion of the east front

20   is within the restricted area?

21   A.  If you look where the grayish improved areas are, that's

22   the East Plaza.  All of the East Plaza was restricted, up to

23   the yellow line.

24   Q.  In the transcript you talked about the security that was in

25   place around the western part of the building.  What security

1    or barriers were in place around the eastern part of the

2    building?

3    A.   On the east front it was bike-rack connected.

4    Q.   Okay.   And was there -- were there also a layer of

5    barricades on some of the Capitol steps themselves?

6    A.   Yes, each of the three east front steps have a chain

7    barricade.

8    Q.   Were there also any signs up indicating that the area was

9    closed?

10   A.   There are some signs throughout the area, yes.

11   Q.   Okay.   Now, I want to focus on the middle of the Capitol,

12   near where there's text that says "Capitol Grounds" over that

13   improved area.   Is there a central staircase there on the east

14   front leading up to the Capitol building?

15   A.   Yes, there are the east front rotunda steps.

16   Q.   If you climbed those stairs from the ground level, where

17   would you end up?

18   A.   You would end up at the rotunda door.   It's the second

19   floor of the Capitol, on the inside.

20   Q.   So then if you entered through that door, you were inside

21   the building.   Where would you be?

22   A.   You would be in the rotunda.

23   Q.   Is there a little breezeway, too, that is in front of the

24   rotunda as you enter those doors?

25   A.   There is.

1    Q.  Now, in the *Couy Griffin* trial you answered some questions

2    about the security procedures for entering the building, but I

3    want to develop those a little bit further.

4            What does an employee of one of the offices in the

5    U.S. Capitol have to do to get into the building?

6    A.  They would need to come through one of the entrances, show

7    their congressional staff ID.  They would then be allowed to

8    enter in the building, in which they would be screened, put

9    their bags on a conveyor belt x-ray machine and go through a

10   metal detector.

11   Q.  What about a visitor?  What does a visitor need to do to

12   enter the Capitol building?

13   A.  Currently the Capitol building is closed to visitors unless

14   you're on official business.  And if that is the case, then the

15   sponsoring office would come down, meet you at the entrance,

16   bring you in, you would then go through the same screening, put

17   your stuff in the x-ray machine, you would then get hand-wanded

18   by the officers.

19   Q.  Is it fair to say you go through the same bag check and

20   magnetometer process, but you also need someone to sponsor your

21   entry?

22   A.  That's correct.

23   Q.  Was the Capitol closed to visitors back on January 6, 2021?

24   A.  It was.

25   Q.  Back when the Capitol was open to visitors was it -- was

1    the process for checking in as a visitor largely the same as it

2    is today for visitors present on official business?

3    A.  Yes, it is.

4    Q.  Was there ever a point prior to -- in, say, the year prior

5    to the Capitol building closed due to COVID, when somebody was

6    visiting could just walk in without submitting to any kind of

7    security check?

8    A.  That is incorrect.  You cannot.

9    Q.  And I want to talk about those eastern rotunda doors again.

10   Since the construction of the Capitol Visitors Center, have the

11   eastern rotunda doors served as a point of entry for visitors?

12   A.  No, they have not.

13   Q.  Have those eastern rotunda doors served as a point of entry

14   for staff?

15   A.  They have not.

16   Q.  When was the CVC, the Capitol Visitor Center built?

17   A.  Maybe 15 years ago, somewhere around there.

18   Q.  And since then, the eastern rotunda doors have not been a

19   point of entry?

20   A.  That is correct.

21   Q.  Are they ever used as a point of entry for special events?

22   A.  Yes, they are.

23   Q.  And what circumstances are necessary to go through to get

24   permission to use those doors?

25   A.  You would have to get clearance through both respective

1     Sergeant at Arms and Oversight on Capitol Hill.

2     Q.  What about the steps on the east front?  In the *Griffin*

3     trial you mentioned that some of those steps were generally

4     restricted areas.  Is that all of the eastern Capitol steps or

5     just some of them?

6     A.  Just some of the steps that are further up.  They're

7     separated from chain fence and pillars.

8     Q.  And on a normal day, what is security like around the

9     eastern rotunda doors?

10    A.  There's two officers that are placed in different parts of

11    the steps and then there's some out on the plaza area that you

12    see in the picture.

13    Q.  What would happen if somebody climbed the steps walking up

14    to the eastern rotunda doors on a normal day?

15    A.  They would get confronted by a law enforcement officer,

16    Capitol police.  They would tell them it's a restricted area,

17    if they continue they would be placed under arrest.

18    Q.  I want to now talk about January 6 specifically.

19             And can you call up the montage of House and Senate

20    footage?  I believe that is Exhibit 301.  Thank you.

21             So, I want to go to one minute and 15 seconds into

22    the video.

23             (Video played.)

24             Now, we'll pause right here, please.  So, in this

25    video, do we see that it's 12:56 p.m.?

1    A.  Yes, sir.

2    Q.  And does it appear that the Vice President and members of

3    the Senate are leaving the Senate to go to the House?

4    A.  Yes, sir.

5    Q.  So, are you familiar with the events that took place in

6    Congress, generally, on January 6th, before the breach of the

7    Capitol building?

8    A.  Yes.

9    Q.  Have you had a chance to review video footage from Congress

10   and from the Capitol Police security cameras?

11   A.  I've seen some, yes.

12   Q.  So initially, on January 6th before the Capitol was

13   breached, were members of Congress gathered in the House and

14   then members of the senate were present in the Senate chamber?

15   A.  That's correct.

16   Q.  And then at some point, around 12:56, did the Senate

17   adjourn?

18   A.  Yes, sir.

19   Q.  And did the senators go to the House to gather for a joint

20   session?

21   A.  That is correct.

22   Q.  The senators and the Vice President traveled to the House

23   chambers?

24   A.  Yes, sir.

25   Q.  So if you left the main door of the Senate chamber and you

1    walked to the main door of the House chamber, what path would

2    you take through the Capitol?

3    A.  You have to go -- it's a straight shot north to south.  As

4    you approached the middle of the building you would have to

5    walk into the rotunda, you would have to leave the rotunda,

6    walk through Statuary Hall.  At Statuary Hall you end up at the

7    House main door.

8    Q.  And when the joint session adjourned later in the day and

9    the House and Senate returned to the separate sessions, would

10   the senators have passed through the rotunda again?

11   A.  That is correct.

12   Q.  Would they need to pass through the rotunda yet again to

13   reconvene in the joint session of Congress?

14   A.  That is correct.

15          THE COURT:  That's just the most direct route?

16          THE WITNESS:  Yes.

17          THE COURT:  You could go downstairs, through the

18   crypt, and back?

19          THE WITNESS:  That is correct.  You could go down

20   them steps, through the crypt, and walk underneath.  But the

21   most direct route is straight out the main door, straight down

22   to the Senate.

23   BY MR. ROMANO:

24   Q.  So how important was the security at the rotunda to the

25   certification proceedings on January 6th?

1    A.   It's very important.  We have multiple VIPs in the

2    building, so the whole building needed to be secure.

3    Q.   I know in the *Griffin* trial you testified that you were

4    present in different parts of the Capitol during the law

5    enforcement response to the breach.  Were you in the rotunda at

6    all during the day?

7    A.   No.

8    Q.   Okay.  Are you familiar with security footage from the

9    rotunda?

10   A.   Yes.

11   Q.   I would like to call up Exhibit 310, please.

12                    (Video played.)

13                    And can we pause, please.  Now, unfortunately, this

14   video is turned sideways.  I don't know -- there we are.  So,

15   it's still slightly askew, Inspector, but do you see this video

16   here?

17   A.   I do.

18   Q.   And from the buildings and the location, are you able to

19   tell where this video was taken, roughly?

20   A.   I cannot.

21   Q.   Does it appear to be on the streets in Washington, D.C.?

22   A.   It does.

23   Q.   Based on your familiarity with the Capitol, can you tell if

24   this is yet within the restricted area on January 6?

25   A.   I do not believe so.

1    Q.  All right.  Let's go to 311.  So now I'm going to ask if we

2    can spin this again.  Just maybe one notch over to the other

3    direction.

4              Let's -- okay, let's press play on this video.

5              It's about 36 seconds long.

6              (Video played.)

7              Can we turn the volume up just a notch or two?

8              (Video played.)

9              Can we pause there?

10             Inspector, based on what you see in this video, where

11   does it look like this video was taken?

12   A.  Pennsylvania Avenue, facing eastbound towards the Capitol,

13   approaching Third Street, probably.

14   Q.  And is this footage within the restricted area?

15   A.  It is not.

16   Q.  Okay.  You see there are markings on the police cars here

17   on the video?

18   A.  Yes, sir.

19   Q.  What agency do those markings indicate that these police

20   cars are from?

21   A.  Federal Protective Service.

22   Q.  Based on what you know of the events of January 6th, what

23   does it appear that the officers in these cars are trying to

24   do?

25   A.  They're looking to respond up to the Capitol to assist us

1    and other units.

2    Q.  And why do you say that?

3    A.  Because at that point many of the protestors had already

4    breached the grounds and the building so we were calling for

5    additional assistance from our fellow law enforcement partners.

6    Q.  And were the Federal Protective Services one of those law

7    enforcement partners that you sought help from?

8    A.  Yes.

9    Q.  Now, as you are looking at this video, does it appear that

10   the police cars are able to move forward, towards the Capitol?

11   A.  They cannot.

12   Q.  And why not?

13   A.  There's multiple people gathered in front of them as

14   they're trying to move forward in the street.

15   Q.  Does it appear that the person who filmed this video walked

16   close to the police cars?

17   A.  Yes.

18   Q.  And into the path of the travel of at least one of those

19   police cars?

20   A.  Yes.

21   Q.  Let's call up Exhibit 312, please.

22              (Video played.)

23              Pause right here.  This is four seconds into the

24   video.  Does this appear to be a continuation of the -- or,

25   taken shortly after the prior piece of footage?

```
 1    A.  It does.

 2    Q.  And let's play this video.

 3              (Video played.)

 4              All right.  We can pause there at 51 seconds -- 53

 5    seconds now.

 6              Inspector, in this video clip, what does it appear

 7    that the police cars were trying to do?

 8    A.  They were backing up because they couldn't go forward.  So

 9    they're actually having to back up as the people are pressing

10    towards them.

11    Q.  And how did the crowd respond as the police officers in the

12    vehicles backed up?

13    A.  They were happy to see that.  You know, they wanted them to

14    move, it seemed.

15    Q.  And did it seem like the crowd continued to press in to

16    fill the space that the cars opened up as they back up?

17    A.  Yes.

18    Q.  Does it appear that the person filming this video remained

19    in the road, in the way of the police line of travel?

20    A.  That is correct.

21    Q.  Let's call up 313, please.

22              (Video played.)

23              And pause, please.  All right.  Okay.  There we are.

24              And we can press play on this video.

25              (Video played.)
```

```
1              Okay.  Now, Inspector, where did this video appear to
2    be taken?
3    A.  That's the northwest drive of the Capitol, on the west
4    side.
5    Q.  Okay.  Was this video filmed within the restricted area?
6    A.  Yes.
7    Q.  Where would the person filming this video have crossed into
8    the restricted area?
9    A.  I don't know, but from where it is, the northwest drive,
10   the restricted area started at Constitution Avenue and First,
11   on that corner in the northwest.  So they would have crossed in
12   somewhere down in that corner.
13   Q.  Is this video filmed pretty close to Constitution Avenue on
14   the north side?
15   A.  Yes.
16   Q.  Okay.  Can we call up the beginning of this video again.
17              (Video played.)
18              And press pause right here.  And what marking is
19   present on that police vehicle?
20   A.  Capitol Police.
21   Q.  Over to the right of the police vehicle's front windshield,
22   do you see a white box that appears to be hanging off some
23   fencing?
24   A.  Yes, sir.
25   Q.  I would like to call up Exhibit 103, please.
```

1          Okay.  Now, does this appear to be a zoomed-in image

2     from what we were just looking at?

3     A.  Yes, sir.

4     Q.  Can you see the white box attached to the fencing a little

5     bit more clearly now?

6     A.  Yes, sir.

7     Q.  What is it?

8     A.  It's an "Area Closed" sign by order of the Capitol Police

9     Board.  It's an additional layer of fencing to close off the

10    area.

11    Q.  And do you see several of those "Area Closed" signs visible

12    from this still?

13    A.  Yes, sir.

14    Q.  Let's call up 104, please.  Okay.  What are we looking at

15    in 104?

16    A.  That is the north wing of the west Senate.

17    Q.  And do you see one of those "Area Closed" signs there?

18    A.  Yes.

19    Q.  Where is that mounted?

20    A.  That is right around the grotto, which is just an

21    ornamental building.

22    Q.  Does that again appear to be on snow fence, being attached

23    with, maybe, zip ties or something similar?

24    A.  They're usually zip ties on snow fencing, yes.

25              MR. ROMANO:  Your Honor, at this point I ask to call

1    up Defense Exhibit 11.  We haven't yet had the defense exhibits

2    come into evidence, but I know there are a number of videos

3    that Mr. Cron plans to use that I anticipate we would have no

4    objection to.  And this is in lieu of rebuttal testimony later.

5                THE COURT:  Okay.  Mr. Cron, any objection to your

6    Exhibit 11 being admitted?

7                MR. CRON:  I'm just pulling that up right now.

8                (Pause.)

9                MR. CRON:  No objection.

10               THE COURT:  Without objection, Defendant 11 is in and

11   may be played.

12               MR. ROMANO:  Bear with us, Your Honor.  We're in the

13   process of bringing it up.

14               (Pause.)

15   BY MR. ROMANO:

16   Q.  I think we're almost there.  Okay.

17               (Video played.)

18               So let's pause it again.  Inspector, what are we

19   looking at here?

20   A.  This is the northwest sector of the west front.

21   Q.  And can you tell if this is Capitol Police Security

22   footage?

23   A.  This is.

24   Q.  Let's play it for about ten seconds.

25               (Video played.)

```
 1                    Okay.  Let's pause right there at four seconds --
 2       five seconds.  Now, Inspector, is there a map that's been
 3       overlaid on this exhibit?
 4       A.  Yes.
 5       Q.  And then a circle with an arrow in the upper left-hand
 6       corner?
 7       A.  I see the circle.  Yes.
 8       Q.  And does that appear to be overlaid on top of Capitol
 9       Police Security footage?
10       A.  Yes.
11       Q.  All right.  Now, I would like to advance this to about 50
12       seconds again.
13                    THE COURT:  What time is this?
14                    MR. ROMANO:  This is at --
15                    THE COURT:  Oh, 2:37.
16                    MR. ROMANO:  2:20 -- or, 2 --
17                    THE COURT:  I see the time now at the bottom.
18                    MR. ROMANO:  2:37.  Yes.  Thank you.
19       BY MR. ROMANO:
20       Q.  So we're going to advance about 50 seconds into the video.
21       And let's just play from there.
22                    (Video played.)
23                    Pause, please.  We're now at 54 seconds.
24                    Does it appear that there's another piece of Capitol
25       Police Security footage that's appeared overlaid in the lower
```

1    right-hand corner of the screen?

2    A.  Yes.

3    Q.  And let's play and watch the lower right-hand corner of the

4    screen.

5              (Video played.)

6              Do you see the individual who is walking down the

7    path now with the circle and arrow pointing to him?

8    A.  Yes, sir.

9    Q.  And let's pause right there.  We are at 1 minute and 5

10   seconds into the footage.  Is this person within the restricted

11   area as he walks down that path?

12   A.  Yes, he is.

13   Q.  How can you tell?

14   A.  Because if you look just to the left of the sidewalk, them

15   are bike racks.  And if you go to the previous picture of the

16   yellow, that bike rack signifies the yellow perimeter.

17   Q.  So I think what you're saying is the map that we looked at,

18   Exhibit 100 with the yellow outline, those bike racks are part

19   of what's signified by that yellow outline, right?

20   A.  That is correct.

21   Q.  This is part of the perimeter?

22   A.  Yes, sir.

23   Q.  And if I understand you correctly, you were saying that

24   this person is inside the perimeter?

25   A.  That is correct.

1     Q.  Let's call --

2          THE COURT:  Sorry.  You're saying the bike racks are

3     just to the left of the sidewalk?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Okay.

6     BY MR. ROMANO:

7     Q.  Let's call up Exhibit 314, please.  Okay.  And so before we

8     play it, can you tell us where this is on Capitol grounds?

9     Oop, we lost it.

10          There we are.  Before we play it, where is this on

11    the Capitol grounds?

12    A.  That is the north side of the Capitol.  The northwest drive

13    that we talked about, that is on the south side of that.

14    Q.  Okay.  And do you see more of the signage and snow fencing

15    that we've discussed?

16    A.  Yes, sir.

17    Q.  Let's play this clip.

18          (Video played.)

19          Do you see in this clip a number of "Area Closed"

20    signs that the person passed by?

21    A.  Yes, sir.

22    Q.  And if someone walked down that path, where would they be

23    traveling within the Capitol grounds?

24    A.  I don't understand.

25    Q.  So, in that footage did you see a walking path that they

1   appeared to be traveling down?

2   A.  Yes.

3   Q.  You said they were standing in the northwest portion of the

4   Capitol?

5   A.  Yep.  So that's the northwest walkway.  It sits between

6   Constitution Avenue and the grassy areas, so it is still in the

7   restricted area.

8   Q.  And so if somebody were to walk down this northwest pathway

9   in the direction that the camera was facing, would they come to

10  the east front?

11  A.  That would be the path you would -- one of the paths you

12  could take to the east front, that is correct.

13          THE COURT:  I'm sorry.  So you can see, obviously,

14  there was the snow fencing with the "Closed Area" signs on the

15  right.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  You're saying that even already you're in

18  the restricted area because there's the bike racks to your

19  left?

20          THE WITNESS:  That is correct.  The snow fence that

21  you see and the sign, we double layer that.  That was the

22  initial snow fence we put up for the inaugural stage that was

23  being built.  So that area was restricted.

24          THE COURT:  But you'd expanded it then?

25          THE WITNESS:  We expanded it out to Constitution

1    Avenue for the day of the demonstration.

2              THE COURT:  Understood.

3    BY MR. ROMANO:

4    Q.  Let's call up 315, please.

5              (Video played.)

6              Pause here.  At this point where are we on the

7    Capitol grounds?

8    A.  That's the East Front plaza.

9    Q.  Okay.  Was this within the restricted area?

10   A.  Yes.

11   Q.  And I want to play this footage and pause after a couple of

12   seconds.  And, Inspector, I want you to focus on the lower

13   left-hand corner of the screen.

14             (Video played.)

15             We can pause right there.  Do you see, somewhat

16   obstructed by the crowd, but what appears to be a vehicle in

17   the lower left-hand corner of the screen?

18   A.  I do.

19   Q.  What is that vehicle?

20   A.  That is one of our SWAT team vehicles, Capitol Police SWAT

21   team.

22   Q.  And do you see what appears to be a person sitting on top

23   of that vehicle?

24   A.  I do.

25   Q.  Do you see another person that appears to be standing on

1    top of that vehicle?

2    A.  Yes, sir.

3    Q.  Are members of the public ever authorized to sit or stand

4    on U.S. Capitol Police cars?

5    A.  No, they're not.

6    Q.  Let's call up -- let's play this out, please.

7                (Video played.)

8                And let's call up Exhibit 316.

9                (Video played.)

10               Let's pause there.  Let's, actually, advance just

11   slightly, because this is blurry.  Just unpause and pause

12   again, see if we can get clearer.  Few more seconds.

13               (Video played.)

14               Okay.  That's not working for us.

15               But, Inspector, what area are we looking at here?

16   A.  That's the top of the rotunda steps, the east front.

17   Q.  And let's back up to the beginning, back to the beginning

18   of this exhibit.

19               (Video played.)

20               Okay.  And we can stop right there at about 5 seconds.

21   So, do you see a set of doors there?

22   A.  Yes.

23   Q.  What are those?

24   A.  Those are the rotunda doors.

25   Q.  Let's just back up to the very beginning and play again

1    from the beginning.  And I want you to focus on the objects

2    that are between this camera and the rotunda doors -- actually,

3    we don't need to play, this is a clear view.

4            Do you see what appears to be a pitchfork with an

5    upsidedown American flag tied to it?

6    A.  I do.

7    Q.  Do you see beyond that a metal flagpole with an American

8    flag tied to it?

9    A.  Yes.

10   Q.  Could a pitchfork come through security on a day when

11   visitors are able to come into the Capitol?

12   A.  No.

13   Q.  What about a metal flagpole?

14   A.  No.

15   Q.  Why?

16   A.  They're all part of the restricted items.  That would be

17   items not allowed in.  Some can be used for weapons.

18   Q.  Let's have Exhibit 300, please.

19           MR. ROMANO:  Your Honor, we're just going to go to

20   Exhibit 300, which is the montage of Capitol Police security

21   footage, before we watch footage from the defendant's phone

22   inside the Capitol.

23   BY MR. ROMANO:

24   Q.  So I would like to just focus on the portions of this

25   montage that deal with the rotunda.

1          First of all, Inspector have you seen this montage

2     before?

3     A.  Yes.

4     Q.  And in the *Griffin* trial you testified about portions of

5     it, right?

6     A.  Yes, sir.

7     Q.  Okay.  So let's move to 8 minutes and 43 seconds into the

8     montage.  And we'll just press play there.

9          (Video played.)

10         This does not seem to be capturing additional video

11    footage.  Let's start from the beginning and see if that works

12    a little better.  I think it may just need time to load, since

13    this is a large file.  Let's just back it up a little bit to

14    the point where we actually saw the video moving.

15         (Video played.)

16         So, Inspector, bear with us as this file loads.

17    We're at 5 minutes and 30 seconds.  Now, does this appear to be

18    the breach of the Senate wing doors?

19    A.  That is correct.

20    Q.  Let's see if we can move forward a little bit.

21         Now, let's just stop it there because it appears that

22    it may need some more time to load.  Let's pause.

23         (Video played.)

24         We're at about 7 minutes and 2 seconds into the

25    video.  Does there appear to be members of the crowd who have

1    breached the Capitol inside the Ohio Clock corridor?

2    A.  That is correct.

3    Q.  Is this outside the Senate chamber?

4    A.  It is.

5    Q.  Let's see if we can get this to pick up going forward now.

6         Okay.  Let's play it from about 6 minutes and 40

7    seconds and we'll see if it will -- oh.  Apologies for the

8    technical difficulties, Your Honor.

9         I believe we had this up and working on another

10   computer.  We're going to just switch over the inputs.

11        (Video played.)

12        So there, let's pause it.  We've successfully gotten

13   the video up.  We're starting it at 8 minutes and 40 seconds

14   into it.

15        (Video played.)

16        Let's pause right here.

17        Inspector, is this from Capitol Police Security

18   footage at 2:25 p.m.?

19   A.  This is.

20   Q.  And what are we looking at here?

21   A.  That is the breezeway that we spoke of earlier that leads

22   from the rotunda doors, which you see on the right, to the

23   rotunda to the left.

