```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      )  Criminal Action
                                       )  No. 21-cr-394
 4                     Plaintiff,      )
                                       )  BENCH TRIAL
 5      vs.                            )  DAY 2 of 2
                                       )
 6      Matthew Martin,                )  Washington, DC
                                       )  April 6, 2022
 7                     Defendant.      )  Time:  10:00 a.m.
        _____
 8
                         TRANSCRIPT OF BENCH TRIAL
 9                           HELD BEFORE
               THE HONORABLE JUDGE TREVOR N. McFADDEN
10                   UNITED STATES DISTRICT JUDGE
        _____
11
                       A P P E A R A N C E S
12
        For Plaintiff:    Mary Dohrmann
13                        Michael Romano
                          U.S. Attorney's Office
14                        555 Fourth Street Northwest
                          Washington, DC  20530
15
        For Defendant:    Dan Cron
16                        Dan Cron Law Firm, P.C.
                          425 Sandoval Street
17                        Santa Fe, NM  87501

18      _____

19      Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
20                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
21                             Washington, DC  20001
                               202-354-3267
22

23

24

25
```

1          THE COURT:  Good morning.

2          THE COURTROOM DEPUTY:  Your Honor, this is criminal

3     case 21-394, *United States of America versus Matthew Martin*.

4          Counsel, please come forward to identify yourselves

5     for the record, starting with the government.

6          MS. DOHRMANN:  Good morning, Your Honor.  Mary

7     Dohrmann on behalf of the United States.  And also present is

8     Michael Romano on behalf of the United States.

9          THE COURT:  Good morning, folks.

10         MR. CRON:  Good morning, Your Honor.  Dan Cron on

11    behalf of Matthew Martin, who appears personally.

12         THE COURT:  Good morning, Mr. Cron.  Good morning,

13    Mr. Martin.

14         All right.  We're in the middle of the defendant's

15    testimony.

16         Mr. Martin, if you could retake the stand, sir.  I'll

17    remind you that you're still under oath.

18         Mr. Romano.

19         MR. ROMANO:  Thank you, Your Honor.

20         THE COURT:  And, I'll just tell folks in the

21    audience, in light of the CDC's recent finding that D.C. is a

22    low area of COVID transmission, I do not require people to wear

23    masks.  You're, obviously, welcome to, if you wish to do so.

24         Mr. Romano.

25         MR. ROMANO:  Thank you, Your Honor.  Give me just a

1    minute as my computer loads, Your Honor.

2                     CROSS-EXAMINATION (Cont.)

3    BY MR. ROMANO:

4    Q.  All right.  Mr. Martin, yesterday, near the end of your

5    direct examination, your attorney asked you a number of

6    questions about statutes that you're charged with violating and

7    your intent.  Do you remember those questions?

8    A.  Yes.

9    Q.  Okay.  I want to start there and focus on Count 4, which

10   charges you with parading, demonstrating, and picketing in the

11   Capitol.

12               When you left your hotel room the afternoon of

13   January 6, you say that you were planning to go to a rally on

14   the east side of the Capitol, between the Capitol building and

15   the Supreme Court, right?

16   A.  That's correct.

17   Q.  Okay.  And so you left dressed in political gear, right?

18   A.  Yes.  I had a mask that I occasionally had on and off.

19   Q.  And a hat?

20   A.  Yes.

21   Q.  And you were carrying a flag?

22   A.  Yes.

23   Q.  Okay.  And you -- your intent was to wear those items and

24   carry those items at the rally, right?

25   A.  Yes.

1    Q.  And you carried that flag with you all the way across

2    Capitol grounds?

3    A.  Yes.

4    Q.  And you carried that flag up the stairs?

5    A.  Yes.

6    Q.  Onto the landing?

7    A.  Yes.

8    Q.  And you entered the building with it?

9    A.  Yes.

10   Q.  All right.  Now, you talked with the FBI about your

11   understanding of why the crowd was present at the Capitol,

12   right?

13   A.  Yes.

14   Q.  And you spoke with the FBI about what the crowd wanted to

15   accomplish, right?

16   A.  I speculated, yes.

17   Q.  Well, you told the FBI what you understood the crowd wanted

18   to accomplish?

19   A.  Yes -- or, I speculated about what the crowd was --

20   Q.  Well, let's probe that a little bit.  You had traveled to

21   D.C. based on Tweets that you had seen from the President,

22   right?

23   A.  Yes.

24   Q.  And you had been to a rally earlier in the day, right?

25   A.  Yes.

```
 1    Q.  And you were watching C-SPAN, right?

 2    A.  Briefly.

 3    Q.  And you, at the rally, you saw a number of other people who

 4    were present for that rally, right?

 5    A.  Yes.

 6    Q.  And then at the Capitol you heard a number of people

 7    chanting different things?

 8    A.  Yes.

 9    Q.  You saw a number of people with signs?

10    A.  Umm, maybe.

11    Q.  You -- maybe you saw people with signs?

12    A.  I don't know if I -- I'm trying to think of a sign I maybe

13    saw.

14    Q.  If we went back and watched some of the video that you

15    presented where you synced up --

16    A.  I wouldn't be surprised if there was a sign.

17    Q.  You passed somebody with a sign at different points?

18    A.  I'm sure.

19    Q.  You wouldn't dispute that?

20    A.  No, I wouldn't.

21    Q.  So your -- what you told the FBI was based on your personal

22    observations from a number of different sources; fair?

23    A.  Yes.

24    Q.  And you told the FBI that you -- the people at the Capitol

25    felt like the election was stolen?
```

1   A.  Yes.

2   Q.  And that you also felt like the election was stolen?

3   A.  Yes.

4   Q.  And you felt that the people at the Capitol wanted to make

5   a scene, right?

6   A.  Yes.

7   Q.  That you believed the crowd was present to stop the

8   electoral vote count?

9   A.  No, not necessarily.  But --

10  Q.  If we went back and listened to a brief clip from your

11  interview, you would be heard telling the FBI that you

12  understood the crowd was present to stop the electoral vote

13  count?

14  A.  I speculated what some of the people's motives were.  And

15  it was a question about attacking the Capitol, why would people

16  attack the Capitol?  Things like that.

17  Q.  I'm not asking about speculation.

18  A.  So that's not a statement about the entire crowd.

19  Q.  I'm not asking you about speculation.  You heard and saw

20  things firsthand, right?

21  A.  I hear things and -- yes --

22  Q.  And you had --

23  A.  -- firsthand.

24  Q.  And you had knowledge about why the rally was happening

25  that morning in the first place?

1    A.   Yes.

2    Q.   And what you told the FBI is you understood the crowd was

3    there to stop the electoral vote count?

4    A.   No.

5    Q.   Okay.  Let's go to Exhibit 330, please.  And can we begin

6    playing at 36 minutes and 53 seconds.

7             And after it starts playing, Ms. Sheff, we can stop

8    at 37 minutes and 37 seconds.

9             So starting at 36:53.  Or a few seconds earlier is

10   fine, as well.

11            (Audio played.)

12            We can pause right there.  And we'll move on.

13            You also, a few minutes later, or a few seconds

14   later, told the FBI that before the riot you saw posts on

15   social media sayings that your job or the job of people there

16   was to make sure the steal is stopped, right?

17   A.   Some people were saying that, yes.

18   Q.   And -- okay.  I know we spoke yesterday about, kind of, how

19   you felt and how you characterized the events of that day.  In

20   fact, you have recently described the events of January 6th as

21   just like a big block party, right?

22   A.   Outside of the Capitol, specifically.

23   Q.   But that's how you described the events of January 6th, as

24   feeling just like a big block party?

25   A.   I specifically said to the woman behind the ticket counter,

1    outside of the Capitol.

2    Q.  Okay.  So, let's unpack that a little bit.  You referenced

3    the woman at the ticket counter.  You're talking about the

4    airport in New Mexico?

5    A.  That she brought to my attention, yes.

6    Q.  So at the airport in new Mexico, when you were leaving

7    New Mexico to travel here to watch the *Couy Griffin* trial, you

8    talked about traveling to D.C., right?

9    A.  I was -- so what happened was, I was going to the ticket

10   counter because I am being forced to check in at the counter

11   because I have been put on a watch list of some form and --

12   probably a terrorist watch list, and I can't --

13   Q.  I'm just asking:  This was at the airport in New Mexico as

14   you were on your way to D.C.?  I'm not asking about all this

15   background.  And it was, right?

16   A.  It was at the airport in New Mexico, the Sunport.

17   Q.  And you spoke with her about the events of January 6th,

18   right?

19   A.  It was at the end of this awkward thing, we -- it just --

20   sitting there for, like, 30 minutes and eventually the -- it

21   came up.  And I was talking to her, it was last minute.  It was

22   very -- I'm trying to get off to my flight.

23   Q.  If you need to explain this more, your attorney can ask you

24   questions.  My question is:  You talked to her about the events

25   of January 6th?

1   A.   Briefly.

2   Q.   And you described it as like a big block party?

3   A.   It was an awkward conversation.  I -- I -- I'm clarifying,

4   that outside of the Capitol it was like a big block party.

5   Q.   Not inside the Capitol?

6   A.   Not inside.  And I meant the grounds.  Outside of the

7   grounds, like not past Third.

8   Q.   Okay.  So, outside of the Capitol grounds altogether was

9   like a big block party, but not inside the Capitol grounds and

10  not inside the Capitol building?

11  A.   Not -- no.

12  Q.   Was it also the part outside the Capitol grounds, but not

13  inside the grounds and not inside the building that felt like a

14  magical day, as you said yesterday?

15  A.   I don't know why I used that term.  It was a festive

16  atmosphere.

17  Q.   Oh, festive?

18  A.   And some of it was -- I mean, there's no delineation

19  between the festivity and the Capitol grounds.  But, there were

20  times -- parts, of course, that were not like that.  And you

21  know that.

22  Q.   Well, let's talk about what happened inside the Capitol.

23  Yesterday you told us that you didn't see the broken glass as

24  you entered the building, right?

25  A.   Yeah, I was paying attention to the guards letting me in.

1    Q.  And you claimed that your camera captured things that you

2    didn't see, right?

3    A.  Yes.

4    Q.  Let's pull up 318.

5              MR. ROMANO:  And, Your Honor, there are a few video

6    exhibits that I might use, but I'm not going to play the full

7    length of any videos.

8              THE COURT:  Thank you.

9    BY MR. ROMANO:

10   Q.  So let's advance it about two seconds.

11             (Video played.)

12             Okay.  Now, let's stop right there.  So there you can

13   see the one window with the broken glass, right?

14   A.  In the video, yes.

15   Q.  And the other window with the broken glass at the same

16   height, right?

17   A.  Yes, in the video.

18   Q.  And those windows are roughly at your eye level?

19   A.  Yes.

20   Q.  Okay.  And before you entered the Capitol building, you

21   were on the landing outside those doors for about ten minutes,

22   right?

23   A.  I'm not sure about the timing, the amount of time.

24   Q.  But you were up on the landing for a while, right?

25   A.  A couple of minutes, yeah.

1    Q.  Well --

2    A.  Some minutes.

3    Q.  This video was taken at about 3:02 or 3:03 p.m., right?

4    A.  Started at, yeah, 3:02.

5    Q.  Then you entered the building, according to the U.S.

6    Capitol Police timestamps, at around 3:03 p.m.  Is that fair?

7    A.  Yes.

8    Q.  And your video yesterday showed you reaching the landing at

9    around 2:04 p.m., right?