24   Q.  Okay.  Press play, please.

25        (Video played.)

```
 1                    Do you see here members of the crowd trying to get
 2        doors open?
 3        A.  Yes.
 4        Q.  And have we just changed the angle on this footage?
 5        A.  That is correct.
 6        Q.  I'd like to pause here, please.
 7                    Now, do you see members of the crowd trying to force
 8        their way through as an officer tries to keep them back?
 9        A.  That is correct.
10        Q.  I want to focus your attention on the rotunda doors
11        themselves.  What do you notice about the windowpanes in those
12        doors?
13        A.  That they're shattered.
14        Q.  And do you see a shattered window on each side of the
15        rotunda doors?
16        A.  That is correct.
17        Q.  Press play, please.
18                    (Video played.)
19                    And let's pause right there.  So, in the end of that
20        footage were members of the crowd able to force their way into
21        the Capitol building?
22        A.  Yes, they were.
23        Q.  Did they --
24                    THE COURT:  Sorry.  Can you go back?
25                    MR. ROMANO:  Yes.  Absolutely.  How far back, Your
```

 1    Honor?

 2              THE COURT:  30 seconds is fine.

 3              (Video played.)

 4              THE COURT:  So, Inspector, there was just one officer

 5    there, the officer in black with the helmet.  There were a

 6    couple other guys in green.  Those were not --

 7              THE WITNESS:  I would have to focus on them, if we

 8    see them.

 9              (Video played.)

10              THE WITNESS:  The first, in the black, is one of our

11    Civil Disturbance officers.

12              THE COURT:  I couldn't tell if he was working with

13    them or against them.

14              (Video played.)

15              MR. ROMANO:  Pause right there, please.

16              Your Honor, were you asking about -- one of the

17    people you were asking about, was that the person with the

18    backpack on the right side of the door?

19              THE COURT:  Yes, just right next to it.

20              THE WITNESS:  Your Honor, at this point there's

21    nobody here assisting Capitol Police.  Any of the outside law

22    enforcement that did come up to respond was not, at this point,

23    here.

24              THE COURT:  Okay.  So that was somebody working

25    against him?

```
1              THE WITNESS:  That is correct.

2              THE COURT:  Okay.  Thank you.

3    BY MR. ROMANO:

4    Q.  And now let's move forward to 13 minutes and 54 seconds

5    into this video.  Or as close to it -- yeah, there we are,

6    press play, please.  We're going back to the entry to the

7    rotunda at 2:36 p.m.

8              (Video played.)

9              Pause, please.  Now, what do you see as we begin

10   watching this video here?

11   A.  You'll see there's two benches propped up at the door and

12   then the two windows that are smashed.

13   Q.  Those are the same windows we were looking at earlier?

14   A.  That is correct.

15   Q.  Does it appear that -- actually, it looks like maybe three

16   benches; two parallel to the door and one perpendicular?

17   A.  Yes, sir.

18   Q.  Does it appear that those were set up as a barrier to

19   prevent further entry?

20   A.  Yes.

21   Q.  And let's press play.

22             (Video played.)

23             Pause, please.  Do you see some officers from the

24   U.S. Capitol Police who approached the door?

25   A.  Yes.
```

1    Q.  How many?

2    A.  Looks like three.

3    Q.  And does it appear that they are outnumbered by other

4    people in the area?

5    A.  Yes.

6    Q.  Press play.

7            (Video played.)

8            Pause.  Actually, keep playing.

9            (Video played.)

10           We jumped forward in time about a minute or two.

11   Press pause, please.

12           And what does it appear is happening now?

13   A.  The crowd is growing and the breach is starting to occur in

14   the rotunda doors.

15   Q.  And this is at 2:38 p.m.?

16   A.  Yes, sir.

17   Q.  Press play, please.

18           (Video played.)

19           And can we back up for a moment, please.  Back up

20   about 30 seconds.  And press play again there.

21           (Video played.)

22           Pause.  And I don't want to impose this

23   characterization on you -- or, actually, let me ask it a

24   different way.

25           Inspector, in the area of the door, do you see a long

1    flagpole that's kind of pointing towards the door?

2    A.  I do.

3    Q.  What does it appear is happening with that flagpole?

4    A.  It's hard to tell.

5    Q.  Can we back up a little bit?  And then press play.

6              (Video played.)

7              Do you note anything in particular about what's

8    happening with that large flagpole?

9    A.  The one in the center looks like it could be hitting the

10   people on the outside.

11   Q.  All right.  So, now let's move forward to 19 minutes and 47

12   seconds.  Press play.  We're now going to 3:28 p.m., back to

13   the rotunda doors again.

14             (Video played.)

15             Pause, please.  And, Inspector, what do we see in

16   this video clip?

17   A.  The whole area has been breached and taken over by

18   protestors.

19   Q.  Press play.

20             (Video played.)

21             We can pause now.  Inspector, at that point did it

22   still appear that members of the police were outnumbered by

23   people inside the Capitol building?

24   A.  That's correct.

25   Q.  And at that point, did you see that there were officers

1      from other police departments assisting members of Capitol

2      Police?

3      A.  Yes, Metropolitan Police.

4      Q.  They were -- fair to say they were still having trouble

5      with the size of the crowd?

6      A.  Absolutely, yes.

7      Q.  Let's movie to Exhibit 318, please.

8              Okay.  And I actually want to make sure that we get

9      the audio on this.  Can we turn up the volume and start from

10     the beginning?

11             (Video played.)

12             Okay.  Pause, please.

13             Okay.  Do you see the same windowpane with broken

14     glass that we were looking at earlier?

15     A.  Yes, sir.

16     Q.  And do you hear a high-pitched noise as this video begins?

17     A.  You do.

18     Q.  What is that?

19     A.  That's the audible alarm that is put on the door.  If the

20     door is breached or accessed with not having proper

21     authorization, that audible alarm will go off until it is

22     properly reset.

23     Q.  Okay.  So, would that alarm have been going off for the

24     entire duration of the time that the rotunda doors were forced

25     open?

1    A.  Yes.

2    Q.  Press play, please.

3              (Video played.)

4              Pause again.  And then do you also see the fractures

5    in the other windowpane we were talking about?

6    A.  Yes, sir.

7    Q.  And let's play the rest of this.

8              (Video played.)

9              Okay.  Do you also hear noise from the crowd there as

10   people are entering the rotunda?

11   A.  Yes.

12   Q.  And do you have any difficulty hearing the audible alarm

13   from the door over the crowd noise?

14   A.  No, sir.

15   Q.  Let's bring up 320, please.  Actually, let's go to 319.

16   And let's just play this.

17             (Video played.)

18             Play 320, please.

19             (Video played.)

20             And -- pause.  I didn't ask you any questions about

21   319, Inspector.  Is that filmed in the breezeway leading into

22   the rotunda?

23   A.  Yes, sir, it is.

24   Q.  Now we're looking at 320.  Where are we now?

25   A.  We are in the rotunda.

```
1    Q.  Press play.

2                (Video played.)

3                Let's pause here.  Inspector, do you hear some kind

4    of siren-type sound going off in this video?

5    A.  Yes.

6    Q.  Do you recognize what that is?

7    A.  It could be emergency vehicles on the outside.

8    Q.  Fair to say you don't know for sure?

9    A.  Correct.

10   Q.  Press play, please.

11               (Video played.)

12               Let's pull up 321, please.

13               (Video played.)

14               Hit pause, please.  That door that we just saw

15   there -- let's back it up so we can see that again.

16               (Video played.)

17               You see some police officers standing in front of

18   that door?

19   A.  Yes, sir.

20   Q.  Where does that lead?

21   A.  That leads west, I believe.  If you back up, I can let

22   you --

23   Q.  Can we back up just a little bit, to the beginning of the

24   clip?  Okay.  And let's press play.

25               (Video played.)
```

1          Now, having watched the video, which I believe is

2     about ten seconds long, do you have a better sense where that

3     leads?

4     A.  It looks like that's the corridor that leads from the

5     rotunda north, towards the Senate floor.

6     Q.  And did it appear that there were a number of police

7     officers standing there?

8     A.  There was.

9     Q.  Did you also hear something that sounded a little like a

10    foghorn, maybe?

11    A.  I did.

12    Q.  Could you tell what that was?

13    A.  I could not, but it looked like one of them rally horns.

14    Q.  Let's bring up 322.

15          All right, there we go.  Bring it back to the

16    beginning, please.  And let's press play.

17          (Video played.)

18          Okay.  Press pause again, please.  What does it

19    appear is happening in this video?

20    A.  Chaos.

21    Q.  Okay.  Let's press play again.

22          (Video played.)

23          Let's pause here.  We're about 29 seconds into the

24    video.  Do you see that door in the background?

25    A.  Yes.

1    Q.   Where does that door lead?

2    A.   That leads to the Upper West Terrace, the west front.

3    Specifically, it's an access area to Speaker's Lobby.

4    Q.   Do you see a number of police officers who appear to be

5    entering that room through that door?

6    A.   Yes.

7    Q.   What were they trying to do, based on your knowledge of the

8    events that day?

9    A.   They were trying to line up and start clearing the rotunda.

10   Q.   Now, Inspector, we've seen a lot of people present in the

11   Capitol during the various bits of security footage that we've

12   reviewed -- you can take that down.

13        Were -- generally, were the people who entered the

14   Capitol on January 6th, following the breach of the Capitol,

15   authorized to be present in the building?

16   A.   No.

17   Q.   And did the presence of those people in the building

18   present a security risk to the Vice President and members of

19   the Congress?

20   A.   They do.

21   Q.   Why?

22   A.   Because none of them were screened.  As we saw in earlier

23   footage, people were bringing in, that we know of, pitchforks

24   and other weapons that we saw.  So we didn't know what else

25   people had on them.

1   Q.  The periods of the video that we've been looking at, were

2   those filmed after the Senate went into recess?

3   A.  That I cannot answer.

4   Q.  Okay.  Well, even if the Senate and/or the House were in

5   recess at the time of these videos, did the presence of people

6   prevent Congress from reconvening to finish its business on

7   January 6th?

8   A.  Yes.

9   Q.  Why is that?

10  A.  Because they had the -- both the Senate and House and other

11  protectees had to be evacuated for their safety.

12  Q.  Was Congress or either House of Congress able to reconvene

13  while any of those people remained in the building?

14  A.  No.

15  Q.  Did Capitol Police and other law enforcement agencies have

16  to clear the building before Congress was able to reconvene?

17  A.  That is correct.

18  Q.  Before Congress was able to continue its business?

19  A.  That is correct.

20          MR. ROMANO:  Court's indulgence.

21          (Pause.)

22          MR. ROMANO:  Thank you, Your Honor.  No further

23  questions for this witness.

24          THE COURT:  All right.  Mr. Cron.

25          MR. CRON:  Thank you, Your Honor.

```
1                          CROSS-EXAMINATION

2    BY MR. CRON:

3    Q.  Good morning, Inspector.

4    A.  Good morning, sir.

5    Q.  Did you personally see Mr. Martin at the Capitol on January

6    6th?

7    A.  I cannot say yes, no.

8    Q.  Now, counsel showed you a clip from a video at 2:28.  That

9    showed, what I understood your testimony to be, the initial

10   breach of the east rotunda door?

11   A.  Okay.

12   Q.  Do you know where Mr. Martin was when that occurred?

13   A.  I do not.

14   Q.  And there's a second one, ten minutes later, at 2:38 that

15   showed then what looked like a larger breach of the east

16   rotunda doors.  Do you know where Mr. Martin was when that

17   occurred?

18   A.  I do not.

19   Q.  And there was another one that was shown at 3:38, which had

20   people being pushed out the east rotunda doors.  Do you know if

21   Mr. Martin was still in the building when that video showed?

22   A.  I do not.

23            MR. CRON:  Those are all the questions I have, Your

24   Honor.

25            THE COURT:  Thank you.
```

1                    I have a question for you.

2                    Could you -- Mr. Romano, could you pull up your 318

3        again?

4                    MR. ROMANO:  Yes.  Absolutely.

5                    THE COURT:  And specifically, I want to see the

6        moments where the -- I guess, the defendant is going through

7        the Capitol doors.

8                    MR. ROMANO:  Yes.  Those videos were taken from the

9        defendant's phone.

10                   All right.  I believe we have it up.  You want us to

11       just play it straight through, Your Honor?

12                   THE COURT:  Well, I'm particularly interested in that

13       moment when he's just going through.  So, if you can get around

14       there.

15                   (Video played.)

16                   THE COURT:  Thanks.

17                   So, do you know what those officers were doing?

18                   THE WITNESS:  They were just monitoring the area.  I

19       would assume at this point -- when there's that many people,

20       it's hard to stop everyone.  So you're concerned, for crowds

21       this size, is crowd crush.  So what happens is they just start

22       coming in faster than your people in front can move.  So the

23       only thing they can do is make sure no one gets hurt through

24       the crowd forcing their way through the doors.

25                   THE COURT:  All right.  Mr. Cron, do you have any

```
 1    questions based on my questions?
 2                MR. CRON:  No, Your Honor.
 3                THE COURT:  All right.  Mr. Romano, any redirect?
 4                MR. ROMANO:  No redirect, Your Honor.
 5                THE COURT:  Thank you.  Thank you, Inspector.  You
 6    may step down.  You're free to go.
 7                Mr. Romano, please call your next witness.
 8                MS. DOHRMANN:  Thank you, Your Honor.  The government
 9    calls Special Agent Travis Taylor.
10                THE COURTROOM DEPUTY:  Please raise your right hand.
11                            TRAVIS TAYLOR,
12    was called as a witness and, having been first duly sworn, was
13    examined and testified as follows:
14                          DIRECT EXAMINATION
15    BY MS. DOHRMANN:
16    Q.  Good morning.  Can you please state and spell your name for
17    the record?
18    A.  Travis Taylor.  T-R-A-V-I-S.  Taylor, T-A-Y-L-O-R.
19    Q.  And where are you employed?
20    A.  I am employed at the FBI in Sante Fe -- the city of
21    Sante Fe, New Mexico.
22    Q.  How long have you been employed with the FBI?
23    A.  Eight years.
24    Q.  And what is your position there?
25    A.  I'm a special agent.
```

1    Q.  What do you do in that role?

2    A.  I work various crimes; national security crimes,

3    counterintelligence, counterterrorism, domestic terrorism and

4    other various criminal matters.

5    Q.  And briefly, what training do you undergo to become a FBI

6    special agent?

7    A.  Twenty-one weeks at Quantico, defensive tactics,

8    room-clearing tactics, legal, law, national security

9    techniques, as well as interview and interrogation techniques.

10   And then after Quantico, continuing education in various

11   different topics in national security.

12   Q.  And, so, due to your training and experience, is it fair to

13   say you're familiar with pepper spray, law enforcement

14   techniques, things of that nature?

15   A.  Yes.  We had pepper spray deployed against us so that we

16   would know what it felt like.

17            THE COURT:  Hazing?

18            THE WITNESS:  Yes.

19   BY MS. DOHRMANN:

20   Q.  And, Special Agent Taylor, were you involved in the

21   investigation and arrest of a Matthew Martin for offenses

22   committed on January 6th, 2021?

23   A.  I was.

24   Q.  Do you see Matthew Martin in the courtroom here today?

25   A.  I do.

 1                  MR. CRON:  We'll stipulate to the identification.

 2                  THE COURT:  All right.  In-court identification has

 3      been stipulated to.

 4                  MS. DOHRMANN:  Thank you, Your Honor.

 5      BY MS. DOHRMANN:

 6      Q.  SA Taylor, how did the defendant first come to your

 7      attention?

 8      A.  So, defendant reported to his workplace that he had been

 9      inside the Capitol and he was referred to talk to the

10      counterintelligence office at Los Alamos National Laboratory.

11      And once the counterintelligence officer received information

12      about Matthew Martin's actions on January 6, they referred that

13      to our agents in the lab, which are FBI employees, two agents

14      that sit in the lab in Los Alamos, and they notified myself

15      that Matthew Martin had been in the Capitol.

16      Q.  And what is the Los Alamos National Laboratory?

17      A.  It's a nuclear research laboratory, as well as they do

18      other scientific research.

19      Q.  Have you ever been there?

20      A.  I have.

21      Q.  Can people just walk into the Los Alamos National Laboratory?

22      A.  To get into any of the restricted spaces you would need a

23      clearance badge, an access badge.

24      Q.  What government agency is involved with the National

25      Laboratory?

1    A.   The Department of Energy.

2    Q.   Okay.  And you told us that the defendant worked there.

3    Are you aware of his role there?

4    A.   Senior engineer.

5    Q.   Did he hold a security clearance from the Department of

6    Energy in connection with that role?

7    A.   A Q clearance, which is a top secret clearance.

8    Q.   What kinds of materials and information does that clearance

9    allow a person access to?

10   A.   Top secret information.

11   Q.   National security information?

12   A.   Yes.

13   Q.   You have to apply to get a clearance like that?

14   A.   You have to go through an extensive background check to get

15   a top security clearance.

16   Q.   Can you get denied for a clearance?

17   A.   You can.

18   Q.   Can you get your clearance taken away?

19   A.   You can.

20   Q.   What might be some reasons that a clearance would be taken

21   away?

22   A.   Untruthfulness regarding foreign contacts, working with a

23   foreign intelligence agency, committing crimes.

24   Q.   And if you have a clearance like that, are there certain

25   things you're supposed to report, if they happen?

```
1    A.  Yes.

2    Q.  Can you give us a few examples of those things?

3    A.  Sure.  Like I said, a foreign intelligence -- working with

4    a foreign intelligence officer, relations with a foreign actor

5    that's not reported, overthrow the government, crimes -- felony

6    crimes, interactions with law enforcement that are unreported,

7    all things that you need to report to the security office.

8    Q.  So there's a lot of big-ticket items there.  But, also,

9    just contacts with law enforcement need to be reported, is that

10   right?

11   A.  Yes.

12   Q.  Okay.  Did you conduct an interview with the defendant and

13   his attorney?

14   A.  I did.

15   Q.  What date did that take place?

16   A.  January 15th, 2021.

17   Q.  And was that, would you say, before any major investigation

18   regarding the defendant's activities on January 6th, 2021 had

19   commenced?

20   A.  Correct.

21   Q.  Where did the interview take place?

22   A.  The Santa Fe Resident Agency, in a conference room.

23   Q.  And is that, then, an FBI building?

24   A.  It is.

25   Q.  Can people just walk into the Santa Fe RA?
```

1    A.   No.

2    Q.   At that interview, did the defendant and his attorney

3    provide you with some printed-out photographs?

4    A.   They did.

5    Q.   Okay.  So we're going to talk now about Exhibits 107 and

6    108, first.

7              All right.  Exhibit 107, is this one of the

8    photographs that was provided to you by the defense?

9    A.   It was.

10   Q.   What did they indicate was depicted in this photograph?

11   A.   Mask with former President Trump's name on it.

12   Q.   What was the relevance of it to the investigation?

13   A.   This was one of the items of clothing that he wore on

14   January 6th.

15   Q.   And 108, please.

16             THE COURT:  So, Ms. Dohrmann, you're not going to be

17   proving he was there.  The defense is not questioning that.

18             MS. DOHRMANN:  Understood, Your Honor.

19             THE COURT:  All right.  Let's keep moving.

20   BY MS. DOHRMANN:

21   Q.   So let's look at Exhibit 108.  We're going to go through a

22   few exhibits quickly right now.  If we can look at -- pull up

23   105.  I'm going to ask a question at the end about all of

24   these.

25   A.   Sure.

1    Q.  Okay.  106.

2                    109.

3                    110.

4                    111.

5                    112.

6                    And 113.

7                    Special Agent Taylor, the exhibits that you just

8    looked at, are those all items that were provided to you by the

9    defense on January 15th, 2021?

10   A.  These are all the images that they provided to us, yes.

11   Q.  Okay.  Did you indicate during that interview that it would

12   be helpful for the defendant to preserve any videos or images

13   from January 6th, 2021?

14   A.  Yes.

15   Q.  Okay.  And on January 20th, 2021, did the defense provide

16   videos recorded on the defendant's phone from January 6th, 2021

17   at your request?

18   A.  I -- defense counsel offered to provide us videos and

19   images.  And the following week after the interview, I asked if

20   they would still be willing to provide those images and defense

21   counsel said yes, and so we picked those up.

22   Q.  We're going to talk more about what was said at that

23   interview on January 15th, 2021, but, first, I want to talk

24   more about the investigation and prosecution of this case.

25                    Was the defendant arrested on April 22nd, of 2021?

```
1    A.  Yes.

2    Q.  Where did that take place?

3    A.  The Santa Fe Resident Agency of the FBI.

4    Q.  And did he agree to provide certain physical evidence and

5    his cell phone in lieu of the government's obtaining search

6    warrants for those items?

7    A.  Yes.

8    Q.  Let's talk, first, about the physical evidence provided by

9    the defendant, Exhibit 1.

10             MS. DOHRMANN:  May I approach the witness, Your

11   Honor?

12             THE COURT:  You may.

13   BY MS. DOHRMANN:

14   Q.  Special Agent Taylor, is Exhibit 1 the hat provided by the

15   defendant that he wore to the Capitol on January 6th, 2021?

16   A.  Yes.

17             THE COURT:  Mr. Cron, are you stipulating he was at

18   the Capitol?

19             MR. CRON:  Yes.

20             THE COURT:  Ms. Dohrmann, do you have any evidence

21   from this witness that's going to be relevant here?

22             MS. DOHRMANN:  Yes, Your Honor.

23             THE COURT:  Okay, let's get to that.

24             MS. DOHRMANN:  All right.  And Exhibit 3, we would

25   like to approach the witness with that item.
```

1          Ms. Chaclan, would it be possible to borrow a

2     scissors?

3          Thank you so much.

4     BY MS. DOHRMANN:

5     Q.  Special Agent Taylor, what is contained in Exhibit 3?

6     A.  A flagpole.

7     Q.  So, briefly, do you know where the defendant purchased that

8     flagpole?

9     A.  I do not.

10    Q.  Okay.  Do you know whether he had it in D.C.?

11    A.  Per videos that I've seen, he had a flagpole in D.C., yes.

12    Q.  And did he have it in New Mexico?

13    A.  He brought this one to our offices in New Mexico.

14    Q.  About how long is the flagpole in Exhibit 3?

15    A.  Maybe a meter.

16    Q.  And can it be extended?

17    A.  It can.

18    Q.  And what is it made of?

19    A.  Metal.

20    Q.  Okay.  And we looked at some photographs earlier that the

21    defense had provided on January 15th, 2021.  Did they provide a

22    photograph of that flagpole on January 15th, 2021?

23    A.  No.

24    Q.  All right.  Moving on now to the CCTV footage.  As part of

25    the investigation into the defendant's presence at the Capitol

1    on January 6th, 2021, did you obtain and review United States

2    Capitol Police CCTV footage?

3    A.  I did.

4    Q.  And were there cameras capturing the defendant's entering

5    into the U.S. Capitol building on January 6th, 2021?

6    A.  Yes.

7    Q.  Have you reviewed Exhibits 303 to 307?

8    A.  I have.

9    Q.  Do they contain CCTV footage showing the defendant in and

10   around the Capitol building?

11   A.  Yes.

12          MS. DOHRMANN:  These are admitted and there's a

13   stipulation regarding them in Exhibit 402.

14   BY MS. DOHRMANN:

15   Q.  If we can look, first, at Exhibit 304.

16          All right.  And we can press play.

17          (Video played.)

18          This video starts at 3:02 and 45 seconds p.m.  We're

19   going to pause it at 29 seconds.  In the meantime, what view

20   from the Capitol is this?