10   A.  I have to check.

11   Q.  Well, the video is in evidence.  The Court can review it.

12         But you were up on the landing for a period of time,

13   right?

14   A.  Yes.

15   Q.  And is it your testimony that if you had noticed the broken

16   glass, you would have turned around and left?

17   A.  No.

18   Q.  You would have entered regardless?

19   A.  If the cops weren't letting people in, I would have not

20   gone in, that's the testimony.

21   Q.  If the police officers had not, in your words, given you

22   permission, you would have not entered?

23   A.  That's correct.

24   Q.  And you also told us yesterday that you must have heard

25   that alarm, which is captured in this video, but you don't

1    specifically remember hearing that alarm, right?

2    A.  That is correct.

3    Q.  All right.  Let's go to Exhibit 319.  And let's advance to

4    about ten seconds.  And start there.

5                (Video played.)

6                Pause.  Right there you heard someone say the phrase

7    "teargas"?

8    A.  I don't remember hearing that, no.

9    Q.  That was, in fact, your voice.  You said, "teargas"?

10   A.  No, I didn't.

11   Q.  Let's play it up.  Play just a few seconds more.

12               (Video played.)

13               Pause.  And there you saw someone suffering the

14   effects of teargas or pepper spray, right?

15   A.  I saw somebody coughing.

16   Q.  And you saw somebody else trying to administer to that

17   person, trying to take care of that person?

18   A.  Yes.

19   Q.  And so it's your testimony that you didn't understand that

20   he was suffering from the effects of teargas or pepper spray?

21   A.  I didn't know what was going on.

22   Q.  And it's your testimony that the voice that we just heard

23   say "teargas," that wasn't your voice?

24   A.  No.

25   Q.  All right.  Let's go to 320, please.  And let's start at 19

1    seconds into the video.  Let's make sure the audio is up as

2    loud as we can.

3              (Video played.)

4              All right.  Pause.  All right.  We just heard a

5    laughter.  That was your laugh, right?

6    A.  No.

7    Q.  That wasn't your voice?

8    A.  No.

9    Q.  Okay.  Yesterday you acknowledged, in other video, that you

10   were laughing, right?

11   A.  It sounded like I was laughing at the guitarist.

12   Q.  But you're saying this laugh wasn't yours?

13   A.  No.

14   Q.  Okay.  Let's go to 321.  And let's advance to 15 seconds.

15             (Video played.)

16             Okay.  Let's pause right there.  We don't need to

17   play anything.  But here you see a number of police officers,

18   right?

19   A.  That's correct.

20   Q.  You said you understood these police officers were guarding

21   that hallway.  So you had permission to be in the rotunda, but

22   not advance into this hallway, is that right?

23   A.  What I said was they were trying to keep us in the rotunda.

24   Q.  That's what you say was your interpretation of their

25   behavior, right?

1   A.   That's correct.

2   Q.   And then in the corner there, just right off to the right

3   side, you see that one of those police officers is wearing a

4   gas mask?  It's on the right-hand side of the door.

5   A.   Barely.

6   Q.   Okay.  But you see it?

7   A.   Now that you point it out.

8   Q.   And you didn't notice that on the day of the riot?

9   A.   No.

10  Q.   Let's go to 322.  And lets just pause right at the

11  beginning of this video, not even playing.

12              (Video played.)

13              Okay.  So right there, as your video begins

14  recording, you see police officers dressed in riot gear, right?

15  A.   Yes.

16  Q.   You see police officers wearing riot helmets, right?

17  A.   In a paused video, yes.

18  Q.   It's right at the beginning of the video that you captured?

19  A.   Yes.

20  Q.   And this is your video?

21  A.   As it's paused, yes.

22  Q.   I'm not asking if it's paused, I'm asking if it's yours.

23  A.   But I'm telling you it's paused because I know where you're

24  going.

25              MR. ROMANO:  Your Honor, I would ask you to instruct

1    the witness to answer my questions.

2            THE COURT:  All right.  Yeah.  Mr. Martin, you've had

3    an opportunity to tell your side, and you can again during

4    redirect --

5            THE WITNESS:  Okay.

6            THE COURT:  -- but at this point I'll just ask you to

7    respond to the prosecutor's questions.

8            THE WITNESS:  Okay.  I'm sorry.

9            THE COURT:  Thank you.

10   BY MR. ROMANO:

11   Q.  And there the police are wearing, sort of, a bright yellow

12   vest, as well?

13   A.  Yes.

14   Q.  And let's play this to about five seconds into the video.

15            (Video played.)

16            And right there, in roughly the middle screen, you

17   saw a police officer strike at a member of the crowd with a

18   baton?

19   A.  I see a -- in the video, a police officer striking the

20   crowd -- in the middle of the crowd -- or, I saw someone, a

21   police officer, do something with the baton.

22   Q.  Swing a baton at a member of the crowd?

23   A.  Um, you'll have to replay the video.

24   Q.  Let's go back to the beginning.

25            (Video played.)

1          Pause.  Did you see that?

2    A.  Yes.

3    Q.  Now, you spoke yesterday, and again this morning, about not

4    being able to see everything that was captured in the camera.

5    I want to go to Exhibit 303.  And then move to about 3 minutes

6    and 30 seconds into that video.  And just pause it on the still

7    image at 3 minutes and 30 seconds.

8          (Video played.)

9          Okay.  Now, let's see.  You are here, in the right

10   portion of the video, right?

11   A.  That is me.

12   Q.  Okay.  Let's just play it for a few seconds.

13          (Video played.)  And pause.  Okay.  So, there you are

14   holding your cell phone above your head, right?

15   A.  Yes.

16   Q.  Would you say it's maybe six inches to a foot above your

17   head?

18   A.  Umm, I -- I don't know how that scales, but that sounds --

19   I don't know.

20   Q.  Okay.  And it's also in front of your head, right?

21   A.  Yes.

22   Q.  And as you are recording, the screen of the cell phone is

23   pointed to you, right?

24   A.  Umm, in a manner of speaking, yes.

25   Q.  So the camera was pointing outward, away from you, right?

1    A.  Um-hum.

2    Q.  The screen -- I'm sorry.  Is that a yes?

3    A.  That -- yes.

4    Q.  And the screen was facing your face, right?

5    A.  It -- facing above my head.  Not -- I wouldn't say it was

6    directed -- well, I see what you're saying.

7    Q.  And so that's, yes, it was in the same direction as your

8    face?  The screen was facing you?

9    A.  Okay.

10   Q.  Yes?

11   A.  Yes.  Fine.

12   Q.  And there were times when you were recording film that you

13   were looking at the screen of your cell phone as you were

14   recording them?

15   A.  I would expect that to be the case.

16   Q.  Okay.  Well, let's go to 306, please.  And let's advance to

17   about 5 minutes and 55 seconds into the video.

18              (Video played.)

19              Okay.  And pause.  Okay.  So then this is you again

20   at the bottom of the video, where I've highlighted?

21   A.  Um-hum.

22   Q.  Yes?

23   A.  Yes, that's me.

24   Q.  Okay.  Let's press play.

25              (Video played.)

 1              And pause.  Now, you just got out your camera, right?

 2    A.  Yes.

 3    Q.  And the timestamp here is 6 minutes and 1 second?

 4    A.  Yes.

 5    Q.  And this is when you recorded the clip we were just looking

 6    at, as police entered the rotunda?

 7    A.  Yes.

 8    Q.  And let's play.

 9              (Video played.)

10              And pause.  And I know your back is to the camera,

11    but here you were looking at the footage that you were

12    recording in the screen of your cell phone as you were

13    recording it, right?

14    A.  I was trying to, yes.

15    Q.  Okay.  And play.

16              (Video played.)

17              And we'll go to about 6 minutes and 45 seconds.

18              (Video played.)

19              You are still watching -- although you were turning

20    away at times, you were also still trying to watch the footage

21    you were recording in your phone screen, right?

22    A.  I would say I was taking a glance every once in awhile.

23    Q.  Okay.  And now it's 6 minutes and 45 seconds.  Shortly

24    after this we're going to see you put the phone down to your

25    side, right?

```
 1    A.   Shortly I'll put down the phone.

 2    Q.   Let's play it for a few more seconds.

 3              (Video played.)

 4              Right there.  Okay so at 6 minutes and 52 seconds, at

 5    this point you were no longer holding the phone up, right?

 6    A.   Yes.

 7    Q.   And, in fact, the video clip that we looked at a few

 8    minutes ago, Exhibit 322, was the last video clip that you

 9    recorded inside the rotunda, right?

10    A.   That is correct.

11    Q.   From here on out, through the rest of your time in the

12    rotunda, you were just watching the events that unfolded there,

13    right?

14    A.   Of what I could see.

15    Q.   You were watching the police?

16    A.   No.

17    Q.   You were not watching the police --

18    A.   Trying to.  I mean, I was looking in that direction, trying

19    to --

20    Q.   So it's your testimony you were looking in the direction of

21    the police, but not watching them?

22    A.   Where I thought they were.

23    Q.   And remained in the rotunda, looking in the direction of

24    the police, for about four minutes before you turned to leave?

25    A.   No.
```

1    Q.  If we were to watch four minutes of video, would it show

2    you looking in the direction of police until you turned to

3    leave?

4    A.  After I crossed the room, I do look back to see what's

5    going on.

6    Q.  Is that a yes or a no?

7    A.  I -- I -- the truth is, I'm leaving when I turn around.

8    I'm trying to head to the door.  That's the moment I start -- I

9    decide to leave.  So when you asked if -- before I was leaving,

10   that's -- that's kind of -- that's what I need to clarify.

11   Q.  Well, whether or not you decided to leave immediately or

12   decided to leave a few minutes later, you -- there was a period

13   of time where you crossed to the other side of the room and

14   then stood there and didn't walk towards the door, right?

15   A.  There's a point where I stop.

16   Q.  Now, even after the officers cleared the rotunda, you did

17   not leave the Capitol grounds, did you?

18   A.  I was on the east plaza.

19   Q.  Right.  So you left the Capitol building, but not the

20   grounds?

21   A.  That -- as they were defined by earlier testimony, no, I

22   did not.

23   Q.  And setting aside earlier testimony, just based on your

24   understanding that day, you were still near the Capitol after

25   you left the rotunda?

1    A.  I was still near the Capitol.

2    Q.  Okay.  And you photographed what looked like blood on the

3    concrete?

4    A.  Yeah.  And I was -- yes.

5    Q.  That was at about 3:33 p.m.?

6    A.  That sounds about right.

7    Q.  Then you went to a terrace on the north side of the Capitol

8    building?

9    A.  Umm -- yeah.  Sometime later, yes.

10   Q.  Okay.  Let's go to Exhibit 324.  And let's just play for

11   the first 20 seconds of this video.

12              (Video played.)

13              Actually, pause right there.  So there you can see a

14   member of the crowd punching a window?

15   A.  That's correct.

16   Q.  And then let's keep playing.

17              (Video played.)

18              Pause.  Now, that same person is striking the window

19   with a flagpole, right?

20   A.  Yes.

21   Q.  And let's rewind to the beginning and just listen to the

22   sounds of the crowd.  And now let it play out for 20 seconds.

23              (Video played.)

24              Okay.  So we can pause there.  As the video began,

25   you heard the crowd chanting "USA," right?

1    A.  Yes.

2    Q.  And then at about five minutes you joined in chanting

3    "USA"?