21   A.  This is facing eastwardly, towards the east side of the

22   Capitol, and this is an interior camera of the rotunda lobby.

23   Q.  All right.  Special Agent Taylor, do you see the defendant

24   in this frame that's paused at 29 seconds?

25   A.  I do.

1    Q.  Can you please circle him for us?

2              THE COURT:  I'm sorry.  Ms. Dohrmann, this is just a

3    different view of 318, is that correct?

4              MS. DOHRMANN:  No, Your Honor.  318 is the

5    defendant's video, if I'm not mistaken.  This is a different

6    timeframe from -- in the montage we did see some of the same

7    camera angle, but this is a different timeframe now.  I

8    don't --

9              THE COURT:  Right.  But he just came into the Capitol

10   once, right?

11             MS. DOHRMANN:  Correct, Your Honor.

12             THE COURT:  Okay.  Got it.  All right.

13             MS. DOHRMANN:  Yes.  It is the view from the rotunda

14   of his entry, correct.

15             THE COURT:  And you said -- this is the rotunda?

16             THE WITNESS:  This is the rotunda lobby.  So it's

17   facing eastwardly, toward the exterior door of the rotunda

18   lobby.

19             THE COURT:  Okay.  Thank you.  Can you back up a bit?

20             MS. DOHRMANN:  Certainly.

21   BY MS. DOHRMANN:

22   Q.  Do you want to clear the circle?  That's all right.

23   Well --

24             (Video played.)

25             We will pause it at 29 seconds.

1          We can keep playing.

2               (Video played.)

3          We can pause it there.  All right.  We can continue

4     playing this exhibit.

5               (Video played.)

6          Let's pause it there at 37 seconds.  If we can clear

7     the circling.

8     A.  I can't clear the circle.

9     Q.  All right.  Special Agent Taylor, can you just circle the

10    defendant for us?  And what does he appear to be holding in his

11    hand?

12    A.  A cell phone.

13    Q.  Is that consistent with the cell phone you obtained from

14    him and searched?

15    A.  It is.

16    Q.  Based on your review of cell phone evidence, did it appear

17    that he was in fact recording videos with his phone?

18    A.  Yes.

19    Q.  Okay.  If we can call up -- let's go ahead and play this

20    video.

21               (Video played.)

22          We can stop it now at 53 seconds.

23          All right.  We can go to Exhibit 303.

24          All right.  We can go three minutes into the video.

25               (Video played.)

1    Special Agent Taylor, do you know which location this
2    camera is recording?
3    A.  Yes.  This is also in the rotunda lobby, but this camera is
4    facing towards the rotunda versus the exterior doors.
5    Q.  I see.  So the interior rotunda doors versus the exterior
6    rotunda door we saw in 304?
7    A.  Correct.
8    Q.  Okay.  Start playing at 2:58.  We're going to pause at --
9         THE COURT:  Sorry, was that last one not 402?
10        MS. DOHRMANN:  402 was the stipulation underlying
11   them.  The last exhibit was 304.
12        THE COURT:  Now we're at 303?
13        MS. DOHRMANN:  Correct, Your Honor.  Thank you.
14   BY MS. DOHRMANN:
15   Q.  Playing from 2:58.  And we're going to pause at 3:20.
16        (Video played.)
17        Okay, Special Agent Taylor, can you circle for us
18   where the defendant appears in this video?
19   A.  (Complies with request.)
20   Q.  And let's continue playing.  We're going to pause at
21   4 minutes and 1 second in.
22        (Video played.)
23        Thank you.  And, Special Agent Taylor, what space is
24   that that the defendant appears to be waiting to enter?
25   A.  The Capitol rotunda.

1   Q.  Okay.  Thank you.  If we can look at Exhibit 305.  This

2   exhibit also starts at 3 p.m.  We can skip to about 2 minutes

3   and 30 seconds.

4           And, Special Agent Taylor, what are we looking at

5   here in this camera?

6   A.  This camera is over the door that takes you to the Senate

7   side of the Capitol, and this is the rotunda at the U.S.

8   Capitol.

9   Q.  All right.  Start playing at 2 minutes and 30 seconds in.

10  Once it decides to cooperate.

11          (Video played.)

12  A.  This -- I'm sorry.  I was mistaken.  This camera is not

13  over -- this is over the House side, not the Senate side.

14  Q.  Thank you, Special Agent.

15          (Video played.)

16          If we can pause at 2 minutes and 50 seconds?

17          Special Agent Taylor, do you see the officers in

18  yellow-highlighter uniforms who are entering?

19  A.  Yes.

20  Q.  How would you describe their gear, in your training and

21  experience?

22  A.  It looks like gear that riot police wear.

23  Q.  Okay.  Okay.  If we can look at Exhibit 306.  This exhibit

24  also starts at 3 p.m.  We can move about five minutes into it.

25          (Video played.)

 1              And, Special Agent Taylor, can you tell us about the

 2     view from this camera?

 3     A.  So this is the camera I thought was originally over the

 4     Senate side.  So this camera is over the Senate side, facing

 5     into the U.S. Capitol rotunda.

 6     Q.  All right.  So we started at about 4:50.

 7              (Video played.)

 8              All right.  Let's pause it there, 5:09.  Special

 9     Agent Taylor do you see the defendant?

10     A.  I do.

11     Q.  Can you please circle him?

12     A.  (Complies with request.)

13     Q.  And which direction off camera does it appear that he

14     proceeded from?

15     A.  He's coming from the east side of the U.S. Capitol, the

16     rotunda lobby doors, and he's heading northbound towards the

17     Senate side.

18     Q.  You can keep playing.

19              (Video played.)

20              Let's pause there, 5:20.  Special Agent Taylor, do

21     you see, in the bottom middle, slight right of this frame, one

22     individual pouring water into another individual's eyes?

23     A.  Yes.  Would you like me to circle it?

24     Q.  Yes, please.  Thank you.

25     A.  (Complies with request.)

1    Q.  In your training and experience, are you familiar with why

2    that might be done?

3    A.  When I had pepper spray in my eyes --

4             THE COURT:  Sir, sir.

5             MR. CRON:  Objection.  Calls for speculation.

6             THE COURT:  I'm going to overrule the objection.  You

7    may answer.

8    A.  Given the context of the situation and that I had pepper

9    spray sprayed in my eyes, when I had mace in my eyes, I used --

10   or, chemical spray, I used water to try to get chemical spray

11   out of my eyes.

12   BY MS. DOHRMANN:

13   Q.  All right.  We can begin playing.  We'll pause again at 6

14   minutes and 4 seconds into the video.

15            (Video played.)

16            Special Agent Taylor, can you just describe for us

17   where the defendant is?  We're about 5 minutes and 30 seconds

18   in.

19   A.  (Indicating.)

20   Q.  The bottom, middle left of the frame.

21            (Video played.)

22            Let's pause, 6:04.  Special Agent Taylor, we see the

23   defendant recording in the direction of the police activity

24   there --

25            THE COURT:  Sorry.  Can you circle him again?

```
 1                    THE WITNESS:  (Complies with request.)

 2                    THE COURT:  Okay.  Thanks.

 3       BY MS. DOHRMANN:

 4       Q.  Was the defendant in fact recording video, based on your

 5       review of cell phone evidence?

 6       A.  Yes.

 7       Q.  All right.  You can start playing again.

 8                    (Video played.)

 9                    Going to pause at 7 minutes and 2 seconds in.

10                    (Video played.)

11                    Okay.  All right.  And, Special Agent Taylor, if you

12       can just circle for us where the defendant is now at this

13       point?

14       A.  (Complies with request.)

15       Q.  Okay.  And the flagpole that he's carrying there, is it

16       consistent with Exhibit 3?

17       A.  Yes.

18       Q.  All right.  We can continue playing.  We will pause again

19       at 8 minutes and 35 seconds in.

20                    (Playing video.)

21                    And, Special Agent Taylor, at 7 minutes and 36

22       seconds, has just circled the defendant in the center, slight

23       right of the screen, appearing to edge into the crowd and

24       toward law enforcement officers.

25                    (Video played.)
```

```
1              Pause.  Thank you.  All right.  Special Agent Taylor,
2      can you circle the defendant for us, please.
3      A.  (Complies with request.)
4      Q.  So the defendant has just walked away, coughed, and put on
5      a mask.  Is the mask he's putting on consistent with the mask
6      in Exhibit 4?
7      A.  It is.
8      Q.  And which direction is the defendant facing?
9      A.  Facing westwardly in the rotunda, towards the direction of
10     Metro PD.
11     Q.  Okay.  We can start playing again.
12              (Video played.)
13              Let's pause it right there.  That's at 9:03.
14     Which -- thank you.  Which direction, generally -- his head is
15     slightly swiveled -- but, is his body facing in this film?
16     A.  Towards the east rotunda doors.
17     Q.  Sorry.  His body.
18     A.  Westwardly.  Southwest, towards Metro PD.
19     Q.  And you just told us -- you know, what's behind him that
20     he's sort of swivelling toward a little bit?
21     A.  The east rotunda doors.
22     Q.  The way he came in?
23     A.  Yes.
24     Q.  We can play again from 9:03.  We'll pause at 9:43.
25              (Video played.)
```

1            At 9:07 which direction is his entire body facing?

2     A.   Westwardly, towards Metro PD.

3            (Video played.)

4     Q.   All right.  Can you please circle the defendant here at

5     9:43 for us?

6     A.   (Complies with request.)

7     Q.   Thank you.  And I'm actually going to circle something in

8     the middle of the screen there.  I've circled in red.  What is

9     it that you see there?

10    A.   It appears to be a chemical agent spray coming from the

11    direction of law enforcement toward the crowd.

12    Q.   Okay.  And can you describe what door it appears that the

13    officers are moving individuals toward?

14    A.   It appears that they're moving the crowd to exit out of the

15    east rotunda doors.

16    Q.   Okay.  And at 9 minutes and 43 seconds, where is the

17    defendant facing?

18    A.   Westwardly, towards Metro PD.

19    Q.   Not towards the rotunda doors?

20    A.   Correct.  And there's a U.S. Capitol Police on the north-

21    facing door here, blocking that exit.

22    Q.   I see.

23    A.   At the bottom of the screen, where the -- the camera is

24    over a doorway.  There is U.S. Capitol Police in the doorway,

25    from prior CCTV footage.

1    Q.  Okay.  Thank you.  All right.  Let's play again.  And we'll

2    pause at 10 minutes and 9 seconds on the video.

3              (Video played.)

4              All right.  Thank you.  Special Agent Taylor, you

5    have circled the defendant on the far left center of the

6    screen.  And which direction is he facing?

7    A.  He appears to be facing westwardly, toward the Metro PD.

8    Q.  All right.  Let's look at Exhibit 307.

9              Actually, I'm sorry.  Let's -- my mistake.  Let's

10   play the rest of -- or, additional portion of 306.  We can

11   start at 3 minutes -- about 10 minutes and 9 seconds into the

12   video.

13             That's all right.  10 minutes and 4 seconds.

14             (Video played.)

15             Special Agent Taylor has drawn a green arrow pointing

16   toward the defendant.

17             (Video played.)

18             THE COURT:  Can you stop a second?

19             Agent, where is the door -- is there, like, a door

20   out behind them, to the left there?

21             THE WITNESS:  So that wooden panel you see in the top

22   left corner, that's the east rotunda doors, and then that takes

23   you to the rotunda lobby and then it takes you to the outward

24   facing, eastern Capitol doors.

25             THE COURT:  That's where he would come in?

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  And so the officers are clearing them

 3       towards that door?

 4                    THE WITNESS:  Correct.

 5                    THE COURT:  Thank you.  You may continue,

 6       Ms. Dohrmann.

 7                    MS. DOHRMANN:  Thank you, Your Honor.

 8       BY MS. DOHRMANN:

 9       Q.  And we are done with this exhibit now.

10                    If we can look at Exhibit 307.  This view begins at

11       3:11:42 seconds p.m.

12                    (Video played.)

13                    Where it's playing right now, Special Agent Taylor,

14       what are we looking at here?

15       A.  This is the rotunda lobby.  This camera is facing towards

16       the exterior doors in the rotunda lobby, on the eastern side of

17       the U.S. Capitol.

18       Q.  Okay.  And I actually would like to go back to 16 seconds

19       in, if we can do that.

20                    (Video played.)

21                    All right.  Let's pause it.  Can you -- thank you --

22       circle for us the defendant?

23       A.  (Complies with request.)

24       Q.  Okay.  And, Special Agent Taylor, do you know who Officer

25       Marc Carrion is?
```

1   A.  I do.

2   Q.  Do you see him in this image?

3   A.  I do.

4   Q.  Can you circle him, please?

5   A.  (Indicating.)

6   Q.  Or, an arrow is great, to differentiate.  All right.  There

7   is an arrow.

8          Officer Marc Carrion, was he also at the doors in

9   Exhibit 304 that we looked at earlier?

10  A.  Is 304 the defendant's phone or from the CCTV?

11  Q.  304 was the same view of the CCTV footage from earlier.

12  A.  Yes, he's in the same position -- or, he's closer to the

13  doorway in 304.

14  Q.  Okay.  All right.  And so let's play this video.

15         (Video played.)

16         Okay.  If we can pause it at 50 seconds in.  Special

17  Agent Taylor, looking to the left, very far left and center of

18  the screen, can you please circle the law enforcement officer

19  located there?

20  A.  By the doorway?

21  Q.  In the far left center.

22  A.  Is that the officer you're speaking of?

23  Q.  Yes, Special Agent Taylor.  And can you please circle --

24  and do you know what uniform that is that that officer is

25  wearing?

1    A.  It appears to be a U.S. Capitol Police, based off the color

2    and what the other Capitol Police are wearing.

3    Q.  Okay.  And, Special Agent Taylor, can you please circle

4    just any other law enforcement officers that you can identify

5    at this point in, this 50 seconds in?

6    A.  (Indicating.)

7    Q.  Okay.  And so Special Agent Taylor has circled that there

8    are officers now at the doorway to the rotunda, to the left of

9    the rotunda lobby and to the right of the rotunda lobby,

10   essentially surrounding -- if you could circle the defendant,

11   also?

12   A.  (Complies with request.)

13   Q.  Thank you.  Okay.  And the defendant is in the middle of

14   the rotunda lobby, heading toward the doors.

15            You can begin playing again.

16            (Video played.)

17            And we will watch until 2 minutes and 11 seconds in,

18   when the defendant is out of the exterior doors.

19            (Video played.)

20            Let's pause it here, at 2 minutes.  Special Agent

21   Taylor, are you able to still circle for us the defendant?

22   A.  I am.

23   Q.  Thank you.  You just circled the very top center of the

24   video.

25            Special Agent Taylor, is it fair to say that there is

1    basically a constant streaming crowd of people coming from

2    the interior rotunda, traveling in the area surrounded by law

3    enforcement?

4    A.  I would say that's a fair depiction of what's happening

5    here.

6    Q.  All right.  We can take down 307.

7         Turning now to the cell phone evidence in this case.

8    You told us the defendant agreed to a search of his cell phone?

9    A.  Yes.

10   Q.  Okay.  Was it searched using standard cell phone extraction

11   procedures and programs?

12   A.  It was.

13   Q.  Was there information relating to the defendant's presence

14   on January 6th, 2021 in the phone?

15   A.  There was.

16   Q.  Let's talk, first, about the recorded videos and

17   photographs in the phone.  First of all, you told us earlier

18   how the defense provided certain videos on January 20th.  Were

19   some of those videos provided on January 20th, but then not

20   later located in the cell phone when it was searched

21   forensically after his arrest in April?

22   A.  Yes.  There were several videos and images on the thumb

23   drive that was handed to me on January 20th, and when the cell

24   phone extraction occurred there was four -- or, four videos

25   that were not on the cell phone extraction, could not be

1    located on the cell phone extraction.

2    Q.  Okay.  And let's talk about those exhibits.  You've

3    reviewed the exhibits in this case.  Are Exhibits 314, 324,

4    325, and 326 those videos provided by the defense on January

5    20th but not then not located in the phone when it was searched

6    later?

7    A.  Yes, the -- one of the exhibits is of the fencing area that

8    says "Closed" and then the remaining Exhibits should be on the

9    North Terrace.

10   Q.  Thank you.  We'll talk about those momentarily.

11         So for exhibits that were extracted from the cell

12   phone forensically, are there timestamps for those videos

13   automatically recorded by the phone?

14   A.  For the forensic imaging of the phone there are timestamps

15   associated with the images, yes.

16   Q.  Okay.  And what about geolocation information?

17   A.  Yes.

18   Q.  Do you have that kind of metadata for the four videos we

19   just talked about that weren't located in the phone but were

20   provided by defense?

21   A.  So the thumb drive -- or, the videos and images from the

22   thumb drive were downloaded and the ones that are downloaded do

23   not have the metadata.  That thumb drive is now corrupted for

24   whatever reason and I cannot say that -- if the images on the

25   thumb drive have metadata or not.

1    Q.  All right.  And, Special Agent Taylor, you've already

2    testified a good amount about the United States Capitol and its

3    grounds.  Do you have personal knowledge of that information?

4    A.  I do.

5    Q.  All right.  Let's pull up 308.

6              THE COURT:  All right.  Let's find a place to stop.

7              MS. DOHRMANN:  This would be a fine place to stop,

8    Your Honor.

9              THE COURT:  All right.  Why don't we take five

10   minutes.

11             (Recess.)

12             THE COURT:  All right.  Agent Taylor, you're still

13   under oath.

14             Ms. Dohrmann.

15   BY MS. DOHRMANN:

16   Q.  All right.  Let's call up Exhibit 308.  All right.  Let's

17   pause it -- actually, sorry, if we can go back to the beginning

18   and just pause it for a second.

19             (Video played.)

20             Special Agent Taylor, what date was this video and

21   all the remainder of the videos from the defendant's cell phone

22   we will look at today recorded?

23   A.  January 6.

24   Q.  2021?

25   A.  Yes.

1    Q.  All right.  And was this video recorded at about 8:15 a.m.

2    Eastern Standard time?

3    A.  Yes, I believe that's accurate.

4    Q.  Do you know the approximate location of where this video

5    was recorded?

6    A.  I believe it was -- I think we should see in this video

7    that it will be the Washington Monument in the video.

8    Q.  Okay.  Let's press play.

9              (Video played.)

10             We're going to pause it right at 19 seconds, at the

11   very end.  There we go.  And, Special Agent Taylor, do you know

12   who appears here, 19 seconds in?

13   A.  Matthew Martin.

14   Q.  That appears to be the person recording the video?

15   A.  Yes.

16   Q.  Okay.  All right.  Exhibit 309, please.

17             (Video played.)

18             Okay.  Pause it.  Was this video recorded at

19   approximately 1:52 p.m. Eastern Standard time?

20   A.  That appears to be accurate, yes.

21   Q.  And what is the location, if you know?

22   A.  Well, I know the area, and interview with Matthew Martin,

23   this would be the JW Marriott, his hotel room -- most likely

24   his hotel room.

25   Q.  Okay.  And where -- do you know where that JW Marriott is

1    located, cross streets?

2    A.  I believe this is Pennsylvania.  I don't remember the

3    northbound street here.  And the White House is on the other

4    side of this white building, if I recall.

5    Q.  A couple blocks from the White House?

6            THE COURT:  This is the Willard Hotel I'm looking at?

7            THE WITNESS:  This is the JW, and I believe the W is

8    on this corner.  It's the intersection that we can see.

9    BY MS. DOHRMANN:

10   Q.  Okay.  All right.  And, Special Agent Taylor, if you

11   circle -- there's a police vehicle visible on the street.  Do

12   you know what law enforcement agency that is associated with?

13   A.  Metro PD, I believe.

14   Q.  Okay.  All right.  Let's call up Exhibit 310.

15           (Video played.)

16           Okay.  Rotate this.  This is one that we talked to

17   Inspector Erickson about before.  Let me just ask you a little

18   bit of a different question.  Was this recorded at 2:23 p.m.

19   Eastern Standard time?

20   A.  Yes, that appears to be accurate.

21   Q.  Okay.  Do you know the location, approximately, of this

22   video?

23   A.  Per the metadata on the phone, this lat-long puts this in

24   front of the Newseum and the National Gallery of Art, or about

25   the 400 block of Pennsylvania Avenue.

1    Q.  All right.  Let's call up Exhibit 311.  We can rotate that.

2    Another one we've already seen with Inspector Erickson.

3              (Video played.)

4              All right.  Was this video recorded at 2:27 p.m.

5    Eastern Standard time?

6    A.  Yes.

7    Q.  And we just looked into a police vehicle there, several

8    police vehicles.  And you heard that Inspector Erickson said

9    that these are Federal Protective Service vehicles.  Do you

10   know what the Federal Protective Service does?

11             THE COURT:  Okay, I know this.  It's right outside of

12   our courthouse.  I got that.

13   BY MS. DOHRMANN:

14   Q.  We can move on to Exhibit 312.

15             (Video played.)

16             Was this recorded at 2:28 p.m. Eastern Standard time?

17   A.  I believe that is accurate.

18   Q.  We'll let this one play and ask you a question about it at

19   the end.

20             (Video played.)

21             Let's pause it there.  Do you hear that voice that's

22   sort of the loudest one chanting "USA"?

23   A.  Yes.

24   Q.  Could you say whose voice that is?

25   A.  I cannot.

1    Q.   Okay.  All right.  We can keep playing until the end.

2                   (Video played.)

3                   Okay.  We can call up Exhibit 313.  Just going to ask

4    you one question about it, Special Agent Taylor.

5                   (Video played.)

6                   What time, according to the metadata, was this

7    recorded?  Was that at 2:39 p.m.?

8    A.   I believe that is accurate.

9    Q.   Let's call up 314.

10                  (Video played.)

11                  Okay.  And you told us earlier that 314 is one of the

12   videos that you obtained from the defense directly but that was

13   not in the cell phone.  Do you know the exact timestamp of this

14   video?

15   A.   I do not.

16   Q.   Okay.  Do you -- was there a file name associated with the

17   video?

18   A.   I believe it was image 060967, and I cannot find that in

19   the extraction from my searches.

20   Q.   Okay.  When the files are created are the images numbered

21   chronologically?

22   A.   I believe so, yes.

23   Q.   Okay.  And so does this video appear chronologically in

24   between the exhibit we just looked at, 313, and Exhibit 315

25   that we'll look at in a moment?

1    A.   Yes.

2    Q.   Okay.  All right.  We can move on to 315.  And was this

3    recorded at 2:49 p.m. Eastern Standard time?

4    A.   I believe that is accurate.

5    Q.   Okay.  We can let that one play.

6             (Video played.)

7             And now 316.

8             (Video played.)

9             And was this recorded at 2:54 p.m. Eastern Standard

10   time?

11   A.   I believe that to be accurate.

12   Q.   And let's just pause it there.

13            Special Agent Taylor, do you have any estimate as to

14   how many people there are there at the door to the rotunda?

15   A.   As the camera pans around it, it may be over 100, but I

16   can't say for certain.

17   Q.   All right.  Let's call up Exhibit 317.

18            (Video played.)

19            All right.  Let's pause it.  Was this recorded at

20   2:55 p.m. Eastern Standard time?

21   A.   I believe that to be accurate.

22   Q.   And where is this video?  What are we seeing as far as the

23   door in this video?

24   A.   This is the door that takes you into the rotunda lobby, and

25   this is on the east side of the U.S. Capitol.

1    Q.  Okay.  Can you circle for us the pitchfork with the flag

2    attached to it?  You know, we talked about that with Inspector

3    Erickson.

4    A.  (Complies with request.)

5    Q.  Special Agent Taylor has circled a pitchfork with an

6    upsidedown American flag just to the left of the top -- middle

7    top of the rotunda doors.

8           Let's talk a little bit, just briefly, about the

9    defendant's interview.  Did he mention in his interview seeing

10   a picture of a -- someone with a pitchfork at the airport in

11   connection with January 6?

12   A.  He said he saw a social media post, I believe he said it

13   was on The Donald, but the links were to Twitter, where he saw

14   pitchforks with -- flags were on them.  One of the images was

15   at an airport.

16   Q.  Okay.  And was he asked by your colleague, Special Agent

17   Hanks, I believe it was, whether he had seen anything like that

18   in person?

19   A.  Yes, he was asked that question.

20   Q.  Okay.  Did he give an answer to that question?

21   A.  He said no, I believe was the response.

22   Q.  Okay.  All right.  Let's look at Exhibit 318.

23           (Video played.)

24           Thank you.  And was this video recorded at 3:02 p.m.

25   Eastern Standard time?