4    A.  I don't remember.

5    Q.  Okay.  Is it your testimony that wasn't your voice, or you

6    just don't remember if you did that?

7    A.  I don't -- I don't remember joining the crowd.  I -- I

8    don't -- I don't remember the chant -- joining the crowd of

9    chanting.

10   Q.  Let's go to 325, please.

11              (Video played.)

12              Right there, at 1 second into the video, you can see

13   smoke in the air, right?

14   A.  Yes.

15   Q.  Let's advance to about 30 seconds into the video.

16              (Video played.)

17              And let's play for about five seconds.

18              (Video played.)

19              And pause.  So right there you saw a police officer

20   pull a member of the crowd down from a window?

21   A.  That's correct.

22   Q.  Let's go to 326.

23              (Video played.)  Pause.  And let's rotate it.  And

24   then advance to about 25 seconds into the video.

25              (Video played.)

1          Okay.  So, right there you can see the doorway in

2     the, kind of, background of the video, right?

3     A.  In the background of the video, yes.

4     Q.  And you can see police officers start to emerge from the

5     doorway?

6     A.  In the video, yes.

7     Q.  And let's press play.

8          (Video played.)

9          And pause.  And you can see those police officers are

10     wearing riot gear, right?

11     A.  In the video, yes.

12     Q.  And gas masks?

13     A.  In the video -- I think you can.

14     Q.  And shortly after that, in this video, you would see gas

15     deployed from the door in an outward direction, right?

16     A.  In this video, yes.

17     Q.  Now, you claim that it was after getting back to the

18     Capitol that you realized the Capitol was breached, right?

19     A.  Yes.

20     Q.  Let's bring up Exhibit 115.

21          Now, Mr. Martin, to be clear, you saw a mob at the

22     Capitol, right?

23     A.  I saw, basically, vandalism.

24     Q.  And that included seeing people pushing and shoving against

25     police officers?

1    A.  Umm, I don't think I saw that.

2    Q.  Okay.  But you certainly saw it in the videos that your

3    phone recorded?

4    A.  I think -- yeah -- well, I think so, yes.

5    Q.  And you -- but you claim that you didn't see that yourself

6    that day?

7    A.  Yes.

8    Q.  And --

9    A.  I saw no violence.

10   Q.  You saw people hitting windows, right?

11   A.  Yes.

12   Q.  With their fists?

13   A.  Yes, in the video.  Yes.  And personally, yes.

14   Q.  And in person.  And you saw somebody striking a window with

15   a flagpole?

16   A.  That's correct.

17   Q.  You saw somebody striking a window with their feet?

18   A.  Yes.

19   Q.  That was the person who had just climbed up on the window?

20   A.  Yes.

21   Q.  And you saw police officers dressed in riot gear?

22   A.  Yes.

23   Q.  And you saw them working to clear a mob out of the Capitol

24   building and away from Capitol grounds?

25   A.  Umm, some of that, yes.

1    Q.   On January 6th, as you left the Capitol rotunda, the crowd

2    was compressing around you, right?

3    A.   Yes.

4    Q.   The crowd was getting tighter and tighter as the police

5    were forcing people towards the door, right?

6    A.   Yes.  I got the sense they were pushing people out.

7    Q.   You didn't just get the sense they were pushing people out,

8    you felt the crowd compress around you?

9    A.   I guess, as things got more crowded.

10   Q.   And you saw people suffering the effects of teargas and

11   pepper spray?

12   A.   I saw somebody -- I saw somebody coughing.

13   Q.   And you also felt the effects yourself, when you turned to

14   sneeze or cough as the police deployed pepper spray?

15   A.   No.

16   Q.   It's your testimony that wasn't what you were reacting to?

17   A.   Well, I don't know what I was sneezing, what caused me to

18   sneeze.

19   Q.   And so, then, let's turn to the next page of Exhibit 115.

20            You told Amy Lewis, 6:11 p.m., "I was in the hotel

21   when I got word the Capitol was breached"?

22   A.   That's correct.

23   Q.   In fact, you knew the Capitol was breached earlier because

24   you saw it yourself, didn't you?

25   A.   No.

1    Q.  And you also claim that the police let you in, right?

2    A.  Yes.

3    Q.  But you understood that the police were overwhelmed, right?

4    A.  Umm, no.

5    Q.  You understood that the size of the crowd --

6    A.  Oh.

7    Q.  -- compared to the number of police officers was enormous,

8    right?

9    A.  Oh, yes.

10   Q.  And you understood that the size of the crowd was what

11   allowed people to overwhelm police, right?

12   A.  Umm, after the fact.

13   Q.  In fact, you explained that to Amy in this text when you

14   said, "Actually you can overrun the Capitol, rather easily I

15   mighty add.  Not as much security as you think.  Our numbers

16   were freaking huge.  They were not prepared," isn't that right?

17   A.  After I had seen the news, yes.

18   Q.  So it was after you saw the news, and not based on your

19   personal observations at the Capitol, that you understood the

20   officers were outnumbered?

21   A.  It was a combination of personal experience and news.

22            MR. ROMAN:  Court's indulgence, Your Honor.

23            (Pause.)

24            MR. ROMANO:  No further questions.

25            THE COURT:  All right.  Mr. Cron, redirect?

REDIRECT EXAMINATION

BY MR. CRON:

Q.  There was reference made to you at the Albuquerque airport.
Would you please explain the full context of that?

A.  Yeah.  As I was saying, the -- I was traveling out here.  I
was unable to do electronic check-in, told I had to come to --
go to the gate to check in.  Basically, the agent there had --
had to call somebody, and spent like 30 minutes on the phone,
just, you know -- she asked me for multiple forms of ID and all
this stuff.  And at the end it was just getting awkward because
I knew it had something to do with this.  And I just quickly,
and unwisely, said --

Q.  Did she ask you a question?

A.  She -- after -- she asked me, "Was it worth it?"  And so
before that I kind of -- I guess she might have asked me, you
know, "Why was this happening?"  And, I guess, yeah, and I kind
of quickly said, "Yeah, I'm one of the defendants in January
6th.  And it's no big deal, I'm innocent."  And she, you know,
got silent and she asked, "Was it worth it?"

         And I kind of -- like, it was an odd question.  So I
kind of rephrased it, "Was it worth going to Washington?"  Or,
"Was it worth going?"  Something like that.  And I then said,
"Well, outside of the Capitol it was like a block party," it
was, you know -- and that's kind of the quick words.

         It was an awkward conversation in the moment that I

1    chose.  And it was like, so, I don't regret coming to

2    Washington.  I would probably stay away from the Capitol, but I

3    enjoyed everything else.  I enjoyed walking down Pennsylvania

4    Avenue, I enjoyed the rally.  And I had felt better from -- for

5    coming.  But, so, it's hard for me to say I regret coming to

6    Washington, D.C.

7            So I was trying to explain that, and quickly.  But

8    also, at the same time this was happening, at the very end she

9    had the go-ahead to print out the tickets, and I'm trying to

10   get moving because I expected the security to take a while

11   because I got the idea that I was on the list at that point.

12   Q.  So, what part of your experience there were you referring

13   to, when you said that before the Capitol it was like a block

14   party?

15   A.  Outside of the Capitol, it was -- it was my experience at

16   the rally, it was my experience on Pennsylvania Avenue, just

17   the walk over there.  It was -- there was -- it was -- people

18   are playing music and it was just a sea of flags.  So my

19   personal experiences were positive.  I was just speaking

20   personally.

21   Q.  Okay.  Now, I want to talk about -- there are three videos

22   that counsel referred to just a minute ago, and those were

23   Government's 324, 325, and 326.

24   A.  Yeah.

25   Q.  What I -- now, there was a video right before that which I

1    think was 323, Government's 323, where you are recording a

2    video, obviously from the grass area, looking at the north

3    side.

4    A.  Yes.

5    Q.  Okay.  Where -- why is it that you were in the grass at

6    that point?

7    A.  So, I was -- before that I was heading back to the hotel

8    and I just, as I was -- I was going back the way I came, that

9    you saw in the videos.  And on the way I looked over to the

10   north side of the building and people were gathering.  There

11   was a large crowd gathering there and there were even some

12   people climbing up.  And it grabbed my attention.  And it was,

13   like, I was just wondering what was going on.  So, I just -- I

14   walked a little closer, just to see what the heck is going on,

15   and decided to backtrack and just get a closer look and see

16   what was happening.

17   Q.  Okay.  And was it that point, then, when you -- when you

18   took those three videos that were just referred to?

19   A.  Yes.

20   Q.  And what did you do right after you finished shooting those

21   videos?

22   A.  Right after I got out of there.  I left.  The next video

23   you saw was the Peace Monument, and I was out of there.

24           MR. CRON:  Okay.  Those are all my questions.

25           THE COURT:  All right.  Thank you.

1          Mr. Martin, you may step down.

2          Mr. Cron, do you have any more evidence?

3          MR. CRON:  No, Your Honor.

4          THE COURT:  Okay.  I'll hear closing arguments from

5     the parties in just a moment.

6          I did want to check, on page 5 of the stipulation of

7     the parties, under the paragraph right under the heading

8     Exhibit 404, and says, "The redactions applied to Inspector

9     Erickson's transcript relate to legal matters not relevant to

10    this trial.  No testimony by Inspector Erickson has been

11    redacted."  It sounds like there's a typo.

12         MR. ROMANO:  My recollection -- I did the redactions,

13    Your Honor.  And there was a period that I redacted before

14    Inspector Erickson began testifying because there was a

15    colloquy between you, Ms. Paschall, and Mr. Smith, I believe.

16    And then in the middle of Inspector Erickson's testimony it was

17    interrupted when Mr. Smith sought to introduce a statement by a

18    Capitol police officer who was not testifying in trial as an

19    admission by a party opponent.  And so there was discussion

20    about whether that was in fact a statement by the government.

21    I redacted all of that, but I believe we did not redact

22    anything that was from Officer Erickson's testimony, just that

23    extraneous part.

24         THE COURT:  I see.  Okay.  So there's not a typo.  It

25    is referring -- you're saying there were redactions, but they

1    didn't relate to Inspector Erickson's testimony?

2                MR. ROMANO:  Correct.

3                THE COURT:  Got it.  Thank you.  I'll hear from the

4    government.

5                MR. ROMANO:  Thank you, Your Honor.  And I believe I

6    indicated in the trial brief that based on what you allowed in

7    *Griffin*, I would ask for 30 minutes, to be divided between the

8    closing and rebuttal.

9                Your Honor, the evidence makes out, beyond a

10   reasonable doubt, that on January 6th the defendant entered the

11   Capitol building and Capitol grounds without lawful authority

12   and remained there without lawful authority.  He knew what he

13   was doing.  He knew he lacked permission to be there.

14               While he was there he was part of a demonstration.

15   He demonstrated, he paraded, he picketed, and his conduct was

16   disorderly and disruptive as defined in the statutes that

17   criminalize both the conduct in Count 2 and the conduct in

18   Count 3.

19               I want to start briefly with Counts 1 and 4, and then

20   spend the bulk of my time speaking about disorderly and

21   disruptive conduct.

22               First, it's clear that the defendant was within

23   restricted grounds, that he entered and remained within

24   restricted grounds.  It's clear he went deep into restricted

25   grounds; deep into the Capitol grounds and into the Capitol

 1    itself.  The idea that he thought he had permission to do this

 2    is nonsense.