```
 1    A.  I believe that is accurate.

 2    Q.  Okay.  And let's let this video play.

 3              (Video played.)

 4              Start it over again.

 5              (Video played.)

 6              Special Agent Taylor, I'm going ask you again how

 7    many officers you see at the rotunda doors in this video?

 8    A.  Based on that I've seen this video before and then

 9    currently as its playing, there's two officers, I believe, at

10    the rotunda door.

11    Q.  Okay.  We are paused at 5 seconds.

12              Let's play until 16 seconds.

13              (Video played.)

14              All right.  And do you know that officer's name?

15    A.  I do.

16    Q.  What is it?

17    A.  Officer Carrion.

18    Q.  Okay.  All right.  Let's call up Exhibit 319.

19              (Video played.)

20              All right.  Let's pause there.  Okay.  There's a lot

21    of people in and out of the rotunda.  Do you see the guy

22    squinting?

23    A.  I do.

24    Q.  Reddish hair.  Okay.  In your training and experience, do

25    you have any idea what may have happened that caused that?
```

1    A.  Given the context of the video and what is said, it appears

2    he has some kind of chemical agent in his eyes.

3    Q.  So, we're going to start playing again in a second.  And,

4    Special Agent Taylor, I want you to listen to someone who says

5    "Teargas."

6              (Video played.)

7              Can you pause it there at 17 seconds?

8              Special Agent Taylor, someone just said "Teargas,"

9    kind of like a question at the end.  Is that consistent with

10   the defendant's voice?

11   A.  Based on my interview with the defendant, it sounds similar

12   to the defendant's voice, but I can't say for certain.

13   Q.  Understood.  All right.  We can continue playing?

14             MR. CRON:  I'll object and move to strike because

15   it's speculative.

16             THE COURT:  I'm overruling the objection.  I think

17   you can -- I don't think he has to say definitively.  I'll take

18   it for what it's worth.

19             You may continue.

20             MS. DOHRMANN:  Thank you, Your Honor.

21   BY MS. DOHRMANN:

22   Q.  All right.  Let's play the rest of this video.

23             (Video played.)

24             Video is replaying.  We can move on now to Exhibit

25   320.

```
 1                    (Video played.)

 2                    Okay.  Pause it.  According to the phone, was this

 3       recorded at 3:04 p.m. Eastern Standard time?

 4       A.  I believe that to be accurate.

 5       Q.  We can press play.

 6                    If you listen, you'll hear someone laughing.

 7                    (Video played.)

 8                    And based on your knowledge and interactions with the

 9       defendant, is that laughing possibly consistent with the

10       defendant's voice?

11       A.  It seems similar, but I cannot be for certain.

12                    MR. CRON:  Your Honor, I object to this.  This is

13       pure speculation on his part.

14                    THE COURT:  Yeah.  I'm having a hard time on a laugh.

15       I mean, did you hear the defendant laugh?

16                    THE WITNESS:  I've heard him speak for about an hour

17       interview and then this -- that voice is similar to other

18       voices heard on the video, so that's where my -- my opinion

19       comes from.  But I can't say for certain.

20                    THE COURT:  All right.  I'm going to sustain the

21       objection on the laugh.

22                    MS. DOHRMANN:  Understood.  Thank you.

23       BY MS. DOHRMANN:

24       Q.  All right.  You're in 320.  If we can now go to 321.

25                    (Video played.)
```

1          Let's pause it.  Was this video recorded at 3:05 p.m.

2     Eastern Standard time?

3     A.  Yes, that appears to be accurate.

4     Q.  Let's go now to Exhibit 322.

5               (Video played.)

6          Let's pause it.  Was this video recorded at 3:06 p.m.

7     Eastern Standard time, according to the phone?

8     A.  That appears to be accurate.

9     Q.  And if you can tell us, do you recognize how many different

10    law enforcement agencies in the rotunda at this time?

11    A.  Based on the video preceding this one and this video, I

12    have seen U.S. Capitol police and this would appear to be Metro

13    PD.

14    Q.  Kind of a basic question:  Based on your training and

15    experience, why do officers wear uniforms sometimes but not

16    others?

17    A.  So that civilians can distinguish who is a police officer,

18    as well as which -- other police officers can distinguish

19    fellow police officers.

20    Q.  Let's continue watching this video.

21               (Video played.)

22          Okay.  Let's now pull up Exhibit 114, which is a

23    photograph.  Okay.  And was this photograph, according to the

24    phone data, taken at 3:33 p.m. Eastern Standard time?

25    A.  That appears to be accurate.

1    Q.  Did you look at the geolocation data for the photograph?

2    A.  I did.

3    Q.  Where does it appear that this was taken, based on that?

4    A.  On the U.S. Capitol grounds, per the lat-long -- longitude

5    and latitude lines, it puts it on the southeast corner.

6    Q.  Are those always exactly 100 percent accurate?

7    A.  Just depending on the source of the data, how accurate it

8    is.

9    Q.  And can you circle for us the smattering of red drops on

10   the concrete here?

11             THE COURT:  I see them.

12             MS. DOHRMANN:  Thank you, Your Honor.

13   BY MS. DOHRMANN:

14   Q.  Okay.  Exhibit 324.

15             (Video played.)

16             Let's pause it.  All right.  So you told us earlier

17   that this is another one of the videos that was provided by

18   defense on January 20th, 2021, several months before the

19   defendant's arrest, but wasn't located in the phone when it was

20   searched after his arrest.

21             So, is there a timestamp that you have from metadata

22   for this video?

23   A.  No, I do not have a timestamp for this video.

24   Q.  Based on the file name, does it appear to have been taken

25   after -- oh, you know what?  I'm sorry.  I -- well, we'll do

1    324 and then we have to go back.  I skipped 323.  That was my

2    mistake.

3    A.  Sure.

4    Q.  So, based on the file name associated with the video, did

5    it appear to have been taken after Exhibit 323, which we'll

6    look at momentarily?

7    A.  Based off the file name, which was image_09 -- I don't

8    remember the last two numbers, but this would have come after

9    Exhibit 323.

10   Q.  Okay.  Okay.  And do you know where on the Capitol grounds

11   this video is being recorded?

12   A.  Per the subject interview, as well as my knowledge of the

13   Capitol, this appears to be the North Terrace of the U.S.

14   Capitol.

15   Q.  And the person taking the video, where do they appear to be

16   standing?

17   A.  The northeast side of the terrace, I believe.

18   Q.  All right.  Let's play this exhibit.

19              (Video played.)

20              Okay.  Let's pause it at 23 seconds.  Do you see the

21   exterior -- an exterior door to the Capitol in this -- or, any

22   portion of it, I should say, in this frame at 24 seconds?

23   A.  I do.

24   Q.  Can you please circle it for us?

25   A.  (Complies with request.)

1    Q.  Okay.  And based on the video, does it appear to be open or

2    closed?

3    A.  It appears to be open.

4    Q.  Okay.  All right.  Let's continue playing.  Thank you.

5              (Video played.)

6              All right.  Let's now go backwards in time to Exhibit

7    323.

8              (Video played.)

9              Let's pause it.  Was this video, according to the

10   phone, taken at approximately 4:03 p.m. Eastern Standard time?

11   A.  Yes, that appears to be accurate.

12   Q.  Okay.  And what are we looking at in this frame at

13   3 seconds in?

14   A.  Per the metadata on the phone, this is approximately in the

15   northwest corner of the north side of the Capitol.  So this

16   would be the North Terrace.

17   Q.  Is that also consistent with your personal knowledge of the

18   Capitol?

19   A.  Yes.

20   Q.  All right.  Let's let this one play.

21              (Video played.)

22              So, just real quickly, since we've already looked at

23   324, is 324 -- does that appear to be recorded from up on the

24   terrace that we see people on in 323?

25   A.  Yes.

1    Q.   Okay.  Thank you.  All right.  Let's look at 325.

2                (Video played.)

3                Pause it.  Special Agent Taylor, this is another one

4    of the videos that you testified earlier was obtained from the

5    defense on January 20th, 2021 but was not in the cell phone

6    when it was searched after the defendant's arrest in April.

7    What is the location here?

8    A.   This is the north side.  North Terrace of the U.S. Capitol.

9    Q.   And do you see the smokey substance in the air?

10   A.   I do.

11   Q.   Okay.  So based on both your training and experience and

12   your review of the subsequent exhibits that we're going to look

13   at, do you know what that is?

14   A.   I can't say.  It could be just smoke, it could be teargas.

15   I think, later in this video, people are coughing.  But I can't

16   say what the smoke substance is.

17   Q.   Okay.  Let's let this one play.

18                (Video played.)

19                At about 33 seconds in, did you see a law enforcement

20   officer?

21   A.   I did.

22   Q.   Were you able to tell what agency that officer was with?

23   A.   It appeared to be U.S. Capitol Police.

24   Q.   Okay.  Continue playing.

25                (Video played.)

```
 1              Let's pause it at just about the very end.  I'm
 2     sorry.  We can keep playing it.
 3              (Video played.)
 4              All right.  Let's pull up Exhibit 326.
 5              THE COURT:  Did you say what time that 325 was?
 6              MS. DOHRMANN:  I believe the testimony was that that
 7     was one where we don't have the metadata.
 8              THE COURT:  Okay.
 9     BY MS. DOHRMANN:
10     Q.  However, Special Agent Taylor, did that -- 325, did it
11     appear chronologically to follow 324, based on the filing?
12     A.  Yes.
13     Q.  All right.  326.  If you can rotate it.
14              (Video played.)
15              Thank you.  And let's just keep it paused for a
16     second.  Is this another exhibit for which you do not have
17     timestamp metadata?
18     A.  Correct.
19     Q.  Did it appear to be taken at the same location as Exhibits
20     324 and 325?
21     A.  Yes.
22     Q.  We can go ahead and play this.  And we'll pause it right
23     before the end, right at the end.
24              (Video played.)
25              We can pause it there, actually, at 24 seconds.
```

1    Special Agent Taylor, can you circle any law enforcement

2    officers you're able to identify in this video?

3    A.   (Complies with request.)

4    Q.   Okay.  The agent has circled two individuals wearing

5    helmets and other police gear in the center of the video.

6              Okay.  We can continue playing from 25 seconds.

7              (Video played.)

8              All right.  If we can just go back to about -- and

9    pause at about 1 minute and 19 seconds.  It's a little tricky.

10   There.  A little bit further back to catch it.

11             (Video played.)

12             Oh, I see.  Can you go to 1:19?  Perfect.  Thank you.

13             (Video played.)

14             All right.  Let's stop it right there.  So that's

15   1:19.  Can you circle for us what appears to be a large cloud

16   of smoke?

17   A.   (Complies with request.)

18   Q.   Is it clear what -- to you what that may be?

19   A.   Based off its projectile and where it's coming from, it's

20   believed to be -- I believe it to be a chemical agent being

21   deployed by law enforcement.

22   Q.   Okay.  All right.  Let's go now to Exhibit 327.

23             (Video played.)

24             Pause it.  Thank you.  Okay.  And based on the

25   metadata for the phone, was this recorded at 4:22 p.m. Eastern

1   Standard time?

2   A.  I believe that to be accurate.

3   Q.  All right.  And do you know where this is recorded?

4   A.  Per the metadata, the geolocation puts it at the Peace

5   Monument, and that is the Peace Monument in the background.

6   Q.  All right.  Let's play this video.  It's just 19 seconds.

7              (Video played.)

8              All right.  And we can pull up Exhibit 328, which

9   will be the last of this segment of Special Agent Taylor's

10  testimony.

11             (Video played.)

12             All right.  Based on the metadata from the phone, was

13  this recorded at 8:19 p.m. Eastern Standard time?

14  A.  I believe that to be accurate.

15  Q.  And do you know what police vehicles -- what agency these

16  are that we're looking at?

17  A.  Appears to be Virginia State Troopers, based off of the

18  type of vehicle and the color.

19  Q.  And based on your review of the metadata and the -- your

20  personal knowledge, where does this video appear to be recorded

21  from?

22  A.  It appears to be recorded from the JW Marriott.

23  Q.  All right.  If we can press play.

24             (Video played.)

25             All right.  Brief indulgence.

```
 1              Just one brief question, Special Agent Taylor, about
 2    the video we just watched.  Do you recall Exhibit 327?  That
 3    was the one at the Peace Monument.
 4    A.  Yes.
 5    Q.  Based on the file names, did that appear to be recorded
 6    chronologically after Exhibit 326?
 7    A.  Yes.
 8    Q.  Okay.  Thank you.
 9              Special Agent Taylor, I want to talk about a
10    different part of your investigation now.  Did you interview an
11    Amy Lewis in connection with this investigation?
12    A.  I did.
13    Q.  When did that occur?
14    A.  A few days after the interview of Matthew Martin.
15    Q.  Okay.  How did it occur?
16    A.  Telephonically.
17    Q.  Okay.  And how does she know the defendant?
18    A.  Super -- Amy Lewis is the supervisor to Matthew Martin.
19    Q.  So she was also a --
20    A.  And also a friend, per Matthew Martin.
21    Q.  Okay.  And also a federal contractor?
22    A.  Yes.
23    Q.  And did she provide you with certain text messages between
24    her and the defendant on January 6th of 2021?
25    A.  Yes.
```

1    Q.  And when you searched the defendant's phone, were those

2    texts in there?

3    A.  Yes.

4    Q.  I want to talk briefly about another part of your

5    investigation, your interview with an Angelica Hernandez.  Did

6    you interview her on February 12th of 2021?

7    A.  Yes.

8    Q.  How did that -- was that interview conducted?

9    A.  Telephonically.

10   Q.  How does he know Matthew Martin?

11   A.  Angelica Hernandez is a personal trainer to Matthew Martin.

12   Q.  And did she provide some text via email that she said Matt

13   had sent her from Washington?

14   A.  She did.

15   Q.  Did you find text between her and the defendant in the

16   defendant's phone relating to January 6th, 2021 -- let me be

17   more specific, from January 6th, 2021?

18   A.  I did.

19   Q.  And were the text you found in the defendant's phone that

20   were between them on January 6th, 2021 among the text that she

21   sent you?

22   A.  There were additional text that she had sent Matthew Martin

23   that she did not provide to myself.

24   Q.  And that Matthew Martin had sent her that she did not

25   provide you as well?

```
 1    A.  Correct.

 2    Q.  All right.  Let's talk more about those text messages.

 3            So let's look at Exhibit 115.

 4            THE COURT:  Oh, I'm sorry.  I should have told

 5    people.  You don't need to wear masks in here, if you don't

 6    want to.  CDC has said that D.C. is an area of low

 7    transmission.  So, feel free to wear masks, but you don't have

 8    to.

 9            Go ahead, Ms. Dohrmann.

10            MS. DOHRMANN:  Thank you, Your Honor.

11    BY MS. DOHRMANN:

12    Q.  Exhibit 115, have you had an opportunity to review this?

13    A.  I have.

14    Q.  Have you reviewed the Cellebrite report from the cell phone

15    extraction?

16    A.  I have.

17    Q.  And you also said you obtained messages from Amy Lewis

18    directly, correct?

19    A.  Correct.

20    Q.  Looking at 115, what time zone are the timestamps in?

21    A.  I believe these are in Eastern Standard time.

22    Q.  And for the Cellebrite report, what time zone are the texts

23    in?

24    A.  Universal Time zone.

25    Q.  But over all those different time zones, is it fair and
```

1    accurate of the exchange between Amy Lewis with the defendant

2    on January 6 of 2021?

3    A.  To the best of my knowledge.

4    Q.  Is this message from Matthew Martin at the top of the

5    exhibit the first message between them on January 6, 2021?

6    A.  I believe that is accurate.

7    Q.  And to the best of your knowledge, is this the entirety

8    the thread from their conversation on January 6 of 2021 -- it's

9    not, so --

10   A.  I believe there's more to this, yes.

11   Q.  All right.  Maybe we can view it side by side.

12                Brief indulgence.

13                (Pause.)

14                All right.  You've gotten to look at both pages of

15   the two-page exhibit.  Now that you've seen both of them, is

16   that the entirety of the conversation on January 6th 2021?  You

17   can scroll back up, if needed.

18   A.  I don't believe Amy Lewis responds to this thread until

19   later.

20   Q.  Okay.  On a different day, perhaps?

21   A.  Yes.

22   Q.  All right.  And if you could please, staying on this page

23   of the exhibit, read for the Court Amy's text at 6:07 p.m. and

24   the defendant's response?

25   A.  "You can't overrun the Capitol building."

1           Matthew Martin says, "Actually you can, rather

2     easily, I might add.  Not as much security as you think.  Our

3     numbers were freaking huge.  They were not prepared."

4     Q.  And can you read Amy's text at 6:10 p.m.?

5     A.  "I hope you stayed outside.  That's essential."

6     Q.  And what was Martin's response?

7     A.  The sun glasses emoji.

8     Q.  Okay.  And what about after that?

9     A.  Matthew Martin says, "I was in the hotel when I got word

10    the Capitol was breached."

11    Q.  Okay.  And at 6:16 p.m. in a text he mentions an MRE bar.

12    What is a MRE bar?

13    A.  Meals ready to eat.

14    Q.  Okay.  All right.  Let's look at Exhibit 116.

15          All right.  Similar to 115, have you had an

16    opportunity to review this exhibit?

17    A.  Yes.

18    Q.  And have you looked at the Cellebrite forensic report?

19    A.  Yes.

20    Q.  Exhibit 116 is in Eastern Standard time?

21    A.  Yes.

22    Q.  The Cellebrite is in Universal -- well, I don't know what

23    it stands for, but --

24    A.  Universal, yeah, UTC.

25    Q.  Is Exhibit 116 the entire conversation between Angelica

1    Hernandez and the defendant on January 6, 2021?  And I want to

2    show you the additional pages of the exhibit.  And we can go

3    back to the beginning, too.

4          Did they exchange other text on January 6?

5    A.  I don't believe there was text -- or, I think there was

6    text in the morning that said, "Good morning."

7    Q.  Okay.  So, it's maybe not all the text on January 6, 2021.

8    But, overall, is it fair and accurate of the portion that it

9    does show?

10   A.  Yes.

11   Q.  Okay.  So, in the entire Exhibit 116, were any of the texts

12   that Angelica sent you via email, when you asked for her texts

13   with Martin, were any of them from January 6th of 2021?

14   A.  I believe the text she sent me were after January 6 and

15   they were news articles, I believe.

16   Q.  Okay.  So let's look at -- on page 2, if we could.  Focus

17   on that one page 2 of the exhibit.  Okay.  All right.  So, at

18   6:49:32 p.m. Matthew Martin texts, "BTW, don't tell Amy I was

19   in the Capitol."  Based on your investigation, did Amy and

20   Angelica know each other?

21   A.  Amy Lewis gave me -- recommended I speak to Angelica

22   Hernandez, as well as provided me her phone number.  So it

23   appears that she knew her.

24   Q.  So we know Angelica didn't give you these texts when you

25   asked, but do you recall whether she told you separately that

1    the defendant had asked her not to tell Amy what he told her

2    about being inside the Capitol?

3              MR. CRON:  Objection.  Hearsay.  This is a question

4    being asked independent of what's contained on the texts.

5              THE COURT:  I don't see how -- that's a problem.

6              MS. DOHRMANN:  It's not for the truth of the matter,

7    Your Honor, it's just whether -- whether it's true or not, but

8    whether Angelica actually told this special agent that he said

9    that.

10             THE COURT:  Okay.  Sorry.  You're asking whether

11   Angelica told him that the defendant said something to her?

12             MS. DOHRMANN:  Correct.  He has direct personal

13   knowledge of what Angelica said to him.  It's not the content

14   of it that we're trying to prove, whether it's true or not, but

15   just the fact that she did or did not say to the special agent

16   information about the defendant being inside the Capitol.

17             THE COURT:  I'm trying to understand how that's

18   relevant though.

19             MS. DOHRMANN:  Just whether Angelica told him that

20   the defendant had said to her, "Don't tell Amy I was inside the

21   Capitol."

22             THE COURT:  All right.  I'm going to sustain the

23   objection.

24   BY MS. DOHRMANN:

25   Q.  Okay.  And the text, "Don't tell Amy," if you recall, was

1    that chronologically sent before or after the text exchange --

2    excuse me -- yes, the text, "Don't tell Amy," that was sent to

3    Angelica, was that chronologically before or after the exchange

4    between Amy and the defendant in 115?

5    A.  I believe it was 29 minutes after he began speaking with

6    Amy.

7    Q.  Okay.  Began or finished?  We can look back at 115.

8    A.  I can look at my notes, if that's critical.

9    Q.  Actually, let's look at 115.  I think that would refresh

10   his recollection.

11        All right.  Looking at 115, does that refresh -- and

12   let's go to the second page.  Does that refresh your

13   recollection about whether it was 29 minutes after the end of

14   the conversation with Amy or the beginning of the conversation

15   with Amy?

16   A.  This is at 6:10 p.m.  Can I see when he tells Angelica to

17   not tell Amy?

18        THE COURT:  It was about 7 p.m.  I get it.

19        MS. DOHRMANN:  All right.  We can move on.  Thank

20   you.

21   BY MS. DOHRMANN:

22   Q.  All right.  Let's turn now to the defendant's interview on

23   January 15th of 2021.  Was he advised of his rights?

24   A.  Yes.

25   Q.  And did he have a lawyer present?

```
1   A.  Yes.

2   Q.  Was the interview audio-recorded?

3   A.  Yes.

4   Q.  What was his demeanor like?

5   A.  I asked him -- asked him if he felt stressed and he agreed

6   with, "Yeah."

7   Q.  Did he seem stressed?

8   A.  He did seem a little stressed.

9   Q.  Did you warn him about 18 U.S.C. 1001?

10  A.  Yes.

11  Q.  What does that statute criminalize?

12          THE COURT:  I know.

13  BY MS. DOHRMANN:

14  Q.  Did he admit to going inside the Capitol?

15  A.  Yes.

16  Q.  What did he say about how he got inside the building?

17  A.  That he was on the east side of the U.S. Capitol and that

18  the guards let him in.