 3         He -- his testimony that he climbed over snow fencing

 4    because he thought it to be a shortcut is completely

 5    nonsensical.  It is belied by his arguments about why he

 6    thought he had permission to enter the Capitol.  It makes no

 7    sense that in one place he thought he had permission because it

 8    was explicitly given by police, and another place he thought he

 9    had permission because there were no police officers to tell

10    him no.

11         It's belied by his texts to Amy Lewis that shows he

12    understood the police were overwhelmed and the Capitol was

13    overrun and the police were incapable of addressing the size of

14    the crowd.  It's also --

15         THE COURT:  I'm sorry.  You -- so your view is he

16    knew he was in a restricted area when he went over the snow

17    fence?

18         MR. ROMANO:  Yes.  And continued to know he was in a

19    restricted area thereafter.

20         THE COURT:  Okay.  So you agree there's no

21    evidence -- I mean, it looked to me like he was in the

22    restricted area on the sidewalk.

23         MR. ROMANO:  Right.

24         THE COURT:  But you agree there's no evidence he

25    would have known that?

1          MR. ROMANO:  No, I think he may very well have known

2     he was in the restricted at that point.  I agree he was

3     actually in the restricted area at that point.  But, certainly

4     his knowledge is clear at the point that he walked over the

5     snow fencing.

6          THE COURT:  I was trying to remember, was he walking

7     up Constitution Avenue or the northwest circle?

8          MR. ROMANO:  I believe he was walking up the

9     northwest circle.  My recollection of the testimony and video

10    evidence is that the bike racks were lined up on Constitution

11    Avenue, he was walking on the sidewalk of Constitution for a

12    period of time, and then he crossed off the sidewalk and into

13    the northwest circle.

14          THE COURT:  Okay.  Thank you.

15          MR. ROMANO:  And, so, the -- we think it's clear that

16    he was within the restricted area; he entered, he remained.

17    Once he crossed over the snow fencing, which would have been

18    shortly after 2:30 p.m., he was within the restricted area

19    until about 4:20 or 4:22 p.m., when his video footage put him

20    at the Peace Circle.

21          THE COURT:  The only evidence we have of him crossing

22    over a snow fence is from Mr. Martin's testimony, right?

23          MR. ROMANO:  That's correct.

24          THE COURT:  I don't remember any pictures of what it

25    looked like when he crossed over, or anything like that.

1          MR. ROMANO:  Yes, there weren't any that the

2     government presented.  From both the government's footage and

3     the defense footage, there were photos and videos of the snow

4     fencing that led to that point.  I think the Court can

5     certainly infer that it looked similar as he walked past.  He

6     had seen fencing with the "Area Closed by Order of the Capitol

7     Police Board" signs as he walked down that path.  And whether

8     or not the signage was still present at exactly the place where

9     he crossed or the snow fencing was still completely intact in

10    exactly the place where he crossed -- it was probably torn down

11    a little bit -- he knew what that fencing was designed to do.

12         He knew it was designed to prevent people from

13    crossing into that area.  The idea that, you know, the

14    restricted area, as he claimed, he thought was just the area

15    between two rows of fencing is nonsensical.  And we view that

16    and we submit that that explanation lacks credibility and the

17    Court should not credit it.

18         THE COURT:  What do I do with the fact that there are

19    hundreds of people kind of milling around on the lawn?  I mean,

20    it looked to me peacefully when he went by.

21         MR. ROMANO:  Your Honor, we would suggest that in

22    view of the totality of his conduct and statements, he

23    understood that the police were overwhelmed and he understood

24    that the police lacked the ability to clear the grounds and

25    clear the building.

1          THE COURT:  When he walked up the lawn?

2          MR. ROMANO:  Possibly when he walked up to the lawn,

3    but certainly later, as he approached the building itself, as

4    he saw the crowd on the steps, as he saw the crowd in the

5    rotunda.  What the evidence also shows, that he understood that

6    his presence in the building was disruptive.  And I want to go

7    back to the -- what he would have seen and heard as he entered.

8          First, while he was on that landing, which the

9    evidence shows was for about ten minutes, he would have heard

10   the sound of the door alarm.  It is audible on his phone, it is

11   audible over the level of the crowd noise on his phone.  He

12   certainly would have heard that at some point in the ten

13   minutes.

14         He also very likely would have seen broken glass.

15   The government submits his claim not to have seen broken glass

16   as he entered is false.  Both because it's clearly at eye

17   level, he clearly had to take a little bit of time as the crowd

18   moved slowly, and the video shows -- and he admitted after

19   being pressed a bit forcefully on the issue -- that he was

20   actually trying to watch the video that was recorded with his

21   phone.  He obviously saw that broken glass.

22         If the Court goes back and looks at his interactions

23   with the officers -- I know there was a lot that was made over

24   whether he was waved in or not -- what the Court will see is

25   that Officer Carrion was talking with the officer across from

1    him.

2         THE COURT:  He looked like he was talking to the

3    protestor.

4         MR. ROMANO:  He may have been talking to another

5    protestor, he may have been talking to the officer across from

6    him.  Our view is that he's speaking with the other officer.

7    But there was a person in between them, so we acknowledge that.

8    And Officer Carrion, we submit, was speaking with his hands.

9    He was just gesturing normally, as one does when one speaks.

10   He wasn't turned towards the defendant at any point, he wasn't

11   gesturing towards the defendant at any point.

12         And, in fact, if you go back to Exhibit 304 and watch

13   from between 20 to 30 seconds, you will see that the defendant,

14   as he admitted, reached out and put a hand on the officer.  And

15   you will see Officer Carrion lean back a little bit in what

16   looks like he's recoiling at the touch.  There's no interaction

17   where Officer Carrion was giving the defendant permission, and

18   no way the defendant actually interpreted that as permission.

19   That is a story that he's telling now to escape the

20   consequences of his actions.  And it is also worth noting --

21         THE COURT:  You don't think it's just as plausible

22   that the officer kind of leaned back so that he could go

23   through?

24         MR. ROMANO:  No.

25         THE COURT:  I mean, people had been going through.

1    The officer leans over, blocking the way, the defendant waits,

2    the defendant leans -- or, the officer leans back and the

3    defendant goes through.

4              MR. ROMANO:  I think the timing of it, watching the

5    interaction, it appears that he is reacting to the touch.

6              THE COURT:  All right.  Maybe you can play that.

7              MR. ROMANO:  Sure.  Can we bring up Exhibit 304,

8    please?  And go to approximately 20 seconds in, or maybe 15

9    seconds in.  And let's press play.

10             (Video played.)

11             It's possible he leans back just in part of the

12   conversation, I suppose.  It's our view that he's reacting to

13   the touch.  But be that as it may, we don't view there to be

14   any credibility to the defendant's claims that he thought he

15   was given permission to enter based on that extremely brief

16   exchange.

17             We also think the evidence shows that the defendant

18   was not being truthful in his testimony about that for several

19   reasons.  The Court can look at Exhibit 115, look at what the

20   defendant said to his supervisor on the day of the riot,

21   explaining to -- basically refusing to answer his supervisor's

22   questions about going into the Capitol.  And as he admitted on

23   the stand, he was, I believe, "taking her temperature."  And he

24   admitted to answering questions in a way that would lead her to

25   draw an inference that he didn't go into the Capitol, or at

1    least that he failed to be fulsome with her.

2          He claimed that he planned all along to tell her when

3    he got back to work.  We would submit to the Court that the

4    defendant, being intelligent, knowing what was going on in the

5    news, changed his plans when it became clear that people were

6    being arrested for being present at the Capitol.  He disclosed

7    on Monday and then he disclosed to the FBI --

8          THE COURT:  Sorry, I missed.

9          MR. ROMANO:  Right.  In the time between January 6th

10   and January 11th, the law enforcement response to the riot was

11   beginning.

12         THE COURT:  I see.  So you're saying that he didn't

13   intend to tell her, and then when he realized how bad it was,

14   that he decided he would tell her.

15         MR. ROMANO:  Correct.  And that's -- I mean, there's

16   suggestion of that, although not that in explicit terms in the

17   FBI interview, where he talks about as he saw how things were

18   being received in the news.

19         Now, on the stand he talked about that day, as he saw

20   how things were being received in the news.  He was back in his

21   hotel room for maybe an hour before he texted with his

22   supervisor.  We don't think he created that intent to tell her

23   then, on that day.  We think that's something that evolved as

24   he was traveling back to new Mexico.

25         He spoke with his supervisor on the 11th, he spoke

1    with the FBI on January 15th.  And what he told his supervisor

2    and then told the FBI that he told his supervisor was, "The

3    police let me in."  Not, "The police waved me in," not, "I saw

4    this hand gesture from the police."  We submit that this is a

5    modified version of the story that he has come up with since

6    seeing the video, since finding a segment that he can slow down

7    to a quarter speed and circle and find a hand gesture that

8    allows him to create a defense for himself; not something that

9    was actually true on that day, not something that actually

10   informed his intent.

11       So, I want to turn now to the question of his

12   disorderly and disruptive conduct.  Your Honor, it's the

13   government's view that he was not just present in the building;

14   there was no such thing as mere presence for the defendant on

15   that day.  The defendant demonstrated an understanding that the

16   size of the crowd made it difficult for police to do their job.

17   So he intended, when there, to be part of that crowd and make

18   it difficult for police to do their job.

19       THE COURT:  So your position is anybody who

20   trespassed was also disorderly?

21       MR. ROMANO:  That's not necessarily our view, Your

22   Honor.  We certainly think that in other cases the evidence

23   could make out that trespassers were also disorderly.  But here

24   we have the additional acknowledgement by the defendant of

25   understanding that his trespass and the trespass of others

1    interfered with the police's ability to do their job and, we

2    submit, interfered with the ability of Congress to resume.

3          We're not trying to lay down a blanket rule about all

4    cases.  We're trying to speak to the defendant's intent, what

5    the defendant knew and what he admitted as he talked about the

6    events of that day.

7          But it's not just a matter of him arriving at the

8    Capitol.  So, as he entered the building, he put his hands on a

9    police officer.  We submit he saw that broken glass, he heard

10   that alarm.  We submit he noticed that a member of the crowd

11   was suffering from the effects of teargas.  We don't think the

12   Court should credit his claim that that was not his voice on

13   the video.  So, he saw a member of the crowd on the floor, in

14   pain, as another member of the crowd was tending to him.

15         THE COURT:  Sorry.  When you say that he put his

16   hands on the police officer, what do you mean by that?

17         MR. ROMANO:  He reached out and touched the police

18   officer who was standing at the door.

19         THE COURT:  I understand that.  Are you suggesting

20   that was some sort of violent action?

21         MR. ROMANO:  No.  But we do suggest that he was

22   intending to get in, he was intending to move his way in, and

23   that was disruptive conduct.  It was disrupt to what the police

24   were trying to do, and it was disruptive of, you know, the

25   events of the Capitol that day.

1           THE COURT:  So you think rather than thanking the

2     officer, he was somehow pushing him out of the way?

3           MR. ROMANO:  Or, if not pushing him out of the way,

4     he was making space for himself.  He was using his body to make

5     it easier for him to get in.  We certainly do not think he was

6     thanking the officer and we don't think the Court should credit

7     that statement.

8           THE COURT:  Do you think the other guy who was

9     shaking hands with him a couple minutes before was thanking

10    him?

11          MR. ROMANO:  I couldn't speak to that.  I don't

12    have --

13          THE COURT:  What do you think was going on there?

14          MR. ROMANO:  I think the other person was probably

15    speaking with the officer, but I don't know what was going on

16    there.  I don't have information about what the other person

17    may have said or done before he entered the Capitol building.