19  Q.  What did he say about when and why he left the building?

20  A.  That he saw police forming a line to push the crowd out, so

21  he thought he should leave, I believe was the words.

22  Q.  Just briefly, what did he say motivated him to go to D.C.?

23  A.  He saw Tweets from former President Donald Trump and that

24  there would be a rally on January 6.

25  Q.  When you asked him if he saw altercations between police
```

1  officers and the crowd, what did he describe in response?

2  A.  He said he heard a brief commotion and that he saw a kid

3  trying to kick out a window -- or, young adult.

4  Q.  Did you follow up with that answer?

5  A.  Yes.

6  Q.  Okay.  Let's pull up now Exhibit 330 at 23 minutes and 39

7  seconds.

8          If you could start playing.  Let's turn up the volume

9  all the way.

10          (Video played.)

11          We want to be back --

12          MR. ROMANO:  I think she hit that by accident.

13  BY MS. DOHRMANN:

14  Q.  Okay.  Here we are, starting at 23:38.

15          (Video played.)

16          Pause it there.  All right.  So there was a person

17  who asked a question.  Was that you, Special Agent Taylor?

18  A.  Yes, it was.

19  Q.  And there was a person who said, "Things seemed pretty

20  chill," with respect to your question?

21  A.  Yes.

22  Q.  Who was that?

23  A.  Matthew Martin.

24  Q.  Okay.  All right.  Special Agent Taylor, at the time that

25  you interviewed the defendant on January 15 of 2021, did you

1    have access to any video of what happened inside the rotunda?

2    A.  No.

3    Q.  Okay.  Did you ask the defendant why he thought the Capitol

4    was targeted?

5    A.  I did.

6    Q.  Okay.  Let's listen now to -- let's go to 35:48.  And we're

7    going to listen to approximately two minutes.

8              (Video played.)

9              We can pause at 37:57.  And, again, the person asking

10   the question was you and the person answering was the

11   defendant?

12   A.  Correct.

13   Q.  Okay.  At the conclusion of the interview, were you asked

14   to let the defendant's employer know that he was being, quote,

15   fully cooperative, end quote, and, quote, forthright, end

16   quote, with the FBI?

17   A.  Yes.

18             MS. DOHRMANN:  Brief indulgence.

19             (Pause.)

20             MS. DOHRMANN:  The government has no further

21   questions for this witness.

22             THE COURT:  Thank you, Ms. Dohrmann.  Mr. Cron?

23                         CROSS-EXAMINATION

24   BY MR. CRON:

25   Q.  Hello, Special Agent Taylor.

1    A.  Hello, sir.

2    Q.  How are you today?

3    A.  Good.  And you?

4    Q.  Good.

5            So, Mr. Martin spoke voluntarily with you on January

6    15th, correct?

7    A.  That is correct.

8    Q.  And he did not have to be interviewed, did he?

9    A.  That is correct.

10   Q.  He signed a waiver, nonetheless, didn't he?

11   A.  That is correct.

12   Q.  And you also told him early on that if there was any

13   question he didn't want to answer, that he could not answer

14   that question, didn't you?

15   A.  That is correct.

16   Q.  And he answered every single question that you asked him,

17   didn't he?

18   A.  That is also correct.

19   Q.  Now, he voluntarily provided you with all of the videos and

20   still photos that he took on his trip five days later, correct?

21   A.  That is also correct.

22   Q.  And that was pursuant to a request by you?

23   A.  You had offered that you had the media and I said we would

24   appreciate it if you held on to that media and if we could

25   schedule a time to pick up the media that you were offering,

1    yes.

2    Q.  So you asked for the media, correct?

3    A.  Yes, if you were still willing to provide it.

4    Q.  Okay.  And we provided all that media to you, didn't we?

5    A.  Correct.

6    Q.  Now, also, when you called me to let me know that a warrant

7    had been issued, Mr. Martin turned himself in voluntarily,

8    didn't he?

9    A.  That is correct.

10   Q.  And he also, at your request, turned over all of the

11   physical evidence that you had asked for, as well as his cell

12   phone, correct?

13   A.  That is also correct.

14   Q.  Now, going back to Exhibit 116.

15         MR. CRON:  And, Your Honor, this was modified from

16   when I was originally given the exhibit in --

17         MS. DOHRMANN:  Objection, Your Honor.

18         THE COURT:  Let me -- just -- let me hear from him,

19   Ms. Dohrmann.

20         MR. CRON:  Well, what I'm getting at is I want to

21   show him this 116 that was provided to the Court.  I can't put

22   it up here because what I originally received was different

23   from this.  And, so, I want to ask him some questions about

24   Exhibit 116 that was just presented to the Court.  I just don't

25   have it in electronic form.

1          THE COURT:  Okay.  So you're just asking to approach?

2          MR. CRON:  Yes.

3          THE COURT:  Okay.

4          MS. DOHRMANN:  We can pull it up.

5          THE COURT:  But it sounds like you've got a different

6     version than he has, is that --

7          MR. CRON:  No, this is what is currently 116.  I just

8     didn't have a version of it.

9          THE COURT:  All right.  Thanks, Ms. Dohrmann.

10          MR. CRON:  Could we go to the second page?

11     BY MR. CRON:

12     Q.  Okay.  Do you see there a text at 5:13 p.m. from Mr. Martin

13     to Angelica Hernandez?

14     A.  I do.

15     Q.  What did that text say?

16     A.  Matthew Martin says, "I don't know much at all about what

17     is going on.  I really don't have any connection until I get

18     back there."

19     Q.  Get back "there" or get back "here"?

20     A.  Sorry.  You're right.  "Here."

21     Q.  Okay.  And also, with respect to -- and let me get another

22     document.

23          Okay.  You testified earlier that with respect to

24     Government Exhibit 323, that the timestamp on that particular

25     video file was at 4:03 p.m. Eastern time, correct?

1    A.  I said I believe that to be accurate.  And I think that

2    was, yeah.

3    Q.  Okay.  All right.  And then you further testified that on

4    Exhibits 324, 325, and 326, that those -- those particular

5    videos that were taken by Mr. Martin, that you weren't able to

6    determine the timestamp, correct?

7    A.  Are these the time when he was on the North Terrace?

8    Q.  Yes.

9    A.  Correct.

10   Q.  And then you also testified that with respect to Government

11   Exhibit 327, that the timestamp on that was 4:22 p.m., correct?

12   A.  I think I said I believe that to be accurate, yes.

13   Q.  Okay.  So, it would be fair to deduce, then, that -- excuse

14   me.  And you also said that the -- the MOV files that are

15   numbered in sequence, that with respect to that sequencing,

16   that 324, 325, and 326 would have been in between 323 and 327,

17   correct?

18   A.  I believe that to be a fair assessment.

19   Q.  Okay.  So it would be fair, then -- excuse me.  You also

20   said that at 4:22, which was the view of the Peace Monument --

21   or, I think it's designated here as Peace Circle -- that that

22   was at 4:22 p.m., correct?

23   A.  Correct.

24   Q.  So, it's fair to deduce, then, from the sequencing here,

25   that Mr. Martin left the Capitol grounds to get to the Peace

1    Monument somewhere between 4:03 and 4:22, correct?

2    A.  I think that would be a fair assessment.

3              MR. CRON:  May I have a moment, Your Honor?

4              THE COURT:  You may.

5              (Pause.)

6              MR. CRON:  Those are all my questions, Your Honor.

7              THE COURT:  All right.  Any redirect, Ms. Dohrmann?

8              MS. DOHRMANN:  Very briefly, Your Honor.

9              THE COURT:  Okay.

10                      REDIRECT EXAMINATION

11   BY MS. DOHRMANN:

12   Q.  Special Agent Taylor, I just want to ask you a couple of

13   questions following up on what led up to the interview that

14   both defense counsel and I have talked to you about that took

15   place on January 15th of 2021.

16              So on January 6th, per Exhibit 115, Amy Lewis, the

17   defendant's supervisor, had told the defendant that it was

18   essential that he stayed outside of the Capitol building, is

19   that right?

20   A.  Correct.

21   Q.  And he did not ever tell her that he went inside the

22   Capitol building on January 6 of 2021?

23   A.  Correct.

24   Q.  On January 11th, you mentioned before that his -- an

25   intelligence officer was notified of his being inside the

1    Capitol.  Had he, on January 11th, told Amy Lewis that?

2    A.  I believe the counterintelligence officer might have been

3    notified on the 12th.  Could have been on 11th.  But I told Amy

4    Lewis on the 11th that he was in the Capitol.

5    Q.  And on January 15th he had an interview with you?

6    A.  Correct.

7    Q.  That was before he was charged in this case?

8    A.  Correct.

9            MS. DOHRMANN:  No further questions, Your Honor.

10           THE COURT:  All right.  Thank you, Special Agent

11   Taylor.  Appreciate your testimony.  You're free to go.

12           THE WITNESS:  Thank you, Your Honor.

13           THE COURT:  Why don't we take a lunch break.  Let's

14   come back at 1:30.  Thanks, folks.

15           (Recess.)

16           THE COURT:  All right.  The government call its next

17   witness.

18           MR. ROMANO:  Your Honor, the government calls Officer

19   Jonathan Monroe.

20           THE COURT:  Good afternoon, Officer.

21           If you can come up here, and remain standing for a

22   moment.

23                    JONATHAN MONROE,

24   was called as a witness and, having been first duly sworn, was

25   examined and testified as follows:

```
 1                        DIRECT EXAMINATION

 2    BY MR. ROMANO:

 3    Q.  Officer, the judge had advised us all earlier, but you

 4    weren't in the courtroom at the time, you're free to wear or

 5    take off your mask as you find comfortable.

 6    A.  Okay.

 7    Q.  Can you please state your name for the record?

 8    A.  Yeah, Officer Jonathan Monroe.

 9    Q.  And, Officer, how are you employed?

10    A.  I'm employed with the Metropolitan Police Department in

11    D.C.

12    Q.  And how long have you worked for the Metropolitan Police

13    Department?

14    A.  Approximately five and a half years.

15    Q.  Where are you currently assigned?

16    A.  I'm assigned to the Fifth District, patrol.

17    Q.  Back on January 6th of 2021 were you assigned to a

18    different unit?

19    A.  Yes.  I was assigned to a CDU platoon.

20    Q.  What's a CDU platoon?

21    A.  Civil Disturbance Unit.

22    Q.  What are the responsibilities that you had as a member of

23    the Civil Disturbance Unit platoon?

24    A.  Responding to protests throughout the city.

25    Q.  Were you on duty on January 6, 2021?
```

1    A.  Yes, I was.

2    Q.  And did your duties take you to the U.S. Capitol building

3    and its grounds?

4    A.  Yes, they did.

5    Q.  At around 3 p.m. were you involved in clearing people out

6    of the Capitol rotunda?

7    A.  Yes, I was.

8    Q.  And as you prepared to testify today, did you review

9    footage from your body-worn camera beginning shortly before you

10   entered the rotunda and continuing for about 15 minutes?

11   A.  Yes, I did.

12             MR. ROMANO:  Your Honor, I would like to bring up

13   Exhibit 329, which is a portion of the footage from Officer

14   Monroe's body-worn camera that day.

15             THE COURT:  Okay.

16   BY MR. ROMANO:

17   Q.  This is 15 minutes and 15 seconds long.  Let's start

18   playing at the beginning.

19             (Video played.)

20             I think we skipped forward about 30 seconds just

21   there, but that's fine.

22             Officer, as this begins, where were you on the

23   Capitol grounds?

24   A.  I was on the platform, which is on the west side of the

25   Capitol building.

```
 1                    (Video played.)
 2    Q.  Are you walking northbound right now?
 3    A.  Yes.
 4    Q.  Let's pause the video.  If you were to look left -- and it
 5    seems like the camera is starting to turn to the left -- what
 6    would you see?
 7    A.  To the left were, I don't know, thousands of people that
 8    were on the Capitol grounds and attempting to come up, farther
 9    up the Capitol.
10    Q.  On the west side of the Capitol grounds?
11    A.  It was the west side.
12    Q.  Where the inauguration stage had been built?
13    A.  Yes.
14    Q.  In fact, looking into the distance in this piece of footage
15    you can see a portion of the inaugural stage, is that right?
16    A.  Yes.
17    Q.  If we can play again.
18                    (Video played.)
19                    At this point your audio hadn't yet clicked on, is
20    that correct?
21    A.  That's right.
22    Q.  Now as we're watching this, did you start on that upper
23    west terrace area or were you somewhere else before this?
24    A.  Before, on the platform here, I was down -- down the steps
25    there, kind of on the lower portion of where the inaugural
```

1    stage was set up.

2    Q.  I won't ask you any questions about what you did there.  I

3    just wanted to ask you if you began here or somewhere else.

4         Let's pause right now.  So, it's 2 minutes and

5    7 seconds into the video.  Your audio just clicked on.  And did

6    you hear somebody shouting instructions to other police

7    officers?

8    A.  Well, before this, before it went to audio, I heard over

9    the radio one of my sergeants asking for help inside the

10   rotunda, so that's why I started walking over there where

11   there's no audio.

12   Q.  And then once the audio clicked on was there another

13   officer who was saying something about helping people inside?

14        (Video played.)

15   A.  Yeah, there was something, the guy over here in the corner

16   was saying something about people inside.

17   Q.  And as you entered the -- this door, did you hear an alarm

18   sounding?

19   A.  Um --

20   Q.  Let's back up.

21   A.  Not until -- I guess maybe the video would --

22   Q.  Back up just to about 2 minutes.  Okay.  Press play.

23        (Video played.)

24   A.  I hear it now.

25   Q.  Let's pause right there, 2 minutes and 27 seconds.

1          Officer, you just charged up to the back of a group

2     of officers.  What was on the other side of those officers?

3     A.  It was a large group of individuals that appeared to be

4     pushing officers.

5     Q.  Why did you charge up those stairs?

6     A.  From just looking at the officers, I mean, their feet were,

7     I don't know, a few inches away from the edge of the steps and

8     seemed like they were going to almost fall off the steps.

9     Q.  If you were to continue forward past the officers and past

10    the individuals pushing against them, where would you be within

11    the Capitol?

12    A.  In the middle would be the middle of the rotunda.

13    Q.  Let's continue playing.

14          (Video played.)

15          Let's pause right there.  Now it is 3 minutes and 37

16    seconds into the video.  Officer, in the video did you see

17    yourself handle a couple of objects during the portion we just

18    watched?

19    A.  Yes, I did.

20    Q.  What were those objects?

21    A.  One was a flag, and the other was a bat.

22    Q.  Why were you handling that flag and that bat?

23    A.  Well, the flag was around the other officers.  Most of us

24    didn't have face protection.  It could be used as a weapon,

25    possibly, against us.  And then the bat was on the ground.  So

1    just to take those objects away from the scene, out of the

2    immediate area.

3    Q.   Did you hand them to another officer down the stairs?

4    A.   Yeah, then I passed it off to the first person that I

5    could -- you know, that was safely out of the way.

6    Q.   I want to draw your attention now to the timestamp in the

7    under right-hand corner.   In addition to the timestamp on the

8    video, the video player, does your body-worn camera record the

9    actual date and time on which it is capturing footage?

10   A.   Yes.

11   Q.   And up there do you see, over to the right, a negative 500?

12   A.   Yes, I do.

13   Q.   Does that indicate that this is five hours behind Greenwich

14   Mean Time, or UTC?

15   A.   I'm not sure.

16   Q.   Does this indicate that the video was recorded at 15:02 and

17   34 seconds?

18   A.   Yes.

19   Q.   Or 3:02 p.m. and 34 seconds?

20   A.   Um-hum.

21   Q.   Based on your memory of the events that day, is that

22   accurate?

23   A.   Yes.

24   Q.   Okay.   Let's keep playing.

25              (Video played.)

1           Let's pause.  So it is now 4 minutes 58 seconds in

2     the video, 3:03:55 p.m.  Officer, as we are watching this

3     video, were you and other officers preparing to enter the

4     rotunda?

5     A.  Yes.

6     Q.  And preparing to work at clearing the crowd in the rotunda?

7     A.  Yes.  That was the eventual goal, yeah, once we got in

8     there, to get everybody out.

9     Q.  What was the noise level like at that time?

10    A.  It was loud.  It was hard to hear officers that were right

11    next to you.  So you had to yell, basically, for everything.

12    Q.  Thank you.  Let's continue playing.

13           (Video played.)

14           Let me pause right here.  We're now at 6 minutes and

15    57 seconds into the video.  It's 3:05:54 p.m.  What do you see

16    at the bottom left-hand corner of that video, Officer?

17    A.  There's somebody lying on the ground, having some type of

18    medical emergency.

19    Q.  Now, based on -- or, how did the size of the crowd and the

20    situation you were dealing with affect police ability to

21    respond to a medical emergency in the rotunda?

22    A.  It would make it difficult because there were people on

23    that side of the Capitol, the west side of the Capitol, you

24    know, that we were trying to hold from to come in, and

25    there's -- I didn't know what was on the other side of the

1    Capitol, as well.  So with all the people and then all the

2    personnel, to try to do something like to tend to them and then

3    to the crowd, it would be challenging.

4    Q.  Let's continue playing.

5              (Video played.)

6              Pause right there.  So we're now at 8:29 into the

7    video, 3:07:26 p.m.  Now, do you see officers in the footage

8    begin to do the work of moving the crowd and starting to clear

9    the rotunda?

10   A.  Yes, I do.

11   Q.  And based on your experience on January 6th and your review

12   of body-worn camera, did officers issue verbal commands to

13   members of the crowd to move back?

14   A.  Yes.

15   Q.  And I know there were different responses from different

16   people, but generally, what sort of response did you receive

17   from the crowd?

18   A.  Some didn't -- some weren't combative, some were combative,

19   and then some were kind of somewhere in between.  It was kind

20   of all over the place, so --

21   Q.  Thank you.  We can continue.

22             (Video played.)

23             Pause there.  So that's now 10 minutes and 23 seconds

24   into the video.  Officer, did you see yourself try to steer a

25   couple of other law enforcement officers into a position just

1    there?

2    A.  Yeah, I did.

3    Q.  What were you doing there?

4    A.  I think I was just trying to move them back to where we

5    were all on the same side because there was -- it was starting

6    to get blended, where you would have civilians, officers, and

7    then civilians.  So just to kind of get everybody on the same

8    area.

9    Q.  Did the size of the crowd make it difficult to maintain a

10   consistent police line?

11   A.  I would say, yeah.  I mean, it took a little bit to get

12   there.  I mean, eventually we did, but it took some time to get

13   organized enough to -- yeah.

14   Q.  Okay.  Let's keep playing.

15            (Video played.)

16            Can we pause there?  Actually, let's just play it for

17   another second.  Pause when we see the exit sign.

18            (Video played.)

19            It's hard with the body-worn camera footage, but,

20   Officer, beyond this person who's in front of your camera, did

21   you see a door a moment ago?

22   A.  Yeah, it was right -- kind of, yeah, upper right-hand area.

23   Q.  And is that door where you were trying to funnel people

24   towards?

25   A.  Yes.

 1    Q.  And we can play from here to the end.

 2                (Video played.)

 3                Is that your voice saying, "Walk out"?

 4    A.  Yes, it is.

 5                MR. ROMANO:  Did the court reporter hear me?

 6                THE COURT REPORTER:  (Nods head.)

 7                MR. ROMANO:  Yes.

 8    BY MR. ROMANO:

 9    Q.  So, just a few final questions, Officer.  As you worked to

10    move a crowd like this, how did you go about assessing the

11    level of danger to yourself and your fellow officers?

12    A.  The first thing I would look for is, obviously, to kind of

13    scan -- scan the room as best I could.  Try to look at

14    everything that I could, even though in that situation it was

15    very hard to do because there were so many people.  Look for

16    people with objects in their hands, people yelling vocally loud

17    in my direction, and watch for objects that are being thrown.

18    Q.  And how -- you sort of alluded to this, but how does the

19    size of the crowd affect your ability to assess where threats

20    might come from?

21    A.  Well, with people -- in that situation, the crowd was so

22    large and we were getting intertwined in between each other, so

23    extremely difficult because you can't look at everybody.  I

24    mean, you can try, but it's not going to happen.

25    Q.  And how did the size of the crowd affect your ability to --

1    and other officers' ability to actually clear the rotunda?

2    A.  It was difficult.  I was -- in the video, it was hard to

3    get everybody pointing in that direction.  And even when we got

4    everybody in that direction, they just still -- you know, some

5    were defiant and did not want to leave, and it just took a long

6    time.  And it's a small door to get everybody out of.  But,

7    yeah.

8    Q.  Did the effort to clear the rotunda continue for a period

9    of time after what we saw in this video?

10   A.  Yes.

11            MR. ROMANO:  Court's indulgence.

12            No further questions, Your Honor.

13            THE COURT:  All right.  Mr. Cron.

14                        CROSS-EXAMINATION

15   BY MR. CRON:

16   Q.  Hello, Officer Monroe.

17   A.  Hello.  How you doing?

18   Q.  Good.  How are you?

19   A.  Not too bad.

20   Q.  You did not see Mr. Martin commit any violence in the

21   rotunda that day, did you?

22   A.  No.

23   Q.  And you did not see Mr. Martin destroy any property in the

24   rotunda, did you?

25   A.  No.

1    Q.  You don't remember even seeing Mr. Martin, do you?

2    A.  No.

3    Q.  You don't know if Mr. Martin was in a position to have

4    heard any commands from the fellow officers of yours with the

5    Metro Police to leave, do you?

6    A.  No.  I didn't even know he was there.  I --

7    Q.  Okay.  And I believe that you -- excuse me -- mentioned

8    that it was very noisy?

9    A.  Um-hum.

10   Q.  And it was so noisy that it was even hard to hear the

11   person standing next to you?

12   A.  Um-hum.  Yes.

13   Q.  Is that correct?

14   A.  That's correct.

15            MR. CRON:  Okay.  No further questions.

16            THE COURT:  All right.  Any redirect?

17            MR. ROMANO:  No, Your Honor.

18            THE COURT:  Thank you, Officer.  Appreciate your

19   testimony here.  You're free to leave.

20            THE WITNESS:  Thank you, Your Honor.

21            MR. ROMANO:  No further evidence, Your Honor.

22   Government rests.

23            THE COURT:  Okay.  Mr. Cron.

24            MR. CRON:  Your Honor, the defense calls Matthew

25   Martin to the stand.

```
 1                 THE COURT:  Okay.

 2                            MATTHEW MARTIN,

 3    was called as a witness and, having been first duly sworn, was

 4    examined and testified as follows:

 5                 MR. CRON:  Your Honor, it will take me a minute to

 6    get hooked up here.

 7                 THE COURT:  You've got water behind you, I think.

 8                 THE DEFENDANT:  Thank you very much.

 9                            DIRECT EXAMINATION

10    BY MR. CRON:

11    Q.  Please state your name for the record.

12    A.  Matthew Martin.

13    Q.  Where do you live?

14    A.  I live in Santa Fe, New Mexico.

15    Q.  I noticed in the United States' trial brief that they said

16    that you were employed by the Los Alamos National Laboratories

17    on January 6, 2021.  Was that true?

18    A.  No.

19    Q.  Who was your employer?

20    A.  Mission Support and Test Services, LLC.

21    Q.  How long have you worked there?

22    A.  I worked there 18 and a half years.  That includes former

23    contracts, former names of the company.