18    I don't have information about his behavior on camera or the

19    length of time he was in the building.  And that's certainly

20    not in evidence for the Court to make a finding about here.  I

21    couldn't speak to his intention.

22          THE COURT:  Sure.  I mean, the defendant testified

23    that he heard the guy thank him and thought that was a good

24    idea.  He put down his phone so he could do the same thing.

25    What do you mean there's no evidence?

1          MR. ROMANO:  Well, there's no evidence beyond the

2     defendant's words about what this other person did.  The other

3     person may have thanked the officer, the other person may not

4     have.  We think there are significant issues with the

5     defendant's credibility, and the Court overall should not

6     credit these sort of statements about what he perceived.  We

7     think there are times when the defendant was being untruthful,

8     when he lied.  Certainly in admitting to Amy Lewis about being

9     dishonest, admitted to misleading her.  We think that he lied

10    about when and how he knew there was a breach.

11          We think that he was untruthful about what he saw in

12    the Capitol.  And I would return to my point about him

13    resisting, but then finally acknowledging that he was able to

14    see the things that were displayed in his cell phone screen as

15    he was recording them.  We think he was being untruthful when

16    he said it was not his voice and not his laugh in those videos.

17          And we also think he was being untruthful when he

18    said that as soon as it became obvious to him that the police

19    were trying to clear the rotunda, that he turned around and

20    left.  Your Honor, the evidence clearly shows, and the Court

21    will remember the video, he stayed in the rotunda for four

22    minutes before turning to leave.  His body was facing the

23    police the whole time.  There were times when he turned over

24    his shoulder to look at the crowd or look in other directions.

25    But, he certainly didn't start to leave immediately.

1            On cross-examination we watched the ending of the

2     footage where he was holding up his camera.  But then at what I

3     believe is about 7 minutes and 30 seconds into that exhibit, he

4     also walked closer to the police line.  He walked up to the

5     back of the crowd that was facing down, against police.  He was

6     edging into the crowd.

7            We submit the inference to be drawn from his conduct

8     in the rotunda was that he was -- he didn't want to get

9     physical with the police himself, he didn't want to participate

10    in a fight, but he did want to see who would win and if he

11    could stay there.  And if the police were further overwhelmed,

12    he wouldn't have left.  This idea that he didn't know he

13    couldn't be there because he was not personally asked to leave

14    is nonsense.

15           And then we submit his conduct outside the building

16    shows further disruptive conduct.  He was off the terrace, he

17    was on the grass, then he went back up to the north terrace.

18    He stood close to police officers, he stood close to other

19    windows that other rioters were trying to break into.  You

20    could hear his laugh -- or, I'm sorry, you could hear him

21    chanting "USA" as he saw rioters trying to break windows, as --

22    he admitted he saw that.  These were not even things that he

23    tried to deny seeing himself, and claimed that he saw on video

24    later.

25           THE COURT:  So that would only go to Count 2, is that

1    correct?

2                MR. ROMANO:  That would go to Count 2 or count 3

3    because Count 3 -- well --

4                THE COURT:  Count 3 requires --

5                MR. ROMANO:  -- in the Capitol building, that's true.

6    The statute says building or grounds.  But I think the way

7    we've charged it is in the building.  Right.  So that would go

8    to Count 2, that's correct.

9                But it is also probative of his intent in the

10   Capitol, because it shows a continuing intent to disrupt by

11   presence, a continuing understanding that the size of the crowd

12   interferes with the ability of police to clear the crowd and to

13   prevent violent and destructive conduct from occurring.

14               Court's indulgence.

15               We think that is further confirmed by the videos that

16   the defendant recorded on his way to the Capitol.

17   Specifically, of those Federal Protective Service police cars

18   that are trying to reach the Capitol.  You can see clearly

19   there that the crowd is obstructing their forward progress.  He

20   walked into their path of travel himself.  He got close to the

21   vehicles himself and was filming them as they backed up.  He

22   saw how the crowd was affecting the police before he even got

23   to the rotunda doors.

24               THE COURT:  So the parading, demonstrating, or

25   picketing in a Capitol building, it says, "To demonstrate

1    refers to conduct that would disrupt the orderly business of

2    Congress by, for example, impeding or obstructing passageways,

3    hearings or meetings, but does not include activities such as

4    quiet praying.  What do you think, if there was a group of

5    people who were praying, that all of those people were praying

6    there in the rotunda, but the presence of such a large number

7    of people made it difficult for the officers to remove them, do

8    you think that would be a violation?

9              MR. ROMANO:  I think it could be.  And certainly if

10   they were occupying space that was needed for Congress to do

11   its job, as was the case here, where the members of the House

12   and Senate might be traveling to each other's chambers through

13   that pathway or through other parts of the House.  I think it

14   could be disruptive or it could be parading, demonstrating, and

15   picketing if it happens on a day when the Capitol is closed, it

16   could be, depending on people's knowledge of the proceedings.

17   And here we have those facts.

18              In any event, the defendant is not in a corner

19   quietly praying.  He's part of the crowd that is occupying

20   space in the building for a political purpose.  We think it is

21   absolutely clear that as parading, demonstrating, or picketing.

22              THE COURT:  Okay.

23              MR. ROMANO:  Court's brief indulgence.

24              (Pause.)

25              MR. ROMANO:  I'll reserve the remainder of my time

1    for rebuttal, Your Honor.

2              THE COURT:  All right.  Thank you, Mr. Romano.

3              MR. ROMANO:  Thank you.

4              THE COURT:  Mr. Cron?

5              MR. CRON:  Thank you, Your Honor.  First of all, on

6    behalf of Mr. Martin and myself, we would like to thank the

7    court and the court staff for the courtesies that have been

8    extended.  We're a couple of thousands miles away and we

9    appreciate those courtesies.

10             With respect to Count 1, Mr. Martin did not go to the

11   Capitol grounds the day before January 6th and did not witness

12   barriers that had been set up.  He'd never been to the Capitol

13   before, he had no idea what the protocols were for entry to the

14   grounds.

15             He walked from 1331 Pennsylvania, which is the JW

16   Marriott, up to -- and followed Pennsylvania all the way up to

17   First Street.  He went left on First Street and then he turned

18   right onto Constitution Avenue.  At no point when he was

19   traversing that path was there any kind of a barrier on the

20   walkway or the sidewalk leading its way there.  There are

21   thousands of cameras in the vicinity and the government

22   produced no footage to show that he crossed any barriers

23   blocking sidewalks and walkways on that path he took.

24             The only notices were on that "Area Closed" sign, and

25   I want to talk about that a little bit, because there are a lot

1    of people on the other side.  As the Court observed, people

2    were peaceful over there, as you can see in the video.  And

3    there was a narrow strip of seven, ten feet that bounded both

4    sides.  And Mr. Martin believed that that was there basically

5    to protect vegetation, is what he testified to.

6            And so, it was reasonable for him to believe that it

7    was just that section that was closed, especially given all of

8    the other people who were there.  He took that shortcut over a

9    section that was not still up.  And, you know, if you look at

10   the statute, first of all --

11           THE COURT:  Yeah, so let's go to the doors.  I'm not

12   terribly convinced by the snow fencing arguments.  But he gets

13   to the doors.  As Mr. Romano points out, there are alarms

14   going, broken windows, crowds of people.  Why isn't that

15   evidence that he shouldn't be going into the Capitol building?

16           MR. CRON:  As he approached, he sees a Capitol Police

17   officer on each side.  And as he comes closer, there was the

18   interaction with the gentleman in the red hat where he shakes

19   hands with the police officer.  Mr. Martin sees that, and then

20   he sees the motions, which, you know, as the Court could

21   clearly see, he motions this way with -- make sure I'm on the

22   correct side -- with his left hand and then also extends his

23   arm out with his right hand.  And as Mr. Martin testified, he

24   just put his phone down and put his hand on the officer's

25   shoulder as a gesture of thanks and goodwill.

1          Now, everything was very noisy there.  And it's easy

2     now to go back and parse out parts of what's going on and say,

3     well, he must have known.  But the fact of the matter is, it

4     was a very loud scene there, there's a lot going on to try to

5     process.  And what he's trying to do is to video and basically

6     just document things that are going on.

7          THE COURT:  Yeah.  So, I mean, Mr. Romano suggests

8     there's kind of some post hoc justifications going on.  You

9     know, I think that's a fair evaluation of the situation, that,

10    you know, your client has gone back, seen the montage.  I'm not

11    even sure he could have seen the other protestor shaking hands

12    with the officer.  Why isn't that the better take on this, that

13    he knew he wasn't supposed to go in and, kind of, I have a

14    post hoc explanation for what happened?

15         MR. CRON:  Well, first of all, quibbling over the

16    words as to whether, when he talked with the FBI, he said they

17    let him in.  I mean, that's what he told the FBI.  Now, the

18    fact that --

19         THE COURT:  Okay.  I agree with you.  But, that's

20    different than the explanation about kind of waving and

21    thanking and all of that that we have now.

22         MR. CRON:  I would say it is not as detailed and the

23    FBI could have asked him more questions about that, at which

24    point this would have come out.  Special Agent Taylor testified

25    that Mr. Martin was nervous and that it was obvious to him.

1    And, so, it was Agent Taylor who was in charge of asking the

2    questions and he could have probed it further, and if he had,

3    then that would have come out.

4            But the best evidence about it is what the film

5    shows.  The film shows the officer motioning him in with his

6    left hand and extending his right hand, as though, you know,

7    "Come in, there you go."  I mean, I think the best evidence of

8    that, how to interpret it, is the video.  You know, which

9    speaks for itself.

10           So, once again, there was no police officer or

11   official person who was there that ever told Mr. Martin he

12   wasn't allowed to be there.  He saw police on the east side.

13   He saw, once inside the rotunda, saw the other Capitol Police

14   officers blocking the hallway.  And, once again, it was a loud

15   situation in there.  And I know that the Metro Police officer,

16   I think it was Officer Monroe who testified, said that it was

17   very loud in there and that you had trouble even talking, you

18   know, hearing what the person next to you was saying.  And so

19   Mr. Martin at no time was in close proximity to those police

20   officers and he actually even steps back during the course of

21   the video.

22           Now, with respect to Count 2, this requires more than

23   mere presence in a restricted building, and this Court so found

24   that in the *Griffin* case.  That was one of the findings that

25   the Court made, that the statute requires disorderly or

1    disruptive conduct, in addition to presence in a restricted

2    building.  It requires --

3              THE COURT:  Do you agree with the government's trial

4    brief on the elements for each of these offenses?

5              MR. CRON:  I would have to go back and look at it.

6    I -- it's been awhile since I looked at it, Your Honor.

7              THE COURT:  But you're not offering some other

8    definition for any of these counts?

9              MR. CRON:  I don't remember exactly what their trial

10   brief said --

11             THE COURT:  Okay.

12             MR. CRON:  -- is what I'm saying.

13             THE COURT:  Okay.  But you're not offering any other

14   standard?

15             MR. CRON:  Since I don't remember exactly what they

16   said, I -- I can't address that.

17             THE COURT:  Are you offering a standard at all?

18             MR. CRON:  Well, the standard is that the statute

19   requires conduct in addition to mere presence in the building.

20   It requires that the accused must knowingly and have intent to

21   impede the orderly conduct of government business in a

22   restricted building.  And it further requires that the conduct

23   of the accused does in fact impede or disrupt the orderly

24   conduct of Congress.