24    Q.  And what was your position there?

25    A.  I was a senior engineer.
```

1    Q.  What was the mission of Mission Support and Test Services,

2    LLC?

3    A.  It's the contractor for the -- to run the Nevada National

4    Security site.  They're based out of Las Vegas.

5    Q.  And what is their relationship to Los Alamos National

6    Laboratory?

7    A.  Completely different contract for Department of Energy.  We

8    do collaborate.

9    Q.  I also noticed that in the United States' trial brief it

10   stated that you had a -- what was termed top secret clearance.

11   Who issues top secret clearances?

12   A.  The Department of Defense does.

13   Q.  And did you have a top secret clearance?

14   A.  No.  I had a Q.

15   Q.  Did you have a national security clearance?

16   A.  Yes.

17   Q.  Who issued it?

18   A.  As Agent Travis Taylor testified, I have -- oh, Department

19   of Energy do clearance.

20   Q.  Okay.  What kind of clearance did you have?

21   A.  Q clearance.

22   Q.  Do you still work there?

23   A.  No, I do not.

24   Q.  Why is that?

25   A.  I was fired over these charges.

1    Q.   Okay.  Did that happen -- were you fired before or after

2    the charges were filed?

3    A.   After.

4    Q.   Drawing your attention to December 19th, do you recall

5    seeing anything on Twitter that drew your attention?

6    A.   Tweet from President Trump.

7            MR. CRON:  Excuse me, Your Honor.  May I confer with

8    counsel for a minute concerning --

9            THE COURT:  You may.

10           (Off-the-record discussion.)

11           MR. CRON:  Your Honor, with respect to Exhibit --

12   Defense Exhibit numbers 1 through 10, we have agreement from

13   the government and stipulation that they be admitted into

14   evidence, and we so move.

15           MR. ROMANO:  Your Honor, we have no objection to the

16   admission of 1 through 10.  We don't have a formal written

17   stipulation and we are not necessarily vouching for any of

18   these exhibits, but we do not object to them.

19           THE COURT:  Understood.  1 through 10 are in.

20   BY MR. CRON:

21   Q.   You mentioned that you saw a Tweet from former President

22   Trump.  I would like for you to look at what's been marked as

23   Exhibit 1, Defense Exhibit 1.  Is that the Tweet that you saw?

24   A.   Yes.

25   Q.   And when you saw that Tweet, then what did you do?

1    A.  I made travel arrangements to Washington, D.C. for January

2    6.

3    Q.  What was your intention in going to Washington?

4    A.  To support Trump and Mike Pence.

5    Q.  Had you ever been to one of his rallies before?

6    A.  I had not.

7    Q.  Did that have anything to do with your decision to go?

8    A.  Yeah.  Yeah, it did.

9    Q.  And why is that?

10   A.  To be able to attend one.

11   Q.  What did you do then?

12   A.  I booked airline, I booked hotel.  What did I do then?

13   Q.  Okay.  So you booked airline reservations --

14   A.  Yes, I did.

15   Q.  -- and hotel?

16   A.  I did.

17   Q.  Okay.  And without us going through them, are the receipts

18   and dates that are contained in Exhibits 1 through 10 accurate?

19   A.  As I saw them, yes.

20   Q.  Okay.  Now, when did you go to Washington?

21   A.  Flew out on January 5th.

22   Q.  Do you remember what time you were scheduled to arrive?

23   A.  6:55 p.m., I believe.

24   Q.  Is that in fact when you arrived?

25   A.  I think so, yes.

1    Q.  And when were you scheduled to leave Washington?

2    A.  I was scheduled to leave Washington on the 7th, at

3    2:05 p.m.

4    Q.  And is that in fact when you left the District?

5    A.  Yes.

6    Q.  Did you go alone?

7    A.  Yes, I did.

8    Q.  Did you coordinate with anyone else before making your

9    decision to go?

10   A.  No.  I tried to ask my brother if he wanted to go, but he

11   didn't.

12   Q.  Did you have plans to meet up with anybody on the trip?

13   A.  No.

14   Q.  Sorry here.  Something popped up.

15            Okay.  There we go.

16            And did you meet up with anybody on the trip?

17   A.  No, I did not.

18   Q.  Were you alone the entire time you were in Washington?

19   A.  Yes.

20   Q.  Did you know anybody else who was there?

21   A.  No.

22   Q.  Are you a part of any groups like the Proud Boys or Oath

23   Keepers?

24   A.  I am not.

25   Q.  Do you follow any groups like that?

1    A.  I don't.

2    Q.  When you went to Washington, did you take any weapons?

3    A.  I did not.

4    Q.  Did you possess any weapons while you were there?

5    A.  No.

6    Q.  Did you have any chemicals, like bear spray, that could be

7    used offensively against another person?

8    A.  I did not.

9    Q.  Did you take any military gear?

10    A.  I did not.

11    Q.  Did you take any protective equipment?

12    A.  I did not.  A COVID mask, I guess you can qualify that as

13    protective equipment, but --

14    Q.  Did you have any body armor?

15    A.  No.

16    Q.  Did you have a helmet?

17    A.  No.

18    Q.  Did you have a gas mask?

19    A.  No.

20    Q.  We have seen some images of you wearing a hat, coat, a

21    COVID mask, and carrying a Trump-Pence flag on a small

22    flagpole.  Are those images that we've seen so far, do they

23    accurately reflect what you were wearing that day?

24    A.  Yes.

25    Q.  What did you do when you arrived into Washington?

1   A.  I got an Uber to the hotel and they dropped me off.  They

2   had to drop me off a couple blocks from the hotel and I had to

3   walk the rest of the way.

4   Q.  And you mentioned the Marriott.  Where were you staying?

5   A.  The JW Marriott, yeah.  It's at -- it's on Pennsylvania,

6   right across -- it's right where Freedom Plaza is, where they

7   were building the World War I memorial, near the White House.

8   Q.  Okay.  Does 1331 sound like the right address, Pennsylvania

9   Avenue?

10  A.  I -- I don't know.

11          THE COURT:  I know where it is.

12          MR. CRON:  Okay.

13  BY MR. CRON:

14  Q.  Okay.  What did you do after you got checked in?

15  A.  After I checked in, I went back outside.  There was a rally

16  on Freedom Plaza the day before and there was still some street

17  vendors out, so I just checked them out and then I went back up

18  to bed.

19  Q.  Did you leave the hotel after you went back inside?

20  A.  No.

21  Q.  Did you go to the Capitol area on January 5th?

22  A.  I did not.

23  Q.  Okay.  Let's see here.

24          MR. CRON:  Your Honor, I'm just skipping over some

25  things that we've already heard testimony about.

1          THE COURT:  Thank you.

2     BY MR. CRON:

3     Q.  What did you do when you got up on January 6, 2021?

4     A.  I basically just went to the rally area near the eclipse

5     (sic).

6     Q.  Okay.  And what's the Ellipse?

7     A.  Or, the Ellipse, excuse me.  The Ellipse is a park that's

8     just by the White House, towards the Washington Monument area.

9     Q.  Is that where the speeches for the rally was supposed to

10    happen?

11    A.  Yes.

12    Q.  Were you able to get into the Ellipse?

13    A.  I was not.

14    Q.  Why not?

15    A.  The crowds had -- it was pretty packed and already spilling

16    over into the expansion of the -- the expansion area, the

17    overflow area.

18    Q.  Okay.  Where was the overflow area?

19    A.  It was right by the Washington Monument.

20    Q.  Is that, then, where you went?

21    A.  Yes.

22    Q.  Approximately what time did you arrive at the rally?

23    A.  I want to say 8:10.

24    Q.  What happened after you arrived?

25    A.  I just -- I took some video, then I just moved to where I

1    could see one of the television displays and hear the

2    television displays.

3    Q.   Okay.  And when you say "television displays," where were

4    they set up?

5    A.   They're in that overflow area in front of the Washington

6    Monument, in that part there.

7    Q.   And what did they consist of?

8    A.   There were two displays that were -- there were just two

9    displays.

10   Q.   When you say "displays," you mean like big TV monitors?

11   A.   Yeah.  Very big TV monitors, yeah.

12   Q.   Were there any loudspeakers?

13   A.   Yes.

14   Q.   Were you able to hear what was being said by the speakers?

15   A.   Yes, once they turned up the volume.

16   Q.   What happened after the preliminary speakers spoke?

17   A.   Trump eventually came on.  He was late.

18   Q.   Did you stay for his whole speech?

19   A.   I did not.

20   Q.   Why is that?

21   A.   I was getting hungry, needed to use the restroom, cold,

22   and, you know, I just -- and the crowd was starting to pack in.

23   Like, I kind of wanted to get out of there and just get back to

24   the hotel.

25   Q.   About what time did you leave the rally?

1  A.  I'm thinking about 12:20ish.

2  Q.  And where did you go from the rally?

3  A.  I went -- I went -- basically worked my way back to that JW

4  Marriott hotel.

5  Q.  What did you do after you got back to the hotel?

6  A.  I went back to the room, sort of used the restroom, cleaned

7  up, warmed up, and then basically headed down immediately to

8  the gift shop, which was the only place I noticed was open that

9  had a Starbucks in it.  So, I got food, coffee, which I hadn't

10  had before that moment.

11  Q.  Had you had anything to eat before you went to the rally

12  that day?

13  A.  No, I hadn't.

14  Q.  And why is that?

15  A.  I just -- I was -- I was feeling like I was kind of late to

16  the rally, so I had no -- I had no food or coffee.

17  Q.  So after you got your food and your coffee, what did you do?

18  A.  I basically -- I noticed, as I was drinking the coffee and

19  stuff, I noticed the flag, the big flag coming --

20  Q.  Where were you drinking the coffee?

21  A.  Oh, I went up in my room.  Yeah.

22  Q.  Okay.  So you went back up to your room at that point?

23  A.  I did.

24  Q.  And you mentioned something about a flag?

25  A.  Yeah, I noticed, looking out the window, that the big

1    American flag that actually passed overhead while I was at the

2    rally was working its way up Pennsylvania Avenue.  And I

3    brought -- took out my phone and started -- filmed a little

4    segment of that.

5    Q.  Was that the little video we saw of the flag coming up

6    Pennsylvania Avenue --

7    A.  Yes.  Yes, we've seen that.

8    Q.  -- earlier?

9    A.  Yeah.

10   Q.  So what did you do after you finished eating and saw the

11   flag?

12   A.  I started heading -- I had started to -- I got my cold

13   weather gear and stuff back on and started heading back out.  I

14   started heading towards -- started my way to the Capitol.

15   Q.  Okay.  And what was your purpose in going to the Capitol?

16   A.  Again, it was a -- I heard there will be -- there would be

17   a second rally at the Capitol, and so that's how I knew what I

18   was going to.

19   Q.  Now, we know from prior testimony that that video with the

20   flag coming down the street that you recorded was at 1:52.

21   A.  That's my recollection as well.

22   Q.  Okay.  When did you leave your room to go to the Capitol?

23   A.  After around 2 o'clock.

24   Q.  How long did it take you to exit the hotel from the time

25   you left your room?

1    A.  It took a while because everybody was all -- the hotel was

2    packed with Trump supporters, so they were all leaving the

3    rooms at the same time.  So the hotel's elevators were very

4    busy.  So it was like six minutes, seven minutes.

5    Q.  Were you aware that the Capitol grounds had been breached

6    before you left your hotel?

7    A.  I did not -- I was not.

8    Q.  Did you take any videos with your iPhone -- I'm sorry.

9    We've already been over that.

10           Now, was the TV on in your room when that video was

11   recorded?

12   A.  Yes.

13   Q.  And the United States' trial brief asserts that you were

14   watching what they termed a news broadcast when you recorded

15   that video.  Is that true?

16   A.  No.

17   Q.  What were --

18           MR. ROMANO:  Objection to what the U.S. trial brief

19   asserts.  If Mr. Martin wants to respond to any particular

20   questions or evidence that came out earlier in the trial,

21   that's fine, but we don't have an opportunity to argue about

22   what we asserted in the trial brief.  I know the Court has read

23   it.  I just don't think that's a proper question.

24           THE COURT:  All right.  I'm going to overrule the

25   objection.

1    BY MR. CRON:

2    Q.  Okay.  So were you watching a news broadcast?

3    A.  No.

4    Q.  What were you washing?

5    A.  It was a C-SPAN feed of the House of Representatives.

6    Q.  And at the time that that video was taken, who was speaking

7    on C-SPAN?

8    A.  Congressman Jamie Raskin.

9    Q.  And was he speaking from the House floor?

10   A.  Yes.

11   Q.  I'm going to show you what's been marked and -- as

12   Defendant's Exhibit 25.

13            MR. CRON:  Does the government have any objection to

14   its admission?

15            MR. ROMANO:  No objection.

16            MR. CRON:  Move it into evidence, Your Honor.

17   BY MR. CRON:

18   Q.  What is --

19            THE COURT:  All right.  25 is in.

20   BY MR. CRON:

21   Q.  What is Defendant's Exhibit 25?

22   A.  It's the speech that was given by Jamie Raskin on the

23   floor.

24   Q.  Do you see there where there are some words highlighted?

25   A.  Yes, that's --

1   Q.   What's the significance of those highlighted words?

2   A.   That's what you hear in the video.

3   Q.   Now, before you left your room, were you watching any news

4   stations that were reporting on the events transpiring outside

5   the Capitol?

6   A.   There again, no.

7   Q.   Did you know that the barriers to the Capitol grounds had

8   been breached before you even left for the Capitol?

9   A.   I didn't.

10  Q.   While you watched C-SPAN, did the channel report that the

11  barriers to the Capitol grounds had been breached?

12  A.   Not while I was watching.

13  Q.   What did you see on C-SPAN?

14  A.   Just that speech, other congressmen -- I don't even

15  remember if I'd seen another congressman on there.

16  Q.   Okay.  Now, Agent Taylor testified about a text concerning

17  the Capitol breach that was on your phone.  I want to ask you

18  some questions about that.

19            First of all, who is Amy?

20  A.   Amy is my supervisor and a long-time friend.

21  Q.   The text and the question, it's already in evidence, was at

22  6:11 p.m. Washington, D.C. time.  Where were you when the text

23  exchange occurred?

24  A.   I was also back in that same hotel room.

25  Q.   Was that after you had returned to the Capitol?

1    A.  Yes.  Or, returned from the Capitol.

2    Q.  I'm sorry.  Returned from the Capitol.

3           Now, that text said, and I'm quoting "I was in the

4    hotel when I got word the Capitol was breached."  When you

5    referred to the Capitol being breached in your text, were you

6    referring to the Capitol grounds or the Capitol building?

7    A.  The building itself.

8    Q.  And when you used the word "breached," what did you mean by

9    that?

10   A.  I meant broken into.

11   Q.  According -- okay.  So, it's already in evidence that the

12   Capitol building was first breached, the building itself, at

13   2:13 p.m.  Where were you at 2:13 p.m. on January 6th?

14   A.  I was walking down Pennsylvania Avenue.

15   Q.  So is it fair to say that you could not have known that the

16   Capitol building was broken into, or breached, when you left

17   the hotel because it had not yet been -- the building had not

18   yet been breached?

19           MR. ROMANO:  Objection.  Leading.

20           THE COURT:  Sustained.

21   BY MR. CRON:

22   Q.  Did you know that the Capitol building had been breached

23   before you left the hotel?

24   A.  No.

25   Q.  We'll get into the details of this later in your testimony,

1    but when you went into the Capitol building, did you consider

2    that to be breaching the Capitol building?

3    A.  I did not.

4    Q.  And why is that?

5    A.  Because I was let in.

6    Q.  Let in by whom?

7    A.  Capitol Police.

8    Q.  So, in your mind, getting back to this text that's been

9    raised, when you got back to your hotel -- when you got back to

10   your hotel after your trip to the Capitol, had the Capitol

11   building been breached?

12   A.  No.

13   Q.  When did you first know that the Capitol building had been

14   breached, meaning that it had been broken into?

15   A.  It was sometime after I arrived back at the hotel in the

16   evening and I had a chance to actually read news and --

17   Q.  So when you texted at 6:11 p.m. that, "I was in the hotel

18   when I got word that the Capitol was breached," were you

19   referring to when you returned to the hotel after you'd been to

20   the Capitol and turned on the news?

21   A.  That's correct.

22   Q.  Now, I want to play a video.  This is Defendant's Exhibit

23   23.  And -- or, wait.  Is it 23 or 33?

24              No, it's 33.

25              MR. ROMANO:  No objection.  And we believe this is

1    already part of the government's evidence.

2              THE COURT:  Okay.  So without objection, Defense 33

3    is in.

4              MR. CRON:  Okay.

5    BY MR. CRON:

6    Q.  Now, I'm going to go ahead and play this and I would like

7    you to watch it.

8              (Video played.)

9              Who is that laughing there?

10   A.  I think that was me.

11   Q.  Okay.  And where is it that this video was taken?

12   A.  Near Pennsylvania and Sixth.

13   Q.  And how do you know that?

14   A.  I recognize the park and I've looked at the video metadata

15   and used GPS coordinates.

16   Q.  Okay.  Now, I would like to talk about the route that you

17   took from the hotel.  You said you started walking down

18   Pennsylvania Avenue?

19   A.  Yes.

20   Q.  And then where did you go from Pennsylvania Avenue?

21   A.  So I walked Pennsylvania Avenue to First -- all the way

22   down to First Street, near the Peace Monument, it's called, and

23   then turned left onto First and then made a right onto

24   Constitution.

25   Q.  Okay.  Now I'm going to show Defendant's Exhibit 11.

1          MR. ROMANO:  Your Honor, we have no objection to

2     Defendant's Exhibit 11.  This is a compilation of several

3     videos.  And the Court will see that there are some videos

4     overlaid on others.  We played this, I believe, during our

5     case-in-chief.  And the only thing I would just add is there

6     are times when the person off in the distance that's -- I think

7     Mr. Cron is arguing that the defendant is highlighted with a

8     circle or an arrow.  We are not necessarily vouching for all

9     their markings, but we certainly agrees it's fair for the Court

10    to receive.

11          THE COURT:  Understood.  I think 11 is already in.

12          MR. CRON:  Is 11 admitted, Your Honor?

13          THE COURT:  I think the government admitted.

14          MR. CRON:  All right.

15    BY MR. CRON:

16    Q.  Okay.  There is a screen that has popped up in the lower

17    left here.  Let's talk about that for a minute.  In that screen

18    in the lower left, I see there's a red dot.  And what does that

19    red dot signify?

20    A.  It follows my path.  It signifies my location and

21    follows -- shows my path as I'm walking in the video.

22    Q.  Okay.  And is the -- this little map to scale?

23    A.  It is.

24    Q.  And where does the map with the red dot pick you up?

25    A.  On First Street.

1   Q.  Now, I also see that in the upper left-hand corner, that

2   there is a legend there.  What do the titles and legends

3   signify?

4   A.  The legend is specifying the exact file name as provided by

5   the government for that CCTV footage.

6   Q.  So that's CCTV footage?

7   A.  That is.  And a little timer-counter showing where in that

8   CCTV footage the file is you're seeing.

9   Q.  Are there film clips from any other sources that are

10  contained in this video?

11  A.  Yes.  Video from my iPhone is also integrated.

12  Q.  Okay.  And so did you -- are these times synced?

13  A.  Yes.

14  Q.  Okay.  So that as time goes on here and screens appear,

15  they're all synced in time.  Am I right about that?

16  A.  Yes, to the best of my ability, with metadata and events in

17  the videos.

18  Q.  Now, I see that there is a red arrow in the upper left-hand

19  corner.  What does the red arrow depict?

20  A.  It points to me.

21  Q.  And it looks like there is also a lighter colored bubble

22  there?

23  A.  Yes.  Surrounds -- that's meant to highlight me.

24  Q.  Okay.  Now, how do you know that the person right now that

25  that arrow is pointing to is you?

1   A.  I found locations where I could absolutely confirm it was

2   me with this source and other sources and then backtracked it

3   to that point.

4   Q.  So, would it be fair to say then that once you were able to

5   fully identify yourself, you -- it just ran back so that you

6   could follow your path?

7   A.  Yes.

8   Q.  From the time you left your hotel until you went onto

9   Constitution Avenue, did you cross any barriers?

10  A.  No.

11  Q.  When you're on Constitution Avenue, where were you walking?

12  A.  On the sidewalk.

13  Q.  Is that the public sidewalk?

14  A.  Yes.

15  Q.  Were there any barriers across the sidewalk itself that you

16  crossed?

17  A.  No.

18  Q.  Okay.  Let's watch your path here.

19          (Video played.)

20          Okay.  Now, there in the lower right corner is a

21  little bubble with a red arrow.  Who's the red arrow pointing

22  to?

23  A.  That is me.

24  Q.  Are those the clothes you're wearing that day?

25  A.  They are.

1    Q.  Is that the flag you were carrying that day?

2    A.  It is.

3              (Video played.)

4    Q.  And is that lower right frame from CCTV footage?

5    A.  It is from government-provided CCTV footage.

6              THE COURT:  Let me ask you, sir:  So do you agree,

7    were those bike racks on the left?

8              THE WITNESS:  Yeah, the -- I think those are in fact

9    bike racks on the left.

10             THE COURT:  Did you see any signs on them?

11             THE WITNESS:  I don't recall.

12             THE COURT:  Okay.

13             (Video played.)

14   BY MR. CRON:

15   Q.  Okay.  I see that two other frames have appeared.  Where

16   did the footage from the upper right frame come from?

17   A.  It's another CCTV camera provided by the government.

18   Q.  And where did the footage from the lower left panel come

19   from?

20   A.  That I filmed with my iPhone.

21   Q.  Okay.  And once again, these are synced in time?

22   A.  They are.

23   Q.  Now, if we look at the red arrow in the upper left panel, I

24   see that there's a white vehicle immediately in front of you.

25   Is that the same police vehicle that's in front of you in the

1    footage that you took in the lower left panel?

2    A.  Yes.

3              (Video played.)

4    Q.  Okay.  Another frame has appeared here in the lower right.

5    Where did that footage come from?

6    A.  That was from my iPhone.

7    Q.  Okay.  Now, I see that there are -- well, first of all, do

8    you see the sign that says, "Area Closed"?

9    A.  Yes.

10   Q.  Okay.  Now, there have been -- there's been testimony that

11   there were plastic snow fences up.  Do you remember hearing

12   that testimony?

13   A.  Yes.

14   Q.  How many fences, how many plastic fences are there here

15   that you can see?

16   A.  Two.

17   Q.  All right.  And so, when you saw that strip that was

18   bordered by a snow fence on each side and you saw the "Area

19   Closed" sign, what area did you think that that was referring

20   to?

21   A.  I thought it was the area in between, like it was a

22   construction area, or a --

23   Q.  Did you think that those -- that those signs meant that the

24   whole of the Capitol grounds was closed?

25   A.  No, I didn't.

1    Q.  Did you think it was just the area in between the fencing?

2    A.  I did.

3    Q.  Was there anything else that caused you to believe that the

4    whole of the Capitol grounds in that area was not closed?

5    A.  The people walking in the background.

6    Q.  Okay.  Were there a lot of people --

7    A.  There were.

8    Q.  -- on the other side?

9    A.  There were.

10   Q.  Were there any Capitol Police or other government officials

11   telling people they weren't allowed to be on the Capitol

12   grounds?

13   A.  Not at -- not -- no.

14   Q.  Was there anyone at all telling people they weren't allowed

15   to be there and that they needed to leave?

16   A.  No.

17   Q.  Now, did we walk that same route when we were here for

18   Mr. Griffin's trial?

19   A.  We did.

20   Q.  Was there any of the snow fence barrier along the route

21   then?

22   A.  No.

23   Q.  Was there any type of barrier up?

24   A.  They had a bike rack barrier up.

25   Q.  Okay.  I want to show you what's been marked at -- as

1    Defendant's Exhibit 13.

2             MR. ROMANO:  No objection.  We understand that this

3    was not taken on January 6th.

4             MR. CRON:  Right.

5             THE COURT:  All right.  Without objection, 13 is in.

6    BY MR. CRON:

7    Q.  Okay.  And what do you see there?

8    A.  The bike rack.

9    Q.  And is there a sign on there?

10   A.  Yes.  "Police line.  Do not cross."

11   Q.  Did you see any signs like that on January 6th?

12   A.  I don't remember.

13   Q.  Okay.  Now, going back to the -- going back to the video

14   here.

15             (Video played.)

16             And once again, is the red arrow pointing to you?

17   A.  It is.

18   Q.  And does the red dot continue to track your route?

19   A.  It still does, yes.

20             (Video played.)

21   Q.  Okay.  Now, it looks to me like you stepped over part of

22   the snow fence right there to cross onto the grass.  Can you

23   tell us what you were thinking there?

24   A.   I was seeing other people cross there and I thought it was

25   a shortcut at the time.

1   Q.  Had the fence -- was the fence knocked down at that place

2   where you went in?

3   A.  Yes, it was.

4   Q.  So you took a shortcut?

5   A.  I did.

6   Q.  When you took that shortcut and entered the grassy area

7   where other people were, did you think you were entering an

8   area where all of the Capitol grounds and the Capitol building

9   were closed?

10  A.  No, I didn't.

11          (Video played.)

12  Q.  Now, excuse me.  The CCTV footage ends at this point.  And

13  you're walking on a pathway.  First of all, on this walkway

14  that you went on, did you cross any barrier to get to this

15  walkway leading up to the Capitol?

16  A.  I didn't.

17  Q.  Now, I -- we had mentioned from an earlier exhibit -- and

18  right now I'm going to be referring to Exhibit 27.  We referred

19  to the fact that you and I walked that -- the path that you

20  took when we were here for Mr. Griffin's trial.  Do you

21  remember that?

22  A.  Yes.

23  Q.  Okay.  And at the end of this walkway, what was at the end

24  of the walkway?

25  A.  There's a small flight of stairs.

1    Q.  Okay.

2              MR. ROMANO:  No objection to Exhibit 27, which I

3    understand was not taken on January 6th, 2021.

4              THE COURT:  Okay.  Without objection 27 is in.

5              MR. ROMANO:  27, I'm sorry, Your Honor.

6              MR. CRON:  Let's see.  It's a little dark.  Oh, that

7    would explain that.

8    BY MR. CRON:

9    Q.  Okay.  Are those the steps that are at the end of the

10   walkway that we see you walking up at the end of the video we

11   just showed?

12   A.  Yes.

13   Q.  I'm going to show you Defendant's Exhibit 15, which is also

14   a photograph that we took when we were there during

15   Mr. Griffin's trial.

16             THE COURT:  Any objection?

17             MR. ROMANO:  No objection.

18             THE COURT:  Without objection, 15 is in.

19   BY MR. CRON:

20   Q.  Is that a close-up of those steps?

21   A.  It is.

22   Q.  And what is it that you see there in the -- sort of the

23   upper right-hand part, above the steps?

24   A.  It's the -- it looks like the Senate side steps on the east

25   plaza.  It looks like -- I think they refer to that as the

1  carriage entrance or carriage tunnel or something, at the base.

2  Q.  All right.  Now, when you went up those steps, where did

3  you go?

4  A.  I proceeded on to the east plaza.

5  Q.  All right.

6  A.  This is, like, northeast of the Capitol building.

7  Q.  And when you made your way to the east side from the steps,

8  where there any barriers in your way that you went over?

9  A.  No.

10  Q.  Did you then proceed to the east side of the Capitol?

11  A.  Yes.

12  Q.  Did you ever enter the Capitol grounds from the west side?

13  A.  I did not.

14  Q.  Now, you have seen the map of what the Capitol Police

15  designated as restricted grounds for January 6th.  On that day

16  were you aware that the Capitol Police had designated those

17  boundaries as restricted grounds?

18  A.  I wasn't.

19  Q.  Had you ever been to the Capitol grounds before January

20  6th?

21  A.  Never.

22  Q.  Did you know what the protocols were for designated --

23  designating restricted grounds?

24  A.  I did not.

25  Q.  At any point that you were on the Capitol grounds, did you

1    go over onto the west side of the Capitol?

2    A.  No.

3    Q.  Did you see any of the violence that occurred on the west

4    side of the Capitol while you were there?

5    A.  I did not.

6    Q.  Now, I am going to move on to Defendant's Exhibit 16, which

7    is a video similar to the video showing your approach.

8                MR. ROMANO:  No objection.

9                THE COURT:  Without objection, 16 is in.

10   BY MR. CRON:

11   Q.  Once again, is that red arrow you?

12   A.  Yes, it is.

13   Q.  And does that show you entering into the east side?

14   A.  Yes.

15   Q.  Now, you disappeared from view from that corner.

16                (Video played.)

17                And let me just stop it here for a second.  Did you

18   employ the same methodology, in terms of determining where

19   you -- where this red arrow is pointing to you, as you did in

20   the last film?

21   A.  Yes, I did.

22                (Video played.)

23                Can I point something out?

24   Q.  Yes.

25   A.  I was -- I think it's important to know that what I was

1  expecting to find was the rally between the Supreme Court and

2  the Capitol building, so right around this area.

3          THE COURT:  What are you doing here?  It looks like

4  you've kind of stopped.

5          THE WITNESS:  I am -- so, you can notice, these are

6  the first time I actually saw any police officers on the

7  Capitol grounds.  So, they're -- these are the -- I noticed

8  some around that carriage door, but these cops were forming a

9  line on the stairs.  And I was just looking, like, what's

10  behind them?  You know, just checking that out.

11  BY MR. CRON:

12  Q.  Were those police officers telling people that they

13  couldn't be there?

14  A.  I did not hear any of that.

15          (Video played.)

16  Q.  There's an image now that has appeared in the upper right.

17  What is that image?

18  A.  That is a still image I captured of the center steps at

19  that moment.

20  Q.  What was that little blip that was in the upper right-hand

21  corner right there?

22  A.  I went to film on my iPhone the center steps and I

23  accidently pressed the stop button too fast.

24          (Video played.)

25  Q.  Now, what is this video in the upper right-hand corner?

1    A.  My second attempt at that video.  Still of the center --

2    Capitol steps, taken from my iPhone.

3                 (Video played.)

4    Q.  Is that you again with the red arrow?

5    A.  It is.

6                 (Video played.)

7    Q.  What are you doing here?

8    A.  I was curious.  I wanted to see what it was like up on top

9    of the steps, see the view from up there and see what's going

10   on.

11   Q.  So were you trying to make your way to the top of the

12   steps?

13   A.  I was.

14   Q.  Did you have any difficulty making your way to the top of

15   the steps?

16   A.  Yeah, working through all the people.  It was crowded.

17                 (Video played.)

18                 THE COURT:  Is he going to come back into camera

19   view.

20                 MR. CRON:  (Nods head.)

21                 THE WITNESS:  Yep.

22                 (Video played.)

23   BY MR. CRON:

24   Q.  Okay.  Let's see here.  Oops.  Let me get back up to where

25   we were.

1           Okay.  I see here that you are between the second and

2     third columns, is that right?

3     A.  Yes.

4     Q.  And is that the position where you ended up once you got to

5     the top of the steps?

6     A.  Yes.

7           (Video played.)

8     Q.  Now, what is this?

9     A.  This was another video I took with my iPhone on top of the

10    steps.

11    Q.  Now, when you were taking these videos, at what position

12    were you holding your camera?

13    A.  I was holding my camera higher than I could see normally.

14    Q.  Holding it above your head?

15    A.  I was holding it above my head.

16    Q.  Okay.  And how tall are you?

17    A.  I'm 5-10.

18    Q.  Why were you holding your video above your head?

19    A.  So that it can actually see things above the crowd.

20    Q.  So -- okay.  With that crowd, were you actually able to see

21    what the video depicts that you're holding above your head?

22    A.  No, not necessarily.

23    Q.  And, once again, what time is this particular video being

24    taken?

25    A.  As it's labeled below, 2:54 p.m.