25             On -- with respect to this count, the Court has seen

1    the conduct of Mr. Martin inside the building and we don't

2    think that it can be reasonably argued that his actions inside

3    the building constituted disorderly or disruptive conduct and,

4    you know, much less the way that it's charged in the charging

5    document of both disorderly and disruptive conduct.  That's the

6    way that they have charged it.

7          The government has failed to prove that he knowingly

8    impeded the orderly conduct of government business in a

9    restricted building.  And they have also failed to show that

10   his personal conduct disrupted or impeded the orderly conduct

11   of business.

12         You can see in there that, yes, Mr. Martin had a

13   flag, was holding the flag, but he never waves the flag around;

14   he never, as other people did, goes up to the line where the

15   police are to, you know, chant at them or say things to them,

16   you know, which, you know, getting to another count, would be

17   towards, you know, protesting.  He stands there.  The whole

18   time he's in there he's just standing there.  He's not talking,

19   he's not motioning, he doesn't have his fists up in the air,

20   you know, while other people are chanting; nothing like that.

21   And so we believe that the evidence that's on the video shows

22   that he did not engage in disruptive conduct inside.

23         With respect to Count 3, violent entry and disorderly

24   conduct in a Capitol building, once again, this requires more

25   than mere presence.  The statute requires uttering loud,

1     threatening, or abusive language, or engaging in disorderly or

2     disruptive conduct, in addition to the presence of being on the

3     Capitol grounds.  I've already talked about that with respect

4     to Count 2 and I won't go over it again.  But, once again, we

5     submit to the Court that the conduct of Mr. Martin does not

6     constitute what's contemplated with that charge.

7             And, finally, on Count 4, parading, demonstrating, or

8     picketing, you can see plenty of that inside, but not from

9     Mr. Martin.  There are people who are up there, you know,

10    chanting at the police, yelling at the police, there are people

11    waiving flags around, there are people holding up signs.  And

12    none of that is conduct that Mr. Martin was involved in.

13            THE COURT:  Can you address Mr. Romano's argument

14    that his mere presence was -- made the government -- or, the

15    law enforcement's job more difficult, that he knew he was kind

16    of aggravating a volatile situation in which the police were

17    overwhelmed.

18            MR. CRON:  I don't think that the evidence shows

19    that.  Because when he's inside he does not take affirmative

20    actions, like I was saying before, in terms of interaction with

21    the police.  Once he sees -- as you could tell from watching

22    the video, ones he sees what's going on he actually retreats

23    and starts heading over towards the door.

24            THE COURT:  But he didn't leave, right?

25            MR. CRON:  Well, he -- well, a couple of things about

1    that.  One is there's a huge crowd around the door, so he can't

2    get out.  He does, for a while, look to observe what's going

3    on, but that's -- that's in the context of him leaving.  If you

4    look, he's all the way to the back of where it is that the

5    police are, that are forcing people this way.  He's as far away

6    from it as you can get inside.  And there was a very large

7    crowd at the doors.

8            And I can't remember who it is that -- oh, it was

9    Officer Monroe testified that it was slow for people to get out

10   because the space of the doors was small.  And you can see from

11   the video itself how long it took, with all of those people

12   packed in, for Mr. Martin to get out.  It took minutes for him

13   to get out of the building.  And, you know, so it's not a case

14   of where he could say, oh, I see something is going on, so I

15   can get out of here fast.

16           Now, that's -- the other part I think that I want to

17   address is something that was brought up with those last

18   videos, which is that when Mr. Martin did see someone hitting

19   that window, that's when he did leave.  He left right after

20   that.  And we know in the timing that -- of that video of the

21   drummers at the Peace Monument that that's true.  And so, when

22   he saw that, he did leave.

23           So, Your Honor, we respectfully submit to the Court

24   that the government has not met its legal burden in this case.

25   And we also submit to the Court that the evidence shows that

1    Mr. Martin is not guilty of these charges and we ask the Court

2    to so find him.

3              THE COURT:  Can you address the -- his interactions

4    with his supervisor?  I mean, doesn't that show a consciousness

5    of guilt there?

6              MR. CRON:  You know, I completely disagreed with the

7    read on this.  You know, it's his supervisor.  By the time that

8    he is communicating with her, just via some text, it's becoming

9    increasingly apparent because he -- that was -- I mean, when he

10   got back to the hotel was the first time that he started

11   watching any news account.  He hadn't been on the east side --

12   or, west side, rather, and seen any of the violence that had

13   gone on there.

14             And he, as he stated in his testimony, did a couple

15   of things.  One is he did not want her to misinterpret anything

16   that he might say.  Plus, he knew that he would have the

17   opportunity to give her a full explanation once he got back.

18   And I don't think that there's anything unreasonable about

19   wanting to have the opportunity to fully tell her what was

20   going on, and he did.  By everyone's observation, he did

21   exactly that, once he got back.  And so --

22             THE COURT:  And when did he do that?

23             MR. CRON:  So, let's see.  Wednesday -- okay, so the

24   6th was Wednesday, Thursday was --

25             THE COURT:  He traveled back.

1          MR. CRON:  The travel back.  He took Friday off.  And

2     then that very next work day was that Monday.  And so, that was

3     when he told her.

4          So, you know, I would respectfully submit to the

5     Court that the weakness of the government's case is partially

6     shown by them having to reverse engineer what it was Mr. Martin

7     was doing with that in order to try to make it look sinister.

8     I mean, she knew he was there, he had told her he was there.

9     And so it's not like he was trying to keep some secret from

10    her.  All he was trying to do was to have the opportunity to

11    fully explain to her, you know, after he started seeing the

12    breadth of what he did not witness himself while he was there.

13         THE COURT:  Okay.  Thank you, Mr. Cron.

14         MR. CRON:  Thank you.

15         MR. ROMANO:  Your Honor, might I have just a moment

16    to look something up?

17         THE COURT:  Sure.

18         (Pause.)

19         MR. ROMANO:  Thank you, Your Honor.  I want to start

20    right where defense left off, with this idea that we are trying

21    to reverse engineer something out of the conversation with Amy

22    Lewis.  That's ludicrous.  First, because the defendant said he

23    was trying to take her temperature; his own words, his own

24    admission.  Second, because he told Angelica Hernandez don't

25    tell Amy on January 6th when texting with her.  And, third,

1    because the conversation they had on January 11th was not a

2    face-to-face conversation that he was waiting for, it was a

3    phone call.  That's in the interview with the FBI.  He said

4    that he called her after the meeting.  "She told me to call her

5    after the meeting, and I did."  He had his phone at the

6    Capitol.  He had his phone in his hotel room on January 6th.

7    He undoubtedly had his phone on him for the next five days.

8    That explanation is nonsense.

9         Okay.  Second, Your Honor, if the Court is interested

10   at all in the barriers on the east front, just because we

11   didn't explicitly use this in our case-in-chief -- I mean, we

12   admitted it but did not show it.  Exhibit 302 is the

13   motorcade -- the video of the motorcade being moved, that shows

14   where the bike racks were on the east front on January 6th at

15   around 2 p.m.  Granted, that's before the defendant arrived on

16   the east front, but I just wanted to flag that, in case the

17   Court wants to look at that.

18        In Exhibit 316, which the defendant took up on the

19   rotunda landing, we believe that in the distance from the

20   landing you can see bike racks at the base of the Capitol

21   steps.

22        THE COURT:  So, help me think about that.  You're not

23   saying he went over bike racks or anything like that?  You're

24   just saying he could have seen that he was -- passed bike racks

25   as he was walking in the terrace?

```
 1            MR. ROMANO:  Correct.

 2            THE COURT:  Okay.

 3            MR. ROMANO:  Ms. Dohrmann, can I have the trial

 4   brief?

 5            The Court had some questions about our trial brief,

 6   so I wanted to highlight a few things.  In the standard that

 7   we've proposed to the Court from the Seventh Circuit jury

 8   instructions, disorderly conduct occurs when a person is

 9   unreasonably loud and disruptive under the circumstances or

10   interferes with another person by jostling against or crowding

11   them.  That's in our trial brief.

12            THE COURT:  Sorry.  Just looking for where that is.

13   What page?

14            MR. ROMANO:  Page 9, at the bottom.

15            THE COURT:  I see the -- got it.  Okay.

16            MR. ROMANO:  And then on page 10 there's a definition

17   for disruptive conduct, that interrupts an event, activity, or

18   normal course of a process.  We think that there is clear

19   evidence of disorderly conduct when he was unnecessarily

20   crowding officers around the entrance to the rotunda doors,

21   when he joined the back of the crowd in the rotunda as it was

22   facing down against officers, and then on the north terrace as

23   he was part of a crowd that was crowding that space and

24   crowding officers.

25            As for disruptive --
```

 1              THE COURT:  Sorry.  Sorry.  Hold on.

 2              MR. ROMANO:  Sure.

 3              THE COURT:  All right.  Disorderly conduct, say that

 4       again.

 5              MR. ROMANO:  We have, I think, three moments that are

 6       key:  Crowding at the entrance to the rotunda door, crowding

 7       when he joined the back of the crowd in the rotunda that was

 8       facing against officers.  That's at about 7 and 1/2 or so

 9       minutes into -- what did you say it was?

10              MS. DOHRMANN:  306.

11              MR. ROMANO:  That's at about 7 and 1/2 to 8 minutes

12       into Exhibit 306.  And we would ask the Court to recall the

13       testimony when I showed him about 6 minutes and 52 seconds into

14       306 and he said, "After I set my phone down, that's when I

15       decided to leave."  It clearly wasn't because about a minute

16       later he walked up to the back of the crowd, he walked closer

17       to the police line.  He even briefly was part of the crowd that

18       was immediately in the police's vicinity.

19              And then the third point that I highlighted was on

20       the north terrace, when he was part of that crowd, crowding

21       police officers.

22              THE COURT:  Where -- is that where an officer is

23       trying to take somebody down from the window?

24              MR. ROMANO:  Yes.

25              THE COURT:  Okay.

1          MR. ROMANO:  Then on the next page of our trial

2     brief, disruptive conduct, defined as a disturbance that

3     interrupts an event, activity, or the normal course of a

4     process.  We certainly have evidence that the congressional

5     proceedings were interrupted.  We think those would qualify as

6     an event, activity, or the normal course of a process.  And all

7     of the evidence is clear that the defendant understood that's

8     what this event at the Capitol would do.

9          THE COURT:  So, you know, that video shows somebody

10    in a press helmet in front of him.  You know, let's say that's

11    one of Mr. Hsu's colleagues there, that's a legitimate

12    reporter.  Was that person engaged in disruptive conduct?

13         MR. ROMANO:  Well, I think there are different

14    questions that exist for a member of the press versus members

15    of the crowd.  And I'm not -- I don't want to take a firm

16    position that a person who is a member of the press would be

17    engaged in disruptive conduct by just being there, there are

18    certainly First Amendment concerns at that point that don't

19    exist for other people who are present.  And a dividing line

20    that the Court can use in this case are all --

21         THE COURT:  Let's say that person struck a police

22    officer, that would clearly be an assault --

23         MR. ROMANO:  Sure.

24         THE COURT:  -- Wa-Po, or not.  But him just being

25    there, you're saying if he's the defendant, he's engaged in

1    disorderly conduct, but if he's a press officer, maybe he's

2    not?