```
 1                    (Video played.)
 2    Q.  Now, what is this?
 3    A.  It's another video taken by my iPhone, up on top of the
 4    Capitol steps.
 5    Q.  And what time is this video?
 6    A.  2:55.
 7                    (Video played.)
 8    Q.  Now, what is this video?
 9    A.  It's, again, another video I took, same sort of thing,
10    iPhone.  The time is 2:57 p.m.
11    Q.  Is this the last one that you took before you entered the
12    building?
13    A.  I took the one as entering, but that's -- the last one
14    before that video.
15    Q.  Okay.
16                    (Video played.)
17                And, by the way, were we able to locate any CCTV
18    footage that showed you at the top of the steps?
19    A.  As I was looking, I could not find anything.  We didn't
20    find anything.
21    Q.  So, what happened after you recorded this video?
22    A.  The crowd started moving towards the door at some point.
23    Q.  All right.  And what did you do?
24    A.  I went with the flow.
25    Q.  Where does this next video start?
```

1   A.  As I'm entering.

2            MR. CRON:  Okay.  Your Honor, I'm now moving to

3   Defendant's Exhibit 17.

4            MR. ROMANO:  No objection.

5            THE COURT:  Without objection, 17 is in.

6   BY MR. CRON:

7   Q.  Okay.  Before we start this video, orient us as to what is

8   in each of these four frames.

9   A.  So, you've seen some of these from the prosecution's case.

10  The upper left is -- the upper left, upper right, and lower

11  left are all the CCTV camera footage provided by the government

12  from various different angles.  The upper left is looking

13  towards the outside door from the rotunda proper.  I don't know

14  what you -- how you refer to it.  It's looking eastwards.

15           The upper right is above that door, looking into the

16  rotunda.  The lower left is above that staircase on the -- you

17  can see it on the right of the upper right view -- of that

18  foyer or breezeway, whatever you call it.  And the lower right

19  is my cell phone video that I was taking that you've seen

20  before.

21  Q.  Okay.  And once again, are these videos all synced in time?

22  A.  They are.

23  Q.  Okay.

24           (Video played.)

25           Now, what are the two green arrows pointing at here

1    in the upper left?

2    A.  Police officers that are on either side of the door.

3    Q.  Were these police officers allowing people to enter the

4    building?

5            MR. ROMANO:  Objection.  I think defendant can speak

6    to the interactions he had with police officers, but to talk

7    about what police officers were doing as to other people, calls

8    for speculation.

9            THE COURT:  Overruled.

10   A.  It appears to me they were allowing people into the Capitol

11   building.

12   BY MR. CRON:

13   Q.  And what did it look to you like the Capitol policemen were

14   doing with respect to the doors?

15   A.  It looked like they were holding them open, at least that's

16   what I thought they were doing.

17   Q.  Were the Capitol Police trying to block people from

18   entering the building?

19           MR. ROMANO:  Objection.  That question calls for the

20   defendant to speculate about the mindset of what the Capitol

21   Police were trying to obtain.

22           THE COURT:  Sustained.

23   BY MR. CRON:

24   Q.  Did it appear to you that the Capitol Police were trying to

25   block people from entering the building?

1    A.   I did not witness them blocking people from entering the

2    building.  It didn't appear to me they were.

3    Q.   Were the Capitol police at the entrance telling people they

4    weren't allowed to come in?

5    A.   Did I not hear them say that people were not allowed to

6    come in.

7    Q.   Were the Capitol Police at the entrance giving any

8    indication whatsoever to you that people weren't allowed to be

9    entering the building?

10   A.   No.

11   Q.   What would you have done if anyone in authority had given

12   any indication that you weren't allowed to go into the

13   building?

14   A.   I wouldn't have gone in.

15   Q.   Why did you go into the Capitol building?

16   A.   Because it looked like they were letting us in, and I was

17   waved in, as well.

18   Q.   Had you ever seen the inside of the Capitol before?

19   A.   I hadn't.

20              THE COURT:  What do you mean when you say you were

21   waved in?

22              THE WITNESS:  I saw one of the officers gesture me

23   in.

24              MR. CRON:  We'll get to that, Your Honor, here in

25   just a bit.

 1   BY MR. CRON:

 2   Q.   There's testimony in the record, evidence in the record

 3   about visitors ordinarily entering the Capitol through security

 4   checkpoints and the Visitor Center, also the use of

 5   magnetometers and presenting identification to security

 6   officials.   Were you aware of any of these procedures prior to

 7   going to the Capitol, before January 6th?

 8   A.   I was not.

 9   Q.   Why is that?

10   A.   I've never been there before and I don't know what the

11   security procedures of the Capitol building are.

12   Q.   Okay.   I'm about to show you what's been marked for

13   identification purposes as Defendant's Exhibit 18.

14           MR. ROMANO:   No objection.

15           THE COURT:   Without objection, 18 is in.

16   BY MR. CRON:

17   Q.   All right.   Let's see.   Let me find my place here.

18           Okay.   What does -- okay.   So what does this exhibit

19   depict?

20   A.   It's a still of -- captured of me entering.

21   Q.   And what are the green arrows pointing to?

22   A.   The green arrows are once again pointing to the police

23   officers at the door, waving people in.

24   Q.   And what is --

25   A.   At least waving me in.   Sorry.

1    Q.   No, that's okay.

2              MR. CRON:  And that's 18, Your Honor.

3              THE COURT:  Thank you.

4    BY MR. CRON:

5    Q.   And what is the red arrow pointing to?

6    A.   It's pointing at me.

7              THE COURT:  You said that you see them waving.

8              THE WITNESS:  We'll show you that.

9              MR. CRON:  We'll get to that.

10             THE COURT:  Okay.

11   BY MR. CRON:

12   Q.   Now, going back to the video itself.

13             (Video played.)

14             Once again, just for orientation purposes, there's

15   only one green arrow in the lower left-hand.  Is that because

16   it's just a different camera angle?

17   A.   Yeah, it's a different camera angle.  The other police

18   officer is kind of out of view.  You might see him duck in, a

19   little bit.

20             (Video played.)

21   Q.   Okay.  Now I see in the upper left-hand corner there is a

22   little bubble with a man in a red hat.

23   A.   Yes.

24   Q.   Okay.  And what did that signify?

25   A.   It's -- he's highlighted because he -- I hear him thank the

1     officer that is closest to me, and I thought that was a really

2     good idea.

3              (Video played.)

4     Q.   Okay.   Now, did you -- did you see the person in the red

5     hat greet the officer in any way or make any expression to him?

6     A.   Yeah.   Like I said, he thanked him, he shook his hand.   I

7     didn't hear the entire conversation, but I heard the

8     importance, that he was thanking him.

9     Q.   Did you see the policeman turn to shake his hand?

10    A.   I did.

11    Q.   Now, it has been -- it's been noted in previous testimony

12    that when you entered the building, that some of the glass on

13    the doors was broken.   Did you even notice that?

14    A.   Not at the time.   It was --

15    Q.   Why was that?

16    A.   I was looking at the officers, they were waving me in.

17    Q.   It's also noted that there were sounds of alarms when you

18    entered the building.   Did you notice that?

19    A.   I don't remember, but I must have.

20    Q.   Why did you enter the building even though the sounds of

21    the alarms were audible?

22    A.   I figured it was okay because the officers were waving me

23    in.   And I figured it may have just been -- somebody just

24    needed to hit a button or something, or maybe it was one of the

25    protestors with their bullhorn sound effects or something.

```
 1              (Video played.)

 2    Q.  Okay.  We're just a few seconds in.  Is that him shaking

 3    the officer's hand?

 4    A.  Yeah.

 5              (Video played.)

 6    Q.  Okay.  Now, I'm going to now move to -- we'll temporarily

 7    halt this one and move to Defendant's Exhibit 19.

 8              MR. ROMANO:  No objection.

 9              THE COURT:  Is this a good point for a break?

10              MR. CRON:  Yes.

11              THE COURT:  All right.  Why don't we take a

12    five-minute break.

13              (Recess.)

14              THE COURT:  Mr. Martin, I'll remind you, you're still

15    under oath.

16              Mr. Cron, you may proceed.

17              MR. CRON:  Thank you.

18              Excuse me, Your Honor.  I lost track here.  Has 19

19    been admitted?