3            MR. ROMANO:  Well, there's also the mens rea

4    requirement, which would probably be different for a member of

5    the press under the circumstances, that the defendant acted

6    knowingly and with the intent to impede or disrupt the orderly

7    conduct of government business.

8            THE COURT:  Okay.

9            MR. ROMANO:  And, finally, Your Honor, and I have

10   several subpoints here, but I want to respond to defense

11   counsel's question -- or, his argument that when we were

12   talking about the way that the defendant's story evolved over

13   time, he said quibbling over words, whether they let him in.

14   He said the FBI let him in, suggesting that quibbling over

15   words is not, sort of, appropriate here and kind of

16   misunderstands the point.

17           I would emphasize that the defendant quibbled over

18   words repeatedly throughout his testimony on direct exam and

19   cross exam.  From the beginning, for instance, when he

20   emphasized the difference in being employed by a contractor who

21   works for the federal government versus working for the federal

22   government.  He affirmatively sought out opportunities to

23   quibble with the government's case.  He affirmatively sought

24   not to answer questions and recast questions so that he could

25   answer them the way that he wanted, to the point that the Court

1    had to admonish him to stop.

2           The defendant clearly demonstrated that he knows how

3    to say things which are factually true in a manner that serves

4    the goal he is trying to accomplish.  He also demonstrated, in

5    his conversations with supervisor and his conversations with

6    the FBI, that he knows how to exploit gaps in what somebody

7    will be able to fact check.  And he clearly demonstrated while

8    testifying that he wanted to tell his story, volunteering over

9    and over and again, even when it was not being asked of him,

10   that the police waved him in.

11          There was post hoc reasoning, as the Court questioned

12   Mr. Cron about.  And I want to especially emphasize the *Couy*

13   *Griffin* trial because, as the Court knows and as both sides

14   have acknowledged, the prosecutors were here for the *Griffin*

15   trial, Mr. Cron was here, the defendant was here, and he would

16   have heard -- he did hear the Court's findings in that trial.

17          Now, I'm not saying that the defendant and Couy

18   Griffin occupy the exact same space.  They certainly didn't

19   take the same path through Capitol grounds.  But the defendant

20   heard when you said that you did not believe that Couy Griffin

21   did not know he was in the restricted area.  The defendant

22   heard when you say somebody couldn't make their way as deep

23   into the restricted area as Couy Griffin did without

24   understanding that it was a restricted area, and that he

25   remained within after passing all these signs that the area was

1    restricted.

2              THE COURT:  Sorry.  So what's the point there?

3              MR. ROMANO:  The point there is that the defendant

4    had two weeks to think about how he could craft a story where

5    he could tell the Court that he was not guilty of violating

6    1752(a)(1), an offense that, I think, based on the findings

7    that you handed down in *Griffin*, he would know you would be

8    predisposed to think, based on him going further than Griffin,

9    him going into the building, that you would likely not acquit

10   him of that conduct.

11             He had time to think about how to craft a story so

12   that he could explain away stepping over snow fence, which is

13   absolutely the sort of thing that you would have found that

14   Couy Griffin -- would have given Griffin knowledge that he was

15   within a restricted area, as he, for instance, climbed over

16   walls.

17             So, he is an intelligent person, he knows how to

18   craft his testimony.  He knew how to do it with Amy Lewis, he

19   knew how to do it with the FBI, he knew how to do it here on

20   the stand.  This claim that he had no idea what the protocols

21   were at the Capitol, maybe he had never visited the Capitol

22   before that day, but he is an intelligent person, he has worked

23   at a federal facility, and he's familiar with the idea of

24   federal security at places of business.  This idea that he just

25   thought he could come and go as he pleased, without regard to

1    the serious business that Congress was undertaking at the

2    Capitol that day is just nonsense.  It is a lie that the Court

3    should not credit.

4              And for those reasons we ask the Court to find the

5    defendant guilty of all counts.  Thank you.

6              THE COURT:  All right.  Thanks, folks.

7              I would like to take this under advisement.  Why

8    don't we return at 2 p.m.  Thank you.

9              (Recess.)

10             THE COURT:  Apologize for keeping you all waiting.

11             All right.  Before me is a misdemeanor bench trial in

12   *United States versus Matthew Martin*.  I make the following

13   findings of fact and conclusions of law:

14             The defendant traveled to the District of Columbia on

15   January 5th, 2021.  He did not bring any weapons or protective

16   gear, suggestive of any intent to disrupt Congress or engage in

17   violence.

18             On the morning of January 6th he attended the Stop

19   the Steal rally on the mall, then returned to his hotel nearby.

20   He had heard there was going to be a second rally at the

21   Capitol that afternoon, so he joined a crowd of people walking

22   towards the Capitol.  He walked up the sidewalk on Constitution

23   Avenue Northwest, toward the Capitol building, and then up onto

24   the sidewalk on the east Capitol circle.  At the time he

25   entered the sidewalk on the Constitution Avenue Northwest,

1    adjacent to the Capitol lawn, he had entered into the

2    United States Capitol Police and United States Secret Service

3    restricted area.

4              I find that the area is as shown in the Government's

5    Exhibit 100, based on the testimony of Officer -- or, Inspector

6    Erickson and Inspector Hawa from the *Griffin* testimony -- or,

7    from the *Griffin* case.  I specifically find that the area

8    included the sidewalk on which he traveled.  However, there's

9    no evidence before me showing there was any kind of signage

10   indicating the sidewalk was restricted.  There were bike racks

11   between it and the street, but without more, that would not

12   indicate to a reasonable person that he couldn't go on the

13   sidewalk.

14             And I think an equally plausible interpretation was

15   that the bike racks were intended to keep people on the

16   sidewalk and off the street being used by emergency vehicles

17   and motorcades.  There's also no evidence of how the defendant

18   initially got onto the sidewalk and whether there were bike

19   racks or signs there.

20             Therefore, while the government has shown that the

21   defendant had entered a restricted area at this point, it is

22   not shown he knowingly did so.

23             The defendant continued up the sidewalk.  There were

24   numerous other people, both on the sidewalk and across the snow

25   fencing, milling around on the Capitol lawn.  They were largely

1  peaceful.  As the defendant continued up the sidewalk towards

2  the Capitol, at one point he took a shortcut across the lawn

3  from one portion of the sidewalk to the other.  The

4  government -- or, to another sidewalk.

5       The government did not produce any evidence on this

6  point, although the defendant admitted that he crossed over

7  snow fencing that had been trampled under foot before he got

8  there.  I also find that this was not a knowing violation of

9  the restricted area.  As I say, the government has produced no

10  evidence of the state of the fencing or the presence of any

11  signage at this point.  The defendant stated he thought the

12  signage earlier along the sidewalk referred to the small zone

13  between two layers of snow fencing were he believed

14  construction was underway.

15       Given the presence of hundreds of people on the

16  Capitol lawn peacefully gathering when he walked by, I think

17  this was a reasonable assumption.  In any event, I do not think

18  the government has shown the defendant knowingly entered a

19  restricted area at this point.

20       The defendant continued on to the east terrace and up

21  the central steps toward the Capitol rotunda lobby.  The

22  government has adduced evidence that people are typically not

23  allowed in these spaces.  But when the defendant was there,

24  there were hundreds of people in the area, most of them

25  peacefully milling about and some waving flags.  The government

1    has not shown anything that would alert a reasonable person

2    that they were all trespassing and that this was a violation of

3    a restricted area.  Of course, the Court must consider a

4    reasonable person's perspective, not the perspective of a

5    Capitol Police officer or a Capitol staffer or something like

6    that who would know what the restrictions normally are like.

7            Indeed, the defendant pointed out that there was a

8    line of police officers guarding the steps to the Senate

9    stairs, but there was no similar police presence blocking the

10   central stairs.  Again, a reasonable person could believe

11   officers were allowing people to gather on the central stairs,

12   but not the Senate stairs.

13           The defendant then followed a large, largely peaceful

14   crowd into the rotunda lobby.  The large exterior doors had

15   shattered glass and door alarms were sounding.  There were no

16   magnetometers or other security checks for persons entering

17   these doors.  The government contends that these indicia should

18   have alerted the defendant that he was not allowed to enter the

19   doors.  I think there's merit to these contentions.  However,

20   the defendant has offered explanations on each of these.

21           First, he says he didn't see the shattered glass.

22   Given the crowd streaming through the doors and all that was

23   going on, I find that plausible.  Second, he says he doesn't

24   remember if he heard the sirens, but if he did, he thought that

25   was just a door alarm that needed to be reset.  His primary

1    defense, though, is that one of the two officers standing

2    beside the door waved him in.

3          I have carefully reviewed all the evidence in this

4    case, and on this point in particular, and I've particularly

5    utilized the Defense Exhibit 19, which I think is the best

6    evidence of that moment, and I conclude the following:  I find

7    that United States Capitol Police Officer Carrion and another

8    officer were standing beside the doors to the rotunda lobby.

9    People were streaming by them and the officers made no attempt

10   to stop the people, at least by the time the defendant

11   approached them.

12         Given the fact that there were shattered -- there was

13   shattered glass -- and I think my recollection is that some

14   benches had been set up earlier to barricade the doors, I'm

15   sure there had been efforts in the past to stop people, but at

16   the time the defendant is on the scene, the officers are

17   standing beside the doors, allowing people to pass.

18         As the defendant approached the door, Officer Carrion

19   leaned over to speak to either the other officer or a protestor

20   standing beside the door.  Officer Carrion effectively blocked

21   the door at this point and the defendant did not try to push

22   past him.  Officer Carrion made some hand motions, including a

23   waving motion with his left hand.  He then leaned back,

24   reopening the passageway.  At this point the defendant patted

25   him on the shoulder as he went to walk by and into the Capitol.

1    When he patted the officer's shoulder, the officer leaned back

2    even further.  The defendant claims he thought the officer

3    waved him in.

4         I'm not convinced by that.  I think the government

5    may be right, that this is a post hoc gloss on the evidence.

6    But I do think the defendant reasonably believed the officer

7    allowed him into the Capitol, both because the officers had not

8    attempted to stop all the other protesters who had entered

9    before him and because Officer Carrion apparently deliberately

10   and specifically stepped back, allowing the defendant to pass.

11        I also do credit the defendant's claim that he patted

12   Officer Carrion as a way to thank him.  I think that is the

13   most plausible explanation for his decision to put away his

14   iPhone as he entered the building, thus freeing his hand, and

15   then resuming filming almost immediately after entering the

16   building.

17        I should say, I found all of the government's

18   witnesses to be credible.  I heard from several law enforcement

19   officers, I thought they all spoke credibly.  But, none of them

20   were here -- or, present at the Capitol doorway at this time

21   and almost all of their testimony was largely relying on -- or,

22   introducing video evidence or other exhibits, not so much their

23   testimony as directly relevant to the defendant.

24        I thought the defendant was largely credible.  I

25   thought he spoke carefully and very considered in what he said.

1    I do think the defendant shaded his testimony on some points,

2    minimizing his actions and trying to put the evidence in the

3    best light for him.  But, on this point, based on my

4    observations of the defendant and all of the evidence, I

5    credited his explanation as to what he did when he put his hand

6    on the officer.

7          I also want to be clear that I'm not criticizing

8    Officer Carrion or the other officer in any way for their

9    actions here.  As Inspector Erickson testified, the officers

10   were likely just posted there to try to prevent injuries to the

11   crowd.  They were grossly outnumbered at that point and could

12   not have stopped protestors from entering.  Based on what I

13   saw, I think they acted responsibly and reasonably throughout.