20              THE COURT:  I don't think so.  Any objection to 19?

21              MR. ROMANO:  No objection.

22              THE COURT:  All right.  Without objection, 19 is in.

23    BY MR. CRON:

24    Q.  Okay.  What we're going to do here is we'll play through

25    this once and then we'll go back and I'll ask you some
```

1    questions.

2    A.  Okay.

3              (Video played.)

4    Q.  Okay.  Let's go back and look at this again.

5              Okay.  Once again, just to orient, what are the green

6    arrows pointed to?

7    A.  Again, the green arrows are pointing to the two police

8    officers that are standing in the entryway and that waved me

9    in.

10   Q.  And the red arrow?

11   A.  The red arrow is me again.

12             (Video played.)

13   Q.  Okay.  Did you see that motion with the officer's left hand

14   there that happened?

15   A.  Yes.

16   Q.  Let me --

17             (Video played.)

18             Right there.

19   A.  Yeah.

20   Q.  What did that look, to you, like he was doing when he made

21   that motion?

22   A.  He was waiving me to pass.

23             (Video played.)

24   Q.  Now, it looks like you put your hand on his right

25   shoulder -- or, left shoulder, rather?

1    A.   Yeah.   I stopped filming that earlier video, put it in my

2    pocket to free the hand so I could either shake his hand or pat

3    him on the arm, like I did, to reaffirm what the other man

4    said.

5              (Video played.)

6    Q.   And, once again, is this a closer-up of the officer making

7    that motion towards the rotunda?

8    A.   I think it will be in a sec.   Oh, no, this is -- I think

9    it's a more distant one.   2.5, yeah, Zoom.

10             (Video played.)

11   Q.   Okay.

12   A.   Quarter speed.

13   Q.   And once again, what's in the circle?

14   A.   Circle is drawing attention to the officer's left hand,

15   waving me in.

16             (Video played.)

17   Q.   And is that the motion that you saw that you interpreted as

18   waving you in?

19   A.   It is.

20             (Video played.)

21   Q.   Okay.   Now, I would like you to look at the officer's right

22   hand here.   Do you see there where he motions towards the

23   rotunda?

24   A.   Yes.

25   Q.   And what did you interpret that as meaning?

1    A.  It appeared he was waiving me to pass.

2              (Video played.)

3    Q.  Okay.  We're going, now, to go back to Exhibit -- Exhibit

4    17.

5              (Video played.)

6              Okay.  Now, this is where we had left off after you

7    had come into the foyer there, in between the front door and

8    the rotunda door.  What is it that you are doing right there?

9    A.  I had pulled out my iPhone to start filming once again.

10              (Video played.)

11   Q.  Is what's appearing in the lower right corner the video

12   that you're taking, that's depicted up in the upper left

13   corner?

14   A.  Yes.

15              (Video played.)

16   Q.  And where are you headed there?

17   A.  I'm heading towards the -- what I refer to as the rotunda.

18   I guess people are referring to all those areas as the rotunda.

19   But, the rotunda proper.

20   Q.  Now, I want to show you what's been marked as Defendant's

21   Exhibit 21.

22              MR. ROMANO:  No objection.

23              THE COURT:  Without objection, 21 is in.

24              MR. CRON:  And, Your Honor, the Elmo has a little

25   glare to it.

1          THE COURT:  Yes, that's fine.  I've also got the copy

2    that you provided.

3          MR. CRON:  Right.  I was just about to suggest that

4    that might give you a better view.

5    BY MR. CRON:

6    Q.  Now, what is this photo?

7    A.  It's a photo -- it's a close-up still captured from one of

8    the CCTV cameras, inside the rotunda.

9    Q.  Okay.  And what are you doing?

10   A.  I'm standing, just holding the flag.

11   Q.  All right.  And I see that you -- it looks like you have

12   the bottom of your flag pole resting on the floor.  Am I right

13   about that?

14   A.  Yes.

15   Q.  And is this similar to how you hold your flag throughout

16   the time that you are inside the Capitol?

17   A.  The building itself, yes.

18   Q.  Okay.  Going back now to the film.

19          (Video played.)

20          There was someone who appeared to be in some distress

21   there.  Did you know -- first of all, did you see what happened

22   to cause him to be in distress?

23   A.  I did not.

24   Q.  Okay.  Now, what -- what is it now that's appearing in the

25   lower right corner?

1    A.  So, in addition to the background video, which is the

2    new -- it's the rotunda north, it's the camera that is peering

3    southward from the northern door of the rotunda.  The lower

4    right is an iPhone video that I took at this time.

5    Q.  So that's video that you're capturing at the same time as

6    this arrow is pointing to you?

7    A.  Yes.

8              (Video played.)

9              I should mention, the southern camera, that was just

10   up in the upper right, looking north.

11   Q.  Okay.  Now, is this your video in the upper right panel?

12   A.  It is, taken from my iPhone.

13             (Video played.)

14   Q.  What does this show?

15   A.  It shows several police officers in the doorway.  Not --

16   trying to keep us in the rotunda.

17   Q.  And it looks like there's a hallway behind them.  Am I

18   right about that?

19   A.  Or something, yeah.

20   Q.  Okay.  And what did their presence in that -- blocking that

21   hallway signify to you?

22   A.  That I was -- that we were allowed to be in the rotunda,

23   they just didn't want us moving past that point.

24   Q.  Did you try to enter that hallway?

25   A.  No, I did not.

1                          (Video played.)

2    Q.  And let me ask you, did you hear any of the nine Capitol

3    police officers that were depicted at the entrance of that

4    hallway off the rotunda telling anyone that they weren't

5    allowed to be in the rotunda itself?

6    A.  I did not.

7    Q.  Taking into consideration, along with the fact that the

8    Capitol police officer, in your purview, waived you into the

9    building, did you draw any conclusions about whether you were

10   in the building with lawful authority to be there?

11   A.  I thought I was in there with lawful authority.

12                         (Video played.)

13   Q.  Okay.  Now, what is it that has just appeared in the lower

14   left frame?

15   A.  Again, I started filming another video with my iPhone.

16   Q.  And where are you holding your camera?

17   A.  Again, well above my head.

18   Q.  Why was that?

19   A.  Because I couldn't see through the crowd.

20                         (Video played.)

21   Q.  Now, could you see what was going on with the Metro Police

22   with the bright green vests on who had entered the rotunda?

23   A.  I could not.

24   Q.  And why was that?

25   A.  Except for a brief moment when there was a gap, I just

1    couldn't see through the crowd.

2    Q.  And in this part of the video someone can be heard yelling,

3    "Don't back down."  Was that you?

4    A.  No, it was not.

5    Q.  Do you know who that was?

6    A.  I don't know who that was.

7    Q.  Are you able to see his face saying those words in this

8    video?

9    A.  Earlier, yes.

10   Q.  Did you utter any words to anyone while you were inside the

11   Capitol building?

12   A.  No.

13   Q.  Did you have any kind of voice amplification that you used

14   to make any remarks inside?

15   A.  No.

16   Q.  Did you yell anything while you were inside?

17   A.  I did not.

18              (Video played.)

19   Q.  Now, in this part of the clip you can see a lot of people

20   holding their flags high and waiving them around.  Did you do

21   that at any point when you were inside the Capitol building?

22   A.  No, I did not.

23   Q.  And why is that?

24   A.  I didn't see a point.  It also felt disrespectful.

25   Q.  Were you demonstrating while you were in there?

1    A.  I was not.

2    Q.  Did you go there for the purpose of protesting inside?

3    A.  No.

4    Q.  Did you protest while you were inside?

5    A.  I did not.

6              MR. ROMANO:  Objection to that.  Calls for a legal

7    conclusion.

8              THE COURT:  Overruled.

9    BY MR. CRON:

10   Q.  Were you picketing while you were in there?

11   A.  No.

12             THE COURT:  I got the point.  Let's keep going.

13             (Video played.)

14   A.  Can I say something?

15   BY MR. CRON:

16   Q.  Yes.

17   A.  That was me sneezing, not coughing.  And I used the COVID

18   mask to cover my face and mouth.  I'm in the habit of doing

19   that.

20             (Video played.)

21             THE COURT:  All right.  You got about 20 minutes,

22   Mr. Cron.  I don't know that I need to see all this again.

23             (Video played.)

24   BY MR. CRON:

25   Q.  Okay.  I think we've seen -- seen you the rest of the way

1     on this one.  Okay.

2     A.  Did you just mean in the rotunda?

3     Q.  Pardon me?

4     A.  Did he want to see me exiting again?

5     Q.  No.  No, that has already been shown and His Honor has

6     indicated that he's already seen that.

7     A.  Okay.

8     Q.  I move now to Defendant's Exhibit 23.

9              MR. ROMANO:  No objection.

10             THE COURT:  Without objection 23 is in and may be

11    played.

12             (Video played.)

13    BY MR. CRON:

14    Q.  And what does this video depict?

15    A.  This is another CCTV footage provided by the government on

16    the east plaza, looking at the center steps.

17    Q.  And then, once again, is the red arrow pointing at you?

18    A.  Yes, it is.

19             THE COURT:  Do we just see him leave?

20             MR. CRON:  Pardon me?

21             THE COURT:  Is there anything relevant here?

22             MR. CRON:  No --

23             THE COURT:  Just showing leaving through the crowd.

24    I get it.

25             MR. CRON:  Okay.  All right.

1    BY MR. CRON:

2    Q.  All right.  I want to talk about -- apparently there was

3    some metadata that was corrupted in what had been turned over

4    to the FBI.  And, so, there are some times on Government

5    Exhibits 324, 325, and 326 that we don't have the times of

6    those.  Were you able to look at the metadata on those three

7    exhibits to determine the time that each of them was taken?

8    A.  I was.

9    Q.  Okay.  Do you remember off the top of your head at what

10   time Government 324 was recorded?

11   A.  I need to be reminded what 324 is.

12   Q.  Would it refresh your recollection if I showed you a chart

13   that you put together that indicates the times?

14   A.  Yes, and I would also need to be reminded the file name

15   we're referring to.

16            MR. CRON:  Okay.  May I approach?

17            THE COURT:  You may.

18   BY MR. CRON:

19   Q.  Okay.  I would like you to look at what is 985.

20   A.  985?

21   Q.  Yes.

22   A.  All right.

23   Q.  Which corresponds to Government 324.  What time was that

24   video taken?

25            MR. ROMANO:  Your Honor, I object to this.  It's not

1   proper format for refreshing recollection.

2           THE COURT:  Yeah, I'm not sure this is really

3   relevant either.  I mean, tell me if I'm missing something, but

4   I feel like I've seen so many videos.  I got to.

5           MR. CRON:  All right.

6   BY MR. CRON:

7   Q.  Now, we have already seen the video with the drummer at the

8   Peace Monument, and that was recorded at 4:22.  That's in

9   evidence.  When, in relation -- how close in time was it when

10  these other three that were shown this morning from the north

11  side, how close in time to when you were at the Peace Monument

12  were those recorded?

13  A.  Those occurred -- not, like, right before, but before I was

14  leaving.  That Peace monument was a video I was taking as I was

15  leaving the area.

16  Q.  Okay.  What did you do after that?

17  A.  I left and I went back to the hotel on Pennsylvania Avenue,

18  just the way I came.

19          MR. CRON:  Okay.  I'm just cutting out some things

20  here that I think have already been covered.

21  BY MR. CRON:

22  Q.  One of the texts that has been admitted into evidence said,

23  "It was beautiful.  I will remember today for the rest of my

24  life."  Please explain what you meant by that.

25  A.  So, I'm speaking of my personal experience, which I know is

1    not the other experiences that were had -- held that day.  I

2    had a positive experience going out there, mostly.  You know,

3    it was festive at the Trump rally.  I enjoyed walking down

4    Pennsylvania Avenue.  I -- for the most part, I had a good day.

5    Q.  Now, it has been implied that there's something to be made

6    over the fact that you did not tell your supervisor over a text

7    that you had been inside.  Did you end up explaining your

8    circumstances to your supervisor?

9    A.  I did.

10   Q.  And why did you not disclose that over a text?

11   A.  I was worried she would misunderstand, misinterpret that.

12   Q.  And did you want to have the chance to give her a full

13   explanation?

14   A.  I did.  And I knew that later on I would be able to talk

15   with her.  She's a busy person.

16   Q.  Did you then tell her on your first day back on the job?

17   A.  Yeah.  So, the group meeting was that day and just during

18   that group meeting I -- I mentioned, when we're going around

19   the table, that I had some more stuff to talk to you about, and

20   she told me to call her afterwards.  I did, and that's -- I had

21   some other things to discuss, and then I brought that up as

22   well.

23   Q.  Now, you expressed to Agent Taylor that you personally

24   believed at the time that the election had been stolen.  Given

25   this belief, did you go to the Capitol for the purpose of

1   disrupting the Electoral College process?

2   A.  I did not.

3   Q.  When you left the hotel to go to the Capitol, did you think

4   that the counting of the Electoral College was a formality?

5   A.  Yeah, a forgone conclusion.

6   Q.  So did you think that it was a done deal that Joe Biden

7   would be declared the winner?

8   A.  I did at that point.

9   Q.  Did you think that the presence of the crowd at the Capitol

10  would have any effect on the outcome of the Electoral College

11  count when you left to go there?

12  A.  No, I didn't.

13  Q.  Did you go to or enter the Capitol with intent to impede

14  the orderly conduct of a session of Congress?

15  A.  I did not.

16  Q.  Did you go to or enter the Capitol with the intent of

17  disrupting the orderly conduct or a session of Congress?

18  A.  I didn't.

19  Q.  Did you go to or enter the Capitol with the intent to

20  disturb the orderly conduct of a session of Congress?

21  A.  I did not.

22  Q.  Did you go to or enter the Capitol with the intent to

23  impede the orderly conduct of either house of Congress?

24  A.  I didn't.

25  Q.  Did you go to or enter the Capitol with the intent to

1   disrupt the orderly conduct -- to disrupt the orderly conduct

2   of either house of Congress?

3   A.  I did not.

4   Q.  Did you communicate with anyone through any media from the

5   time you left the hotel to go to the Capitol until you got back

6   to your hotel room?

7   A.  No.  I couldn't.

8   Q.  Did you commit any violence upon anyone on your trip to

9   Washington?

10  A.  No, I did not.

11  Q.  Did you vandalize any property on your trip to Washington?

12  A.  I did not.

13  Q.  Did you ever post anything on social media advocating

14  violence in Washington?

15  A.  I did not.

16  Q.  Did you ever post anything on social media advocating

17  disruption of the Electoral College certification to the

18  election?

19  A.  I did not.

20  Q.  When you met with Special Agent Taylor, did you give him

21  the names of websites and platforms that you looked at, along

22  with your user ID names, so that he could look to verify that

23  there was nothing like that out there on you?

24  A.  I gave him that information.

25          MR. CRON:  Pass the witness, Your Honor.

1          THE COURT:  All right.  Mr. Martin, if you could

2     answer Mr. Romano's questions.

3          THE WITNESS:  Sure.

4          THE COURT:  And I've got an executive committee

5     meeting of the court in 20 minutes.  So why don't you go about

6     ten minutes and we'll wrap up for today.

7                         CROSS-EXAMINATION

8     BY MR. ROMANO:

9     Q.  Good afternoon, Mr. Martin.

10    A.  Good afternoon, Mr. Romano.

11    Q.  Before you were let go, how long had you worked at

12    Los Alamos?

13    A.  I didn't work at Los Alamos.  I worked at -- at Mission

14    Support and Test Services, was 18 and a half years.

15    Q.  I understand that's the contractor that employed you.  But

16    you worked at the facility, right?

17    A.  I worked in the town of Los Alamos.  It was a separate

18    facility.

19    Q.  At a facility in the town of Los Alamos?

20    A.  Yes.

21    Q.  Okay.  If you were describing to a friend where you worked,

22    how would you describe it?

23    A.  I would -- actually, just like I did.  I'd describe it, up

24    in Los Alamos.  Like --

25    Q.  Up in Los Alamos, right?

```
1    A.  Not the laboratory, though.
2    Q.  Okay.  How long did you work there?
3    A.  I worked there 18 and a half years.
4    Q.  Okay.  And what sort of education did you have that
5    qualified you to work there?
6    A.  I had a bachelor's of science in electrical engineering.
7    Q.  Where did you get your degree?
8    A.  At Socorro, New Mexico, the New Mexico Institute of Mining
9    and Technology.
10   Q.  And what was your highest position working at the facility
11   where you worked?
12   A.  I was senior engineer.
13   Q.  What sort of responsibilities did you have as a senior
14   engineer?
15   A.  Oh, I had product management responsibilities, I -- I
16   had -- you know, I was -- I had project responsibilities,
17   systems designing, all sorts of things.
18   Q.  You had to, I imagine, have a lot of expertise in
19   engineering to qualify for that sort of job?
20   A.  Yes.
21   Q.  A lot of time working in engineering?
22   A.  I did.
23   Q.  It sounds like that job also required some amount of
24   managing people, too?
25   A.  Not as much, but --
```

1  Q.  Um-hum.  Did you have any sort of continuing education as a

2  part of holding that job?

3  A.  There was a lot of training.

4  Q.  Sure.  So, I want to turn to those text messages.  Can we

5  call up 115, please.

6        You had said a moment ago that you didn't tell Amy

7  Lewis that you went into the Capitol on January 6th because you

8  were worried that she would misunderstand you, right?

9  A.  She would misinterpret, given the news.

10  Q.  She would misinterpret, given the news.  Okay.

11        Now, you were texting with Amy Lewis at about 6 p.m.,

12  right?

13  A.  That sounds right.

14  Q.  You got back to your hotel, maybe, around 5 p.m.?

15  A.  That sounds about right, too.

16  Q.  And so the news that you're talking about, according to

17  you, is something that you had maybe an hour's worth of time to

18  see?

19  A.  Not even that.

20  Q.  Okay.  And you told us on direct examination that Amy was

21  your supervisor and also your good friend, right?

22  A.  Yes.

23  Q.  And Angelica Hernandez was your personal trainer?

24  A.  Yes.

25  Q.  And you were not worried about Angelica Hernandez

1  misinterpreting you going into the Capitol?

2  A.  That's correct.

3  Q.  You told her up front that you went in?

4  A.  Yes.

5  Q.  But you didn't tell Amy?

6  A.  No.

7  Q.  Now, let's look at these texts.  At 6:01 p.m. -- I'm sorry.

8  First, at 5:51 p.m. you asked Amy, "You seen the news," right?

9  A.  Yeah.

10  Q.  And that was the first message between the two of you after

11  you got back to your hotel, right?

12  A.  Yeah, it's -- it was a conversation between friends; it was

13  not with the manager, in that context.

14  Q.  That's not what I'm asking.  I'm asking if that was the

15  first message between the two of you after you got back to your

16  hotel?

17  A.  That's correct.

18  Q.  So you were the one who brought up the news?

19  A.  I did.

20  Q.  You were the one who brought up the Capitol?

21  A.  Um-hum.  I wanted to take her temperature on the issue.

22  Q.  You wanted to see how she might react?

23  A.  I was wondering how she was reacting.

24  Q.  Is that what you mean by "take her temperature"?

25  A.  Yeah.

1    Q.  And her reaction was, at 6:01 p.m., ten minutes later,

2    "Yes.  Please tell me you stayed outside and are now at your

3    hotel"?

4    A.  Um-hum.

5    Q.  And is that a yes?

6             THE COURT:  Sir, if you could just say yes or no.

7             THE WITNESS:  Oh, yes.  Yes.

8    BY MR. ROMANO:

9    Q.  The court reporter needs a verbal answer.

10            Then she sent you, about 15 seconds later, a message

11   that said "6 p.m. curfew," right?

12   A.  Right.

13   Q.  And so her question was in two parts, right?

14   A.  Well, I don't see a question.

15   Q.  Okay.  She was asking you to tell her two things, right?

16   A.  Yeah.

17   Q.  She hoped that you --

18   A.  Well --

19   Q.  -- stayed outside, right?

20   A.  She stated that, yes.

21   Q.  And that she was hoping you were at your hotel --

22   A.  Yes.

23   Q.  -- because of the curfew?

24   A.  She also -- I guess she was notifying me of a curfew, in

25   case I didn't know about it.

1    Q.  And, so, you understood that when she said, "Please tell me

2    you stayed outside," she was talking about please tell me you

3    stayed outside of the Capitol?

4    A.  Um-hum.

5    Q.  Yes?

6    A.  Yes.

7    Q.  You didn't go into the Capitol building?

8    A.  Yes.

9    Q.  Right.  And your answer to her was "I'm now in my hotel"?

10   A.  That's correct.

11   Q.  You answered the second part of her question?

12   A.  Yes.

13   Q.  You deliberately did not answer the first part of her

14   question?

15   A.  Right.

16   Q.  And you knew that sending her that second answer, "I'm now

17   in my hotel," was both technically true and misleading?

18   A.  Um -- I knew -- yes, I avoided that first part.

19   Q.  Intentionally?

20   A.  And there's a reason.

21   Q.  You intentionally avoided that first part?

22   A.  I intentionally avoided that first part.

23   Q.  So you could give her the impression, falsely, that you did

24   not go into the Capitol building?

25   A.  That -- at the time.

1    Q.  Well, when you were having this conversation.  This is the

2    only time we're talking about.

3    A.  So, this -- the context is I know Amy's politics, okay?

4    She is left of center person, so I was worried she would

5    misinterpret.  I was very craftily avoiding that topic because

6    I knew she would misinterpret.

7    Q.  I'm not asking you about Ms. Lewis's politics.  I'm asking

8    if you, on purpose, answered half of her question so she would

9    mistakenly think that you didn't go into the Capitol building.

10   And that's exactly what you did?

11   A.  I was letting her know it was fine.

12   Q.  You were letting her know it was fine?

13   A.  Yeah.  Everything was fine.

14   Q.  What do you mean by that?

15   A.  It means that there was nothing to worry about.

16   Q.  Well, she was worried that you had gone into the Capitol

17   building, right?

18   A.  Yes.

19   Q.  And you didn't answer that question, right?

20   A.  I answered her -- that she had nothing -- I was trying to

21   tell her she had nothing to be concerned with.

22   Q.  Okay.  We'll move on.

23            So, later, you said, at 6:03 p.m., "It was beautiful.

24   I will remember today for the rest of my life"?

25   A.  Yes.

1   Q.  You said that because you were proud of going into the

2   Capitol?

3   A.  I was not proud of -- I was -- I enjoyed the day and it

4   was -- it was a magical day in many ways.  I know some bad

5   things happened.  Right?  But, it's -- like, there's the rally,

6   there was all the Trump supporters everywhere.  It was a

7   festive atmosphere.

8   Q.  What do you mean it was a "magical day"?

9   A.  I mean, it was a festive -- it was a festive day, outside

10  of the Capitol.  There was some anger and stuff around the

11  Capitol, I'm not talking about that.

12  Q.  You understand police officers died?

13  A.  I do not understand that police officers died because of

14  that.

15  Q.  You understand there were members of the crowd who died?

16  A.  Yes.

17  Q.  And people suffered injuries?

18  A.  Yes.

19  Q.  And people suffered psychological trauma?

20  A.  After the fact, yes.

21  Q.  Suffered it because of the events --

22  A.  No, I understand that after -- like, even after this

23  conversation, I didn't even know what happened.

24  Q.  So, let's turn to the next page.  At 6 -- next page,

25  please.

1    At 6:10 p.m. she sent you, again, "I hope you stayed

2    outside.  That's essential," right?

3    A.  Yeah.  And I basically sent her a, uh, emoji saying chill,

4    you know, it's fine.

5    Q.  Okay.  That's what you intended to communicate with a smily

6    face with sunglasses?

7    A.  Um-hum.

8    Q.  Yes?

9    A.  Yes.

10   Q.  And so, again, you didn't actually tell her that you stayed

11   outside, right?

12   A.  I knew I would be able to talk to her later and give her

13   full context.

14   Q.  And you intentionally avoided saying anything that was

15   technically false, right?

16   A.  Yes.

17   Q.  Now, you also know that lying to your supervisor would put

18   your security clearance in jeopardy, right?

19   A.  I didn't know that.

20   Q.  You hold a Q security clearance, right?

21   A.  Yes, I do.

22   Q.  Or you did?

23   A.  Yes.  I did.  I did, yeah.

24   Q.  And I know you were very precise with what agency issued

25   that security clearance.  But, setting that aside, you've been

1    through the training process to receive that security

2    clearance, right?

3    A.  That's correct.

4    Q.  And you have to go through annual trainings to make sure

5    that you understand the obligations of holding that security

6    clearance?

7    A.  Yes.  And in no part of those trainings did it tell you not

8    to lie to your supervisor.  It was more about people

9    investigating.

10   Q.  Mr. Martin, is it your testimony that you didn't think

11   lying to your supervisor could put your security clearance at

12   risk?

13   A.  I wasn't even talking to my supervisor at this time; I was

14   talking to a friend.

15   Q.  Who is also your supervisor?

16   A.  Yes.

17   Q.  And you knew she was your supervisor at the time you were

18   talking to her?

19   A.  Yeah, and I didn't think it --

20   Q.  Whether you were having the conversation as a friend or

21   not, you were talking to your supervisor?

22   A.  I wasn't even thinking about work at this time.

23   Q.  You -- shortly before she asked you a second time if you

24   went into the Capitol, at 6:07 p.m., she said, "You can't

25   overrun the Capitol building," right?

1    A.  I believe you said that already.  You covered that already.

2    Right.

3    Q.  Is that a yes to my question?  She said to you, "You can't

4    overrun the Capitol building"?

5    A.  Yes.

6    Q.  And you wrote back, "Actually --

7    A.  Oh, yeah.  I'm sorry.  Excuse me.  My mistake.

8    Q.  "Actually you can, rather easily might I add.  Not as much

9    security as you think.  Our numbers were freaking huge.  They

10   were not prepared," right?

11   A.  I -- I understand how this can be misread.  What -- so I

12   was responding to her usage of the word "can't" and, you know,

13   as opposed to "shouldn't."  And I was commenting on news and

14   being very sarcastic, "Actually you can, rather easily I might

15   add," and it was just a comment of what the heck happened.

16           And even the next part is factual.  And you'll notice

17   I even reference this in the FBI interview, even the part you

18   played in the courtroom, "Not as much security as you think.

19   Our numbers were huge."  That's factual.  "They were not

20   prepared."  And I was -- that's -- that was just -- I was

21   stating my opinion on what things -- things had gone wrong.

22   Q.  So there were --

23           THE COURT:  Mr. Romano, let's look for a place to

24   wrap up.

25           MR. ROMANO:  I'm sorry?

1          THE COURT:  Let's look for a place to wrap up for the

2     day.

3          MR. ROMANO:  Okay.

4     BY MR. ROMANO:

5     Q.  I'm going to direct your attention down to 6:11 p.m.  You

6     wrote to her, "I was in the hotel when I got word that the

7     Capitol was breached," right?

8     A.  That's correct.

9     Q.  And is it your testimony today that you were talking about

10    learning the Capitol was breached when you got back to your

11    hotel, right?

12    A.  Yes.

13    Q.  Not that you learned the Capitol was breached when you were

14    in your hotel earlier and that you then left the hotel to

15    travel to the Capitol?

16    A.  That's correct.

17          MR. ROMANO:  Okay.  Your Honor, I think we can stop

18    there.  I'll pick it up tomorrow.

19          THE COURT:  Why don't we return at 9 o'clock --

20    actually, I've got something in the morning.  Let's do 10 a.m.

21    tomorrow.

22          Okay.  Mr. Martin, you may step down.

23          Mr. Romano, anything we should be discussing between

24    now and then?

25          MR. ROMANO:  I don't think so, Your Honor.

1          THE COURT:  Okay.  And, Mr. Cron, anything we need to

2     discuss between now and tomorrow morning?

3          MR. CRON:  No, I don't think so.

4          THE COURT:  Okay.  I'll see you all at 10 a.m.

5     tomorrow.

6          MR. ROMANO:  Thank you.

7                         *   *   *

1

2                     CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                          Dated this 13th day of April, 2022

9

10

11                    _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25

```
 1                            INDEX
                     Volume 1 - pages 1 - 195
 2                   Volume 2 - pages 196 - 273

 3      WITNESSES:

 4          John Erickson
                  Direct Examination By Mr. Romano................. 20
 5                Cross-Examination By Mr. Cron.................... 55

 6          Travis Taylor
                  Direct Examination By Ms. Dohrmann.............. 57
 7                Cross-Examination By Mr. Cron...................110
                  Redirect Examination By Ms. Dohrmann............115
 8
            Jonathan Monroe
 9                Direct Examination By Mr. Romano................117
                  Cross Examination By Mr. Cron...................127
10
            Matthew Martin
11                Direct Examination By Mr. Cron..................129
                  Cross-Examination By Mr. Romano.................182
12                Redirect Examination By Mr. Cron...............222

13      GOVERNMENT RESTS.......................................128
        DEFENSE RESTS..........................................225
14

15                        EXHIBITS ADMITTED

16      Government Exhibits:
                  Exhibits 1 - 5................................. 19
17                Exhibits 100-116.............................. 20
                  Exhibits 202 and 203.......................... 20
18                Exhibits 205-212.............................. 20
                  Exhibits 300-330.............................. 20
19                Exhibits 400 series........................... 20

20      Defense Exhibits:
                  Exhibits 1-10.................................131
21                Exhibit 11.................................... 34
                  Exhibit 15...................................154
22                Exhibit 16...................................156
                  Exhibit 17...................................161
23                Exhibit 18...................................164
                  Exhibit 19...................................167
24                Exhibit 21...................................170
                  Exhibit 23...................................176
25                Exhibit 27...................................154
                              *   *   *
```