14         But I also think the defendant's interpretation of

15   their presence was plausible.  Up to this point he seems to

16   have largely encountered peaceful protestors on the Capitol

17   grounds.  It's very -- it was a very different situation than

18   the situation that largely unfolded on the other side of the

19   Capitol building around that time.  It was not unreasonable to

20   assume the officers were permitting people to enter the

21   Capitol.

22         Citizens typically obey police officers, even when

23   they grossly outnumber them.  And given that there was not a

24   mob or a riot scene at the east terrace at that time, the

25   defendant could have plausibly believed that protestors would

1   have complied had the officers blocked the doorway, as he did

2   when Officer Carrion briefly did block the doorway.

3           After entering the rotunda lobby the defendant

4   resumed filming and quickly entered the rotunda himself.  While

5   there, riot officers began gathering in the far end of the

6   rotunda and engaged in skirmishes with protestors.  They slowly

7   began clearing the rotunda of the protestors.

8           During most of this time the defendant stayed well

9   back from the police line and observed the scene from a

10  distance.  He did not crowd the officers, engage in violence or

11  otherwise affirmatively protest.  He kept his flag down, not

12  waving it, as many other protestors did.  Although the

13  government claims he spoke at a couple of points, it's not

14  clear to me that he did and I make no findings that he did.

15  Rather, he seems to have been a silent observer of the actions

16  of others.

17          I do think the defendant was aware of teargas being

18  deployed.  And I disbelieved him on this point.  After about

19  ten minutes inside the rotunda, the defendant departed as

20  officers pushed people back out through the lobby.  He remained

21  on the Capitol grounds for some time and he filmed a couple of

22  violent episodes, including a man trying to break a Capitol

23  window and an officer pulling someone else off a window.

24          He also had a series of text messages with his boss

25  and another friend at the point -- later that evening.  And

1    those conversations, he admits that he intentionally avoided

2    his boss's questions about whether or not he had gone into the

3    Capitol building and, in fact, told his friend not to tell his

4    boss that he had been in there.

5          The defendant admits that he intentionally avoided

6    her questions, that he deliberately didn't answer her questions

7    about going into the Capitol.  He says that he didn't want to

8    engage in that conversation with her because she was liberal

9    and because she was afraid that -- or, he was afraid that she

10    would not take it well, if they had the conversation over text

11    message, rather than in person.  As the government points out,

12    he didn't end up having the conversation in person but, rather,

13    by phone on the first day he was back to work.

14          I think this is probably some evidence of some guilty

15    knowledge, but I think that the defendant's explanation for his

16    actions are also plausible.  I think there are many awkward

17    conversations that someone would prefer to avoid having in

18    text -- via text.  I think it's probably wise not to have

19    conversations like that via text.  And the January 6 situation

20    was unfolding, really, before his eyes on TV and he likely

21    could have realized that she would react to his conduct very

22    differently than the light he thought it was, and based on what

23    he had seen versus what she had seen on TV.

24          I think -- the bottom line, he still did tell her

25    about his activity and presence in the Capitol before he had

1     been contacted by law enforcement.  I think that fact

2     buttresses his explanation for why he did so.  I think in those

3     very early days, the government is right, that it became

4     evident that people were getting arrested, but I think it was

5     also not at all clear that someone like him, who had not been

6     involved in violence, who had a pretty minimal role, would have

7     been targeted.  If anything, by going to a liberal supervisor

8     he was kind of putting a target on himself if he really

9     believed that he had engaged in unlawful behavior.  So I think

10    those text messages are rather inconclusive as to any guilty

11    knowledge of his conduct.

12         I want to turn now to the charges.  Count 1 is

13    entering or remaining in a restricted building or grounds.  The

14    government must show the defendant knowingly entered or

15    remained in a restricted area.  A person acts knowingly if he

16    realizes what he is doing and is aware of the nature of his

17    conduct and does not act through ignorance, mistake, or

18    accident.  I should say, I adopt the government's explanation

19    in its trial brief as to the elements of each offense.

20         First, I find, as I said before, the defendant did

21    enter a restricted area and that the restricted area was as

22    shown in Government's Exhibit 100.  Second, I find that the

23    government has not proven beyond a reasonable doubt that he

24    knew he had done so.  While I think the defendant more likely

25    than not knew he was not allowed to go into the Capitol

building, I think his explanation that he thought the officers
were allowing him to enter the building raises a reasonable
doubt as to his knowledge.  The evidence of the officers'
actions at the doorway is enough to raise a doubt as to the
contrary indicia the government offered.

        I also disagree, as I said, with the government that
his crossing the trampled snow fence alerted him that he was in
a restricted area.  The only evidence that we have at all that
he crossed the snow fencing was his own testimony and watching
the CCTV footage of him taking a shortcut over the lawn where
hundreds of people were peaceably milling about raises serious
doubts that anyone would believe that area was restricted.

        I think Count 1 is a close call, but under our system
of law, close calls go to the criminal defendant.  For all
these reasons I find the defendant not guilty of Count 1.

        Count 2 charges him with disorderly and disruptive
conduct in a restricted area.  Disorderly conduct occurs when a
person is unreasonably loud and disruptive under the
circumstances, or interferes with another person by jostling
against or unnecessarily crowding that person.  Disruptive
conduct is a disturbance that interrupts an event, activity, or
the normal course of a process.  The government points to three
examples of disorderly conduct.

        The first is his crowding at the entrance to the
rotunda lobby.  While there was a crowd there, he seemed quite

1    quiet and orderly.  He waited when Officer Carrion blocked the

2    way to speak to the other officer, and patted Officer Carrion

3    on the shoulder as he passed by.  No reasonable juror could

4    find this activity to be disorderly.  There are often crowds in

5    public places, such as concerts, rallies, et cetera.  I do not

6    think his mere presence in a crowd entering the Capitol

7    building would qualify as disorderly.

8            The second instance the government points to is his

9    participation in the crowd inside the rotunda.  To be certain,

10   there were many instances of disorderly conduct in the rotunda

11   shown in the government's evidence.  I saw yelling, people

12   confronting the officers, and even assaultive conduct toward

13   the officers.  The defendant engaged in none of that.  For most

14   of the time he stood far back from the crowd and videoed from a

15   distance, much like the apparent press members who were also

16   videoing nearby.  He did not shout or chant.  In fact, I don't

17   think he spoke at all while in the rotunda.

18           I do not think the government has proven beyond a

19   reasonable doubt that his conduct in the rotunda was

20   disorderly.

21           The third instance is when he filmed an officer

22   pulling someone off a window on the north terrace after exiting

23   the building.  During this period the defendant is filming some

24   event that is, frankly, out of vision, given the smoke and

25   teargas in the area.  He is well back from whatever is causing

1     the disturbance, as multiple people are also filming it and are

2     closer to the incident than he is.

3          While he is filming this, the Capitol Police officer

4     comes up, apparently yelling, "Get back," and pulls a man off

5     of one of the windows of the Capitol building, close to the

6     defendant.  This happens very quickly and then the officer

7     moves on toward the apparent disturbance.  While the defendant

8     did not, apparently, react to the officer's command, his

9     presence didn't appear to prevent the officer from pulling the

10    man off the window and the officer quickly moved on.

11          I cannot say beyond a reasonable doubt that the

12    defendant engaged in disorderly conduct here, much less that he

13    had intended to do so.  He seemed intent on filming some

14    incident at the time and was not actively resisting or

15    hindering the officers.

16          The government also alleges that his conduct was

17    disruptive in that it had stopped the congressional

18    proceedings.  I find that the proceedings had been halted well

19    before he entered the Capitol building and that they did not

20    resume until long after he had left.  There's no evidence that

21    he intended to disrupt the proceedings or that his presence

22    alone in fact did so.  Looking at his actions and the time at

23    which they occurred, I find that the government has not proven

24    beyond a reasonable doubt that he disrupted congressional

25    proceedings.

1              For all these reasons, I find the defendant not

2     guilty of Count 2.

3              Count 3 is disorderly conduct in a Capitol building.

4     I find the defendant not guilty of Count 3 for the same reasons

5     I acquit him on Count 2.  The government agrees that the same

6     definition of disorderly or disruptive conduct would apply in

7     both cases.

8              Count 4 is parading, demonstrating, or picketing in a

9     Capitol building.  While there is little guidance on the exact

10    meaning of these terms, I do not think the defendant's actions

11    while in the Capitol building are consistent with any of them.

12    He spent almost his entire time in the Capitol building

13    videoing the surroundings and what others were doing.  He did

14    not shout, he did not waive his flag, he did not confront

15    officers, he did not engage in violence.  Indeed, his conduct

16    was about as minimal and nonserious as I can imagine for a

17    protestor in the Capitol on January 6th.

18             I find the defendant not guilty of Count 4.

19             I want to thank the attorneys for their thoughtful

20    and careful presentations.  Mr. Romano, that was one of the

21    best cross-examinations I've seen.  I was very impressed.

22             MR. ROMANO:  Thank you.

23             THE COURT:  Anything further from the government?

24             MS. DOHRMANN:  No, Your Honor.

25             THE COURT:  Mr. Cron?

1          MR. CRON:  No, Your Honor.

2          THE COURT:  All right.  Mr. Martin, you're free to

3     go.  Good luck to you, sir.

4          MR. CRON:  Actually, could we have his possessions

5     released from evidence to him?

6          MS. DOHRMANN:  I think we can address that with

7     Mr. Cron.

8          THE COURT:  All right.  Yeah, I'll ask you to talk

9     with the prosecutors.  And, obviously, you can file a motion,

10    if need be.

11         MR. CRON:  Okay.

12         THE COURT:  Thanks, folks.

13                         *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                          Dated this 13th day of April, 2022

9

10

11                    _____

12                          Janice E. Dickman, CRR, CMR, CCR
                            Official Court Reporter
13                          Room 6523
                            333 Constitution Avenue, N.W.
14                          Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX
                    Volume 1 - pages 1 - 195
 2                  Volume 2 - pages 196 - 273

 3     WITNESSES:

 4         John Erickson
                Direct Examination By Mr. Romano.................. 20
 5              Cross-Examination By Mr. Cron..................... 55

 6         Travis Taylor
                Direct Examination By Ms. Dohrmann............... 57
 7              Cross-Examination By Mr. Cron....................110
                Redirect Examination By Ms. Dohrmann.............115
 8
           Jonathan Monroe
 9              Direct Examination By Mr. Romano.................117
                Cross Examination By Mr. Cron....................127
10
           Matthew Martin
11              Direct Examination By Mr. Cron...................129
                Cross-Examination By Mr. Romano..................182
12              Redirect Examination By Mr. Cron.................222

13     GOVERNMENT RESTS........................................128
       DEFENSE RESTS...........................................225
14

15                      EXHIBITS ADMITTED

16     Government Exhibits:
                Exhibits 1 - 5.................................. 19
17              Exhibits 100-116............................... 20
                Exhibits 202 and 203........................... 20
18              Exhibits 205-212............................... 20
                Exhibits 300-330............................... 20
19              Exhibits 400 series............................ 20

20     Defense Exhibits:
                Exhibits 1-10..................................131
21              Exhibit 11..................................... 34
                Exhibit 15.....................................154
22              Exhibit 16.....................................156
                Exhibit 17.....................................161
23              Exhibit 18.....................................164
                Exhibit 19.....................................167
24              Exhibit 21.....................................170
                Exhibit 23.....................................176
25              Exhibit 27.....................................154
                            *   *   *
